# EXHIBIT 4

2017 WL 5749560
Only the Westlaw citation is currently available.
United States District Court,
M.D. Pennsylvania.

Edward RUEHL, Individually and as Administrator of the Estate of Shirley T. Ruehl, deceased, Plaintiff

v.

S.N.M. ENTERPRISES, INC., Defendant

Civil No. 1:15-CV-168
|
Signed 11/28/2017

**Attorneys and Law Firms**

Tyler J. Smith, James G. Bordas, III, Bordas & Bordas, PLLC, Pittsburgh, PA, for Plaintiff.

Padraig P. Flanagan, Florio Perrucci Stenhardt & Fader, LLC, Phillpsburg, NJ, Todd B. Narvol, Thomas, Thomas & Hafer, LLP, Harrisburg, PA, for Defendant.

## MEMORANDUM OPINION

Martin C. Carlson, United States Magistrate Judge

### I. Introduction

\*1 Expert witnesses play a unique, and uniquely important, role in our system of justice. Drawing upon their experience and training, expert witnesses often provide vitally important testimony which aids judges and juries in navigating the increasingly complicated and technical issues raised by litigation in our modern and complex society. In fulfilling this role, expert witnesses enhance the quality of justice for all who come before the courts.

The role of the expert witness is particularly crucial in complex, technological tort cases. As we have observed:

Pennsylvania law recognizes that proving the elements of these claims in complex tort cases often requires presentation of expert testimony. This requirement is imposed by Rule in professional malpractice negligence actions and requires a certificate of merit from an expert witness to sustain such a claim. See Pa.R.C.P. No. 1042.3. In other complex tort actions, such as product liability cases, courts have also opined that expert witnesses are often necessary to establish liability. Further, courts recognize that there are consequences which flow from a failure to provide such proof. Where a tort action turns on allegations of a technical nature relating to some alleged defect in a product, and the Plaintiff has failed to provide expert proof identifying the defect in the product or drawing a causal connection between that allegedly defective product and the Plaintiff's injuries, courts have held that product liability and related negligence claims fail as a matter of law and must be dismissed. See e.g. Mays v. Gen. Binding Corp., No. CIV. 11-5836 JBS/JS, 2013 WL 1986393, at \*6 (D.N.J. May 10, 2013), aff'd, 565 Fed.Appx. 94 (3d Cir. 2014); Ellis v. Beemiller, Inc., 910 F. Supp. 2d 768, 774 (W.D. Pa. 2012); Mracek v. Bryn Mawr Hosp., 610 F. Supp. 2d 401, 402 (E.D. Pa. 2009), aff'd, 363 Fed.Appx. 925 (3d Cir. 2010); McCracken v. Ford Motor Co., 392 Fed.Appx. 1, 4 (3d Cir. 2010); Koplove v. Ford Motor Co., 795 F.2d 15, 17 (3d Cir. 1986). The only exception to this general rule under Pennsylvania exists with respect to negligence claims "where the matter is ' "so simple, and (the) lack of skill or want of care so obvious, as to be within the range of ordinary experience and comprehension of even nonprofessional persons." ' Berman, supra, 205 F.Supp.2d at 364 (citing Brannan v. Lankenau

Hospital, 490 PA 588 (1980)).” Hakeem v. Salaam, No. CIV.A. 3:03-0098, 2006 WL 4130488, at *7 (M.D. Pa. July 18, 2006), subsequently aff’d, 260 Fed.Appx. 432 (3d Cir. 2008).

American Power, LLC., v. Speedco Inc., No. 1:15-CV-2091, 2017 WL 4084060, at *6 (M.D. Pa. Jan. 17, 2017).

Along with this important role come great responsibilities for the ethical expert witness. At the outset, the ethical expert witness shares a duty with all witnesses to appear as commanded, and testify truthfully in the time, place and manner directed by the court in accordance with the law. In addition the ethical expert witness owes a second, and equally important, obligation to the party that has retained that expert. For the party who is seeking relief from the courts the expert’s testimony may be an integral or indispensable element of proof at trial. Recognizing that the party who has retained an expert is relying upon that expert to assist in carrying the party’s burden of proof, an ethical expert has a legal, ethical and moral responsibility to refrain from gratuitously abandoning the party who has retained the expert’s services.

*2 The instant case, which comes before the court for consideration of a motion filed by the defendant and joined in by the plaintiff to sanction a non-party plaintiff’s expert witness, Michael Panish, (Doc. 64), presents the story of a shocking dereliction of these basic duties owed by an expert to litigants, the court, and the cause of justice. Accordingly, for the reasons set forth below, we will GRANT this motion for sanctions.


## II. Factual Background

This sanctions motion arose out of a technological tort case filed in this court. With respect to this underlying tort case, the pertinent facts are that in August of 2013, an elderly couple, Shirley and Edward Ruehl, traveled to Gettysburg, Pennsylvania on a sightseeing vacation trip. At Gettysburg, the Ruehls checked into the Hampton Inn operated by the defendant, SNM Enterprises. The Hampton Inn’s main entranceway was marked by automated sliding glass doors, which operated on electronic sensors, opening and closing as persons approached the door and entered or exited the hotel.

On the afternoon of August 13, 2013, Shirley Ruehl attempted to pass through these sliding glass doors. Mrs. Ruehl then fell outside the hotel, within several feet of the sliding glass doors, striking her head and fracturing her skull. The parties hotly disputed what caused Mrs. Ruehl to fall. For its part, SNM’s desk clerk on duty has described Mrs. Ruehl as exhibiting a “steady, slow paced” gait, which made the clerk “nervous,” and SNM posited that Mrs. Ruehl simply lost her balance and fell as she left the hotel. In contrast, the Plaintiff cited the statements of another hotel guest, Brian Leposki, who reported that Mrs. Ruehl fell when she was struck on her right side by the closing automatic door as she was entering the hotel. According to Mr. Leposki, the force of this blow caused Mrs. Ruehl to lose her balance and fall, landing in a seated position. Mrs. Ruehl’s momentum then carried her over into a prone position and she struck her head upon the concrete. (Id.) Thus, the Plaintiff asserted that the negligent operation and maintenance of the automatic doors caused Mrs. Ruehl’s fall.

With the issues framed in this fashion, the plaintiffs sought out Michael Panish as an expert witness in this case. At the time that the plaintiffs contacted Panish he held himself out as an expert in multiple construction and building disciplines, and specifically asserted that he was a premier expert witness in the field of automated sliding glass door technology. Panish also asserted that he had served as an expert witness in over 1,000 cases, an attestation which if credited would mean that Panish was thoroughly conversant with his legal and ethical obligations as an expert witness.

Relying upon Panish’s representations, the plaintiffs retained him in April of 2014 to perform an expert analysis in this case, and ultimately paid Panish more than $20,000 for his expert services in this litigation. With the clarity of hindsight, Panish’s April 2014 contract with plaintiffs’ counsel concealed within it the seeds of this dispute, since that contract indicated that “Mr. Panish retains the right to approve video deposition,” (Doc. 76-1), although nothing in this agreement foreshadowed the curious and categorical refusal of Panish to comply with court orders, or attend videotape depositions.

Panish, however, now attests that he has a longstanding, if odd, speculative, and categorical approach to what is a commonplace practice that is specifically authorized by the Federal Rules of Civil Procedure—videotaped depositions of witnesses, including expert witnesses. Indeed, according to a declaration filed by Panish he generally refuses to allow videotaped depositions but has on one occasion allowed such a deposition provided that “my face was not shown.” (Doc. 85-1, ¶ 6.) As it has been explained to the court in prior proceedings, this singular circumstance, an expert witness who refuses to allow his face to be seen on video, apparently stems from some concern on Panish’s part that unknown and

unnamed persons will digitally alter the video in ways that will be detrimental to Panish. In nearly four decades of legal practice devoted exclusively to federal court litigation we have never encountered such an idiosyncratic view by any lay or expert witness, and we credit the plaintiffs' counsel's testimony that the stridency of Mr. Panish's eccentric views was entirely unknown to them when they first contracted with him to perform expert services in this case in April of 2014.

**\*3** Instead, it appears that plaintiffs' counsel received their first direct notice of the adamancy of Panish's opposition to being videotaped some two years later, in the Spring of 2016. At that time, Mr. Panish appears to have communicated to plaintiffs' counsel that he would resist any effort to take his testimony through a videotaped deposition. Panish's announcement at this late date in the litigation created a dilemma for plaintiffs' counsel, who had retained Panish, and paid him considerable sums only to now have these additional conditions imposed upon them as absolute prerequisites for Panish's continued cooperation in this litigation.

The dilemma created by Panish's conduct then came to a head in March of 2017, when the defendant scheduled a videotaped deposition of Panish, something they were entitled to do under the Federal Rules of Civil Procedure. For his part, Panish appears to have demanded, and accepted, a pre-payment of his expert witness fees in the amount of $3,050 from the defendant for sitting for this deposition. (Hearing Exhibit D-1.) However, even as he accepted this money from the defendant, Panish was apparently notifying plaintiffs' counsel that he would not voluntarily agree to participate in this deposition. Presented with this notice of deposition, and confronted with Panish's curious reluctance to consent to a videotaped deposition, plaintiffs' counsel acted in a scrupulous fashion, bringing this dilemma to the court's attention and vigorously advocating on Mr. Panish's behalf. However, despite counsel's advocacy on behalf of Mr. Panish, following a conference with counsel on March 17, 2017, we entered an order in this matter which provided in clear and precise terms as follows:

> Recognizing that the defendant has a right to record Mr. Panish's deposition by video, and finding that the plaintiff has not demonstrated sufficient good cause for the issuance of a protective order, IT IS ORDERED THAT the plaintiff's request for a protective order to preclude the video recording of Mr. Panish's deposition is DENIED. The defendant shall be permitted to record Mr. Panish's deposition by video and stenographic means.

> In order to address Mr. Panish's concerns, however; and to memorialize the defendant's representations regarding the intended use of the video recording of the deposition, IT IS FURTHER ORDERED THAT the parties shall use Mr. Panish's recorded deposition only for purposes of defending or prosecuting the claims in this litigation, and shall not disseminate the recording outside of these proceedings in the absence of a Court order.

(Doc. 57, p. 6.)

Thus, our order directed a videotaped deposition of Mr. Panish, but thoroughly addressed Panish's odd and speculative concern that his visage and words would be digitally altered by unknown sinister actors by setting strict limitations on the dissemination of the video.

Our March 17 order gave Mr. Panish a few clear choices. He could comply with the order. He could seek timely reconsideration of the order. He could through separate counsel file his own motion for protective order, or motion to quash the deposition subpoena that the defendant was attempting to serve upon him. The one thing he could not do, however, was to engage in some unilateral passive-aggressive course in which he ostensibly agreed to schedule a deposition, while privately evading his basic obligation owed by all witnesses by failing to appear for that deposition.

Yet this is precisely the path that Panish chose.

Mr. Panish responded to this clear direction from this court, and the plain dictates of the Federal Rules of Civil Procedure, in a fashion which was deceptive, occasionally profane, highly unprofessional, contumacious and sanctionable. At the outset, according to the testimony and contemporaneous notes of plaintiffs' counsel which we find to be entirely credible, when notified by plaintiffs' counsel following the court's conference call with the parties that the court had denied his request for a protective order which would have forbidden this videotaped deposition Mr. Panish replied: "I don't care about you or her [the decedent plaintiff, Shirley Ruehl] or some asshole judge." (Doc. 86-1.)[1] Indeed, when plaintiffs' counsel appealed to Panish's conscience by noting that the family of the deceased plaintiff, Shirley Ruehl, was counting upon his testimony and assistance, Panish responded in a manner that was cold, calculating and cruel, reportedly stating that: " Nothing will bring her back so who gives a shit." (Id.)

Ruehl v. S.N.M. Enterprises, Inc., Slip Copy (2017)

**\*4** Curiously, at the same time that Panish was presenting his refusal to participate in a videotaped deposition in profane terms as some matter of principle, he was also willing to forego that principle for a price. Specifically, Panish concedes that he told plaintiffs' counsel that he would surrender his principles on this score if they provided him a $10,000,000 indemnity bond from Lloyds of London. Plaintiffs' counsel understandably discounted this bizarre and extortionate suggestion.

Yet at the same time that Panish was privately voicing his complete disdain for this court's order and his own client, he was ostensibly complying with the order by making scheduling arrangements for this deposition in April of 2017. In fact, the email communications between counsel and Panish's office manager, Sharon Darian, reveal that the April 18, 2017 deposition date and location was specifically selected by, and approved by, Panish. As this deposition date approached, the defendant made several unsuccessful efforts to serve a deposition subpoena upon Panish, both in New Hampshire and in California. Moreover, plaintiffs' counsel reached out to Panish on a number of occasions through his office manager, Sharon Darian, by email to confirm and prepare for this deposition. Thus, it is clear beyond any question that Panish's office manager, who identified herself to the parties as Sharon Darian, had a month's advance notice of this deposition date and time, and had agreed to that date for this deposition. We impute this knowledge to Panish himself since we learned at the sanctions hearing in this case that Sharon Darian is actually Sharon Panish, Michael Panish's spouse.[2] Panish also retained the $3,050 advance he had received from the defendant as payment for this deposition, keeping and using those funds for his own benefit for some eight months before surrendering these funds which he had obtained on the pretext that he would undergo a deposition on the eve of the sanctions hearing set in this case. Moreover, even the belated surrender of these funds by Panish came only after the court entered an order explicitly instructing him to return this money. Further, having scheduled this deposition at his convenience on April 18, 2017 in Manchester, New Hampshire, Panish caused the parties to incur additional substantial expenses associated with the deposition, expenses which a moment's candor and honesty on Mr. Panish's part could have avoided.

On April 18, 2017, Panish failed to appear for this deposition without any prior explanation or excuse from the court, or counsel. Panish's failure to appear, and his apparent disregard of this court's explicit instructions, had a series of adverse consequences for the plaintiffs who had retained him. First, the plaintiffs were placed in the difficult position of trying to defend Panish's indefensible conduct, filing pleadings seeking to set aside our March 17 order, an order Panish had effectively ignored. (Docs. 62 and 63.) The plaintiffs were also compelled to negotiate a settlement of this lawsuit from a highly disadvantageous position, since Panish's abandonment of the plaintiffs and refusal to cooperate in this deposition greatly undermined their case. Panish's course of conduct also had an adverse impact upon the defendant, who were denied information relevant to their defense of this case, expended thousands of dollars to schedule this deposition, and paid $3,050 to Panish for his services, money that Panish retained for months despite never living up to his obligations as a witness.

**\*5** It is against this backdrop that the defendant moved to sanction Panish. (Doc. 64.) The plaintiffs have now joined in this motion, (Doc. 76), and after unsuccessful efforts by the parties to serve Panish,[3] the court through the U.S. Marshal's Service effected service upon Panish. Panish then filed a response to this motion, along with a demand that the plaintiffs' law firm be sanctioned. (Doc. 85.) Panish's accusations against this law firm, in turn, compelled the plaintiffs' counsel to submit a reply, a reply which revealed in specific detail Panish's stated contempt for the court and indifference to his own professional obligations to Mrs. Ruehl, his client who had lost her life, as to whom Panish is reported to have said: "Nothing will bring her back so who gives a shit." (Doc. 86.) We have also conducted a hearing in this case, giving all parties a full opportunity to be heard on this matter.[4]

Having conducted these proceedings and carefully weighed the arguments of all counsel, the parties' motion for sanctions will be GRANTED and Panish's request for sanctions is DENIED.

## III. Discussion

### A. Sanctions Motions—Standard of Review

We are presented in this case with a singular circumstance and one without precedent in our experience: An expert witness who accepted thousands of dollars from a defendant to appear for what was later ordered to be a videotaped deposition, and

then retained this money under false pretenses for months after he failed to appear and testify. We are also presented with an expert witness who voiced his contempt for the court and his own client in profane terms before he specifically scheduled, and then failed to appear, for a videotaped deposition that was ordered by this court.

This extraordinary act, in turn, calls upon us to consider some familiar legal tenets regarding the power of the It is well-settled that a district court has the inherent power to sanction parties appearing before it for refusing to comply with its orders and to control litigation before it. See, e.g., Tracinda Corp. v. DaimlerChrysler AG, 502 F.3d 212, 242 (3d Cir. 2007). Indeed, the inherent power of the Court to act in this area has long been recognized by the United States Supreme Court, which has held that:

> It has long been understood that "[c]ertain implied powers must necessarily result to our Courts of justice from the nature of their institution," powers "which cannot be dispensed with in a Court, because they are necessary to the exercise of all others." United States v. Hudson, 7 Cranch 32, 34, 3 L.Ed. 259 (1812); see also Roadway Express, Inc. v. Piper, 447 U.S. 752, 764, 100 S.Ct. 2455, 2463, 65 L.Ed.2d 488 (1980) (citing Hudson). For this reason, "Courts of justice are universally acknowledged to be vested, by their very creation, with power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates." Anderson v. Dunn, 6 Wheat. 204, 227, 5 L.Ed. 242 (1821); see also Ex parte Robinson, 19 Wall. 505, 510, 22 L.Ed. 205 (1874). These powers are "governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." Link v. Wabash R. Co., 370 U.S. 626, 630-631, 82 S.Ct. 1386, 1388-1389, 8 L.Ed.2d 734 (1962).

\*6 Chambers v. NASCO, Inc. 501 U.S. 32, 43 (1991).

Decisions regarding how to exercise this inherent power to sanction misconduct rest in the sound discretion of the court and, if a district court awards sanctions pursuant to its inherent authority, such an award may only be reviewed for abuse of discretion, which will be found only where "the court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact." In re Prudential Ins. Co. Am. Sales Practice Litig. Actions, 278 F.3d 175, 181 (3d Cir. 2002) (quoting In re Orthopedic Bone Screw Products Liability Litig., 193 F.3d 781, 795 (3d Cir. 1999)).

Yet while this court doubtless has the discretion to order imposition of sanctions in appropriate cases, the exercise of this discretion is guided by certain basic principles. Foremost among these principles is the tenet that sanctions should always be narrowly tailored to meet the misconduct, and should entail no greater punishment than is reasonably necessary to address the specific wrongdoing that confronts the court. See Klein v. Stahl, GMBH & Co., Maschinefabrik, 185 F.3d 98 (3d Cir. 1999).This basic, but pivotal, aspect of the exercise of discretion in this area, has been voiced in many ways. Thus, it is well established that, "[b]ecause of their very potency, inherent powers must be exercised with restraint and discretion. A primary aspect of that discretion is the ability to fashion an appropriate sanction for conduct which abuses the judicial process." Chambers v. NASCO, Inc. 501 U.S. at 44-45 (citation omitted). Therefore, in exercising this authority we are cautioned that:

> [A] district court must ensure that there is an adequate factual predicate for flexing its substantial muscle under its inherent powers, and must also ensure that the sanction is tailored to address the harm identified. In exercising its discretion under its inherent powers, the court should be guided by the same considerations that guide it in the imposition of sanctions under the Federal Rules. First, the court must consider the conduct at issue and explain why the conduct warrants sanction.

Republic of Philippines v. Westinghouse Elec. Corp. 43 F.3d at 74.

Moreover:

> [H]aving evaluated the conduct at issue, the district court must specifically consider the range of permissible sanctions and explain why less severe alternatives to the sanction imposed are inadequate or inappropriate. Although the court need not "exhaust all other sanctioning mechanisms prior to resorting to its inherent power" (Landon v. Hunt, 938 F.2d at 450, 454 (3d Cir. 1991)), the court must explain why it has chosen any particular sanction from the range of alternatives it has identified. See Poulis, 747 F.2d at 868 (sanctions under Fed.R.Civ.P. 16 and 37).

Id.

Likewise, Rule 37 of the Federal Rules of Civil Procedure also recognizes and permits imposition of sanctions upon parties and deponents who shirk or unjustifiably ignore their responsibility to appear as witnesses in civil proceedings. See Fed. R. Civ. P. 37, Rule 37(b) and (d). Thus, "under Federal Rule of Civil Procedure 37(b)(1), a deponent may be sanctioned for failure to comply with a court order. Id. 37(b)(1) ('If the court where the discovery is taken orders a deponent to be sworn or to answer a question and the deponent fails to obey, the failure may be treated as contempt of court.'). The Third Circuit has explained Rule 37(b)(1) 'grants a district court the authority to punish a nonparty for failing to follow the court's directions.' Gen. Ins. Co. of Am. v. E. Consol. Utilities, Inc., 126 F.3d 215, 220 n. 3 (3d Cir. 1997) (citing Miller v. Transamerican Press, Inc., 709 F.2d 524 (9th Cir. 1983) for the proposition that Rule 37(b)(1) sanctions may be available against a nonparty deponent who failed to appear at a deposition in violation of a court order)." Yarus v. Walgreen Co., No. CIV.A. 14-1656, 2015 WL 4041955, at *3 (E.D. Pa. July 1, 2015). Further, settled case law acknowledges that "sanctionable misconduct by ... non-party witnesses can take many forms: failures to appear, General Ins. Co. Of America v. Eastern Consolidated Utilities, Inc., supra; destruction of evidence; Helmac Products Corporation v. Roth Corporation, supra; or giving false, misleading and materially incomplete testimony. Black Horse Lane Assoc., LP v. Dow Chemical Corp., 228 F.3d 275, 300–305 (3d. Cir. 2000). In all of its varied forms, this misconduct by non-parties and witnesses may, and properly should, be the subject of sanctions. Id." Bartos v. Pennsylvania, No. CIV.1:08-CV-0366, 2010 WL 1816674, at *5 (M.D. Pa. May 5, 2010).

*7 It has long been held that decisions regarding sanctions motions are "committed to the sound discretion of the district court." DiGregorio v. First Rediscount Corp., 506 F.2d 781, 788 (3d Cir. 1974). This far-reaching discretion extends to rulings by United States Magistrate Judges on discovery matters. In this regard:

> District courts provide magistrate judges with particularly broad discretion in resolving discovery disputes. See Farmers & Merchs. Nat'l Bank v. San Clemente Fin. Group Sec., Inc., 174 F.R.D. 572, 585 (D.N.J. 1997). When a magistrate judge's decision involves a discretionary [discovery] matter ..., "courts in this district have determined that the clearly erroneous standard implicitly becomes an abuse of discretion standard." Saldi v. Paul Revere Life Ins. Co., 224 F.R.D. 169, 174 (E.D. Pa. 2004) (citing Scott Paper Co. v. United States, 943 F.Supp. 501, 502 (E.D. Pa. 1996)). Under that standard, a magistrate judge's discovery ruling "is entitled to great deference and is reversible only for abuse of discretion." Kresefky v. Panasonic Commc'ns and Sys. Co., 169 F.R.D. 54, 64 (D.N.J. 1996); see also Hasbrouck v. BankAmerica Hous. Servs., 190 F.R.D. 42, 44-45 (N.D.N.Y. 1999) (holding that discovery rulings are reviewed under abuse of discretion standard rather than de novo standard); EEOC v. Mr. Gold, Inc., 223 F.R.D. 100, 102 (E.D.N.Y. 2004) (holding that a magistrate judge's resolution of discovery disputes deserves substantial deference and should be reversed only if there is an abuse of discretion).

Halsey v. Pfeiffer, No. 09-1138, 2010 WL 3735702, *1 (D.N.J. Sept. 17, 2010).

Guided by these legal guideposts, we turn to a consideration of Panish's conduct in this case.

## B. Panish Has Engaged in Sanctionable Misconduct

Upon a consideration of all of the evidence in this case we conclude that by failing to appear for the deposition which he specifically scheduled; ignoring the court's order directing a videotaped deposition; abandoning and profanely disparaging his client, an 80 year-old decedent; and for months misappropriating a $3,050 witness fee tendered to him as payment for the deposition which he willfully ignored Michael Panish engaged in conduct which was improper, unethical, contumacious, and sanctionable.

In our view this conduct is both sanctionable, and particularly egregious for a number of reasons.

First, the conduct at issue here involved a dual dereliction of the duty of candor and cooperation that Panish as a witness owed to this court, as well as the duty of loyalty Panish owed to his clients who had paid him more than $20,000 and were relying upon him to provide crucial expert testimony in this case.

Ruehl v. S.N.M. Enterprises, Inc., Slip Copy (2017)

Second, we find that Panish's excuses for failing to abide by these dual legal and ethical responsibilities utterly lack credibility. In essence, Panish appears to justify this misconduct by claiming that his unilateral interpretation of the court's order directing a videotaped deposition allowed him the option of completely abandoning this case. To the extent that Panish implies that this court could not direct him to participate in a videotape deposition, he is simply wrong. Quite the contrary, the Federal Rules of Civil Procedure expressly authorize the party noticing a deposition to choose the manner in which to record the deposition. Fed. R. Civ. P. 30(b)(3)(A). Courts have for years recognized that audio and visual recordings of depositions are "routine". Gillen v. Nissan Motor Corp., 156 F.R.D. 120, 122 (E.D. Pa. 1994). Courts have thus long held that "the use of videotaped testimony should be encouraged and not impeded because it permits the jury to make credibility determinations not available when a transcript is read by another." Weiss v. Wayes, 132 F.R.D. 152, 155 (M.D. Pa. 1990). In contrast to a written transcript, video allows lawyers and factfinders to assess "demeanor and appearance of the witness," id., and courts have found that "facial expressions, voice inflection and intonation, gestures, 'body language' ... may all express a message...." Fanelli v. Centenary College, 211 F.R.D. 268, 270 (D.N.J. 2002) (quoting Riley v. Murdock, 156 F.R.D. 130, 131 (E.D.N.C. 1994)). Therefore we had the right, and duty, to direct Panish to participate in this deposition.

**\*8** Further, Panish's suggestion that his actions were an acceptable, and principled, interpretation of our order directing this videotaped deposition is risible in light of the undisputed evidence. It is clear that Panish did not approach his responsibilities in a principled way. Rather, his actions revealed petulance, deceit, dishonesty, and a fundamental disregard for the rights and interests of others. At the outset, Panish's contemporaneous statements, as recorded by plaintiffs' counsel in March of 2017 when Panish was notified of this Court's March 17 order directing this videotaped deposition, utterly demolish any claim that Panish was acting in a principled way. Instead, these statements provide graphic confirmation of Panish's petulant and contumacious attitude, as Panish declared that "I don't care about you or [his deceased client, Shirley Ruehl] or some asshole judge." Panish's claims of principled resistance to a court order are further undermined by his apparent willingness to sell his principles in return for a $10,000,000 indemnity bond. Thus, Panish's pattern of misleading conduct designed to frustrate this court's order and the discovery process, coupled with his openly voiced contumacious disdain for his responsibility to the court and his own client, is sanctionable as contempt, an intentional "[d]isobedience or resistance to [a] lawful writ, process, order, rule, decree, or command." 18 U.S.C. § 401 (3).

Moreover, Panish's conduct was particularly egregious in two very fundamental ways. First, Panish harmed and prejudiced the defendant in this case. Panish denied this party information that may have been integral to its defense of this lawsuit. Worse, Panish's deceptive conduct in specifically scheduling a deposition and then failing to appear for that deposition resulted in significant litigation expenses for the defense. Worse yet, Panish took an expert witness fee of $3,050 from the defendant under false pretenses, and then improperly retained that fee for months after he failed to appear for this deposition.

Bur perhaps most egregious of all is the disservice which Panish did to his clients, Shirley and Edward Ruehl, an elderly couple who had retained his services to assist them in this litigation. Panish accepted more than $20,000 in payment for his professional services, services that were crucial to the prosecution of this lawsuit. Then once his service as an expert became unpleasant or inconvenient for Panish he abandoned his clients in ways which severely undermined their case. Moreover, Panish followed this course with a cruel, calculated disdain for those he was harming, stating of Shirley Ruehl, his client and an elderly woman who had died following this incident: " Nothing will bring her back so who gives a shit." While Panish may be completely indifferent to the plight he created for the Ruehls, we are not. Therefore, in an effort to assist Panish in locating his moral, legal and ethical compass we will impose the following sanctions in this case.[5]

### C. The Court Will Impose Financial Sanctions Against Panish for the Expenses Directly Incurred by the Parties as a Consequence of Panish's Failure to Appear for this Deposition

In determining the appropriate sanctions for this misconduct by Panish we are mindful that sanctions should always be narrowly tailored to meet the misconduct, and should entail no greater punishment than is reasonably necessary to address the specific wrongdoing that confronts the court. See Klein v. Stahl. GMBH & Co., Maschinefabrik, 185 F.3d 98 (3d. Cir. 1999). Adopting this view, we conclude that the best, and most appropriate measure of sanctions in this case would be to compel Panish to reimburse both parties for the direct expenses they incurred as a result of Panish's sanctionable decision to forego the deposition that was rescheduled at his request.

*9 In reaching this conclusion we recognize that the plaintiffs had invited us to compel Panish to repay his entire expert witness fee of more than $20,000 as a sanction for his misconduct. We have declined this invitation because we believe that such a sanction would not be narrowly tailored, as required by law. Several considerations have led us to this conclusion. First, it is apparent that Panish did provide some professional services prior to his unjustified failure to attend this deposition. Therefore, repayment of his entire fee would not be a specific and narrowly tailored sanction. Further, in our view imposition of a sanction in the form of a repayment of all expert fees would require us to further foray into the contractual details of the arrangement between Panish and counsel, an arrangement that is marked by some conflicts and ambiguities. Since sanctions proceedings are ancillary to merits litigation, we will decline to engage in this effort which would needlessly prolong these proceedings.

Instead, as to the plaintiffs' motion for sanctions, IT IS ORDERED that on or before **December 15, 2017**, plaintiffs' counsel shall submit an itemized accounting of the expenses incurred by counsel in addressing Panish's sanctionable misconduct. This accounting should identify all time and expense incurred by counsel: (1) addressing Panish's objections to the notice of deposition which scheduled this videotaped deposition in March of 2017; (2) all costs, fees, and expenses incurred by counsel preparing for Panish's April 18, 2017 deposition; (3) all costs, fees and expenses incurred by counsel relating to motions practice undertaken by counsel in an effort to persuade this court to vacate the order which we have found that Panish disobeyed (Docs. 62 and 63); and (4) all costs, fees and expenses incurred litigating this sanctions motion, including costs incurred rebutting Panish's own requests for sanctions. Panish may then lodge objections to any specific items claimed by the plaintiffs' counsel on or before **December 29, 2017.** Plaintiffs' counsel may then submit a reply brief in support of their claims costs, fees and expenses on or before **January 12, 2018**.

As for the defendant, the presentation made by the defendant at the sanctions hearing conducted in this case provides a full and complete basis for awarding as sanctions costs and expenses that were directly related to Panish's misconduct. Therefore, IT IS ORDERED that Panish shall pay the following as sanctions in this case to the defendants:

1.   $3,050.00 expert witness deposition fee.[6]

2.   $300.00 March 2017 deposition cancellation fee. (Exhibit D-2.)

3.   $1,045.00 April 2017 deposition fees and expenses, (Exhibits D-4 through D-6.)

4.   $481.75 Process service expenses.

TOTAL:   $4,876.75.

Finally, we recognize that Panish's misconduct may have broader significance beyond the contours of this case since Panish holds himself out as an expert witness in a wide array of disciplines, but has conducted himself in an unprofessional fashion in this case. Mindful of the need to avoid future risk of harm to others, we note that Panish has claimed to be licensed by the State of California as a contractor, and has alleged that he is a member of the American National Standards Institute (ANSI). Since Panish's conduct in the instant case may be relevant to a consideration of his continued licensure by the state and membership in this professional association, IT IS ORDERED that the clerk will forward a copy of this decision to the appropriate licensing and professional association officials for whatever action they may deem appropriate.

So ordered this 28th day of November, 2017.

**All Citations**

Ruehl v. S.N.M. Enterprises, Inc., Slip Copy (2017)

Slip Copy, 2017 WL 5749560

Footnotes

1    Panish's ability to engage in this profane exchange with plaintiffs' counsel following the entry of our March 17 order is itself something of a mystery since Panish cancelled the deposition that was scheduled in this case for March 20, 2017, claiming that he had suddenly contracted laryngitis, but apparently felt well enough to contemporaneously tell plaintiffs' counsel over the telephone that he did not "give[ ] a shit" about his client, Shirley Ruehl, who had allegedly died as a result of injuries suffered in this accident. Presented with this minor mystery, we are left to conclude that Panish's laryngitis, like his loyalty to his own client, was fleeting and episodic.

2    We are also constrained to note that Mrs. Panish has filed an affidavit with the court denying receipt of some email messages relating to the scheduling of this deposition. (Doc. 85-1.) In light of the evidence presented at the sanctions hearing—which conclusively demonstrated that all of the emails were sent to the same email address, an address provided by the Panishes and an address from which Sharon Panish had routinely replied to emails in the past—we do not credit this assertion by Mrs. Panish which is contradicted by all of the objective evidence in this case.

3    Mr. and Mrs. Panish deny evading service of process, (Docs. 85-1 and 85-2), but the facts belie these assertions since the defendant has credibly alleged that: "We had hired process servers who made four unsuccessful attempts at various times of day, between August 24th and August 28th, to serve Mr. Panish at his last known address in New Hampshire; and six unsuccessful attempts at various times of day, between August 23rd and September 2nd, to serve Mr. Panish at his other last known address in Southern California." (Doc. 80.) Mr. and Mrs. Panish, who represent that they have participated in more than 1,000 lawsuits in Mr. Panish's capacity as an expert witness, would be well advised to keep in mind the fundamental truth that there is often little to be gained, and much to be lost, by needlessly evading and avoiding service of process.

4    Panish was represented by recently retained counsel at this hearing. While our decision in this matter is necessarily, and we believe justifiably, critical of Panish's conduct prior to retaining the services of his counsel, nothing in this decision should be construed as criticizing the performance of Panish's counsel. Quite the contrary, in a difficult setting counsel acquitted himself well, displaying candor and diligence, while zealously advancing his client's interests.

5    For his part, Panish has invited us to sanction plaintiffs' counsel, suggesting that counsel was responsible for the debacle created by Panish's abandonment of the Ruehls. (Doc. 85.) Finding that Panish's conduct was wholly unjustified, and that no counsel could have anticipated the level of unreasonable, intemperate behavior exhibited by Panish, we decline this invitation. We will, however, consider Panish's observations regarding the terms of his contract and the prior notice he provided to plaintiffs' counsel of his refusal to submit to videotape depositions as a mitigating factor when assessing sanctions against Panish.

    It has been represented that this money has been reimbursed by Panish on the date of the sanctions hearing.

---

**End of Document**        © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2017 IL App (1st) 152343-U

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.
Appellate Court of Illinois,
First District,
THIRD DIVISION.

Sandra DAHN, as the Independent Executor of the Estate of Catherine M. Collins, Deceased,
Plaintiff–Appellant,
v.
REGAL CHATEAUX CONDOMINIUM ASSOCIATION; EPI Management Company, LLC; Total Maintenance
and Cleaning Services, Inc., Defendants–Appellants.

No. 1–15–2343
|
March 8, 2017

Appeal from the Circuit Court of Cook County, No. 13L13635, The Honorable Kathy M. Flanagan, Judge Presiding.

**ORDER**

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court.

*1 Held: Summary judgment affirmed where, based on the lack of evidence that defendants had actual or constructive notice of a dangerous condition, plaintiff was unable to demonstrate that defendants were negligent. Affirmed.

¶ 1 Plaintiff-appellant Sandra Dahn, Independent Executor of the Estate of Catherine M. Collins (plaintiff or the Estate), Deceased, appeals from the trial court's grant of summary judgment in favor of defendants-appellants Regal Chateaux Condominium Association (Regal), EPI Management Company, LLC (EPI), and Total Maintenance and Cleaning Services, Inc. (Total Management), and against the Estate in its lawsuit seeking damages sustained upon Collins' fatal fall that took place as she was entering her residential building at Regal. The Estate appeals, contending that summary judgment was improper because genuine issues of material fact exist. The Estate asks that we reverse the trial court's entry of summary judgment with respect to each defendant, reverse the portion of the court's August 13, 2015 order striking paragraph seven of the expert's affidavit, and remand to the circuit court for further discovery and trial. For the following reasons, we affirm.

¶ 2 I. BACKGROUND

¶ 3 This case arises out of a November 20, 2013 incident, in which plaintiff's decedent, Catherine Collins, a 74–year–old resident of the Regal Chateaux Condominium complex suffered a subarachnoid hemorrhage and ultimately died[1] after falling down a small flight of exterior stairs at the condominium building, allegedly as a result of the doorknob[2] of the main exterior entrance door breaking off when she attempted to pull the door open. Nobody witnessed the fall. Collins was found lying on the ground at the foot of the stairs with the broken door handle from the door at the top of the stairs in or near her hand. Her estate filed a lawsuit[3] alleging premises liability and negligence claims against: (1) Regal; and (2) the property management company EPI. It also filed negligence claims against maintenance company Total Maintenance. Additionally, the Estate filed a spoliation claim against Total Maintenance because its maintenance man, Dave Busch, threw the doorknob away the next

morning.

¶ 4 More specifically, the complaint against defendants sought damages for injuries Collins sustained when she fell down the exterior stairs to her condominium building when the doorknob of the main exterior entrance broke off when she attempted to pull it open. Counts I through IV are directed at Regal and sound in negligence and premises liability brought under the Wrongful Death and the Survival Act. Similar claims are brought against EPI in counts V through VIII. The remaining counts are directed at Total Maintenance, and sound in negligence under the Wrongful Death Act and the Survival Act, as well as spoliation.

*2 ¶ 5 By Count I, plaintiff alleged that Regal was guilty of negligence—wrongful death because it owned, operated, maintained and controlled the property, including door handles in the common areas, and owed Collins a duty of reasonable care in the ownership, operation, maintenance, control, upkeep, replacement, improvement and care of the premises including the doorknob. Notwithstanding this duty, it alleges, Regal failed to fix the faulty door handle, to inspect the property, maintained the property in a dangerous condition, carelessly and negligently maintained the faulty door handle, and did so despite knowing that the door handle was faulty and posed a danger to invitees including Collins. Count II is a negligence—survival action, also against Regal; Count III is a premises liability/wrongful death claim against Regal for the same acts; and Count IV is a premises liability-survival claim against Regal. Count IV is a negligence—wrongful death claim against EPI, by which the Estate claims EPI owned, operated, maintained and controlled the property, including door handles in common areas, at the condominium complex where Collins lived and that, at the time the door handle broke off in Collins' hand, EPI "Owned and maintained the subject door handle in the common area" and had a "duty of reasonable care in the ownership, operation, maintenance, control, upkeep, replacement, improvement and care of the premises, including but not limited to the entry doors and door handles and other common elements within the condominium complex. Notwithstanding, alleges the Estate, EPI by and through its agents, servants, and employees, caused the faulty door handle to be present, failed to fix the faulty door handle, failed to inspect the property and maintained the property in a dangerous condition, carelessly and negligently maintained the faulty door handle, or carelessly and negligently maintained the faulty door handle despite knowledge that it was faulty and posed a danger to invitees. The Estate alleges that Collins death was a direct and proximate result of one or more of the foregoing reasons. Count VI is a negligence—survival action against EPI management; Count VII[1] is a premises liability—wrongful death claim against EPI; and Count VIII is a premises liability—survival action against EPI. Count IX is a negligence—wrongful death claim against Total Maintenance. By this claim, the Estate alleged that Total Maintenance contracted with EPI to "perform necessary care, upkeep, maintenance, replacement, and improvement of the properties, condominiums, units, common areas, and/or townhomes" in question. At the time of Collins' fall, Total Maintenance was "responsible for completing work orders issued by Defendant, EPI, for the care, upkeep, maintenance, replacement, and improvement of the properties *** and was "authorized to conduct any necessary upkeep, maintenance, and repairs to the properties ***." The Estate alleged Total Maintenance failed in its duty of reasonable care in the maintenance, upkeep, replacement, improvement, and care of the premises, including but not limited to the entry doors and door handles and other common elements within the condominium complex." Count X is a negligence—survival action against Total Maintenance; and Count XI is a spoliation claim against Total Maintenance, alleging that, the day after Collins fell, Total Maintenance should have known not to destroy the door handle, but instead "directed and caused the door handle to be destroyed." It alleges that "[a]s a proximate result of the destruction of the door handle, Plaintiff's ability to prove her case against the Defendants * * * and any potential case against the unknown manufacture[r] of the door handle has been prejudiced."

¶ 6 Decedent Catherine Collins had lived at Regal's 12–building complex of condominium units since 1994. She lived in building number 300. All Regal buildings have a front and back entrance. The entrance at issue here is the front entrance to building 300. This entrance consists of an exterior door with no lock, which opens into a small vestibule. The vestibule contains an interior door that is locked and opens by key or by a buzzer activated by the interior units. Leading up to the door is a series of four steps plus a small landing. The exterior door opens out, toward the landing. Regal has a condominium association board (the Board). According to Regal's written answers to interrogatories, the subject door and door frame were installed at the time the building was erected [in the 1970s], but the date of installation of the specific door handle is unknown.

¶ 7 On the afternoon of November 20, 2013, Collins' neighbor, James Haniacek, saw her return home from grocery shopping and walk up the exterior stairs to the front door of her building. She came back down the stairs, possibly to retrieve more grocery bags from her car. Shortly thereafter, Haniacek heard a noise and found Collins lying at the bottom of the stairs.

According to Haniacek, her head and back were on the sidewalk, her legs were on the stairs, and the doorknob was in her hand. Collins was taken to the hospital and was essentially unable to communicate before her death nearly two months later.

¶ 8 The record on appeal includes a handwritten statement from James Haniacek, Jr., dated December 3, 2013. In it, Haniacek states, in part:

> "I went to renew the plates on my wife's car. When I came home I noticed Ms. Collins walking into her building with some groceries. I took the plate off my wife's car, brought it in the house, cleaned it, put the sticker on it and brought it back outside. I didn't see Ms. Collins come back out for a second trip. I put the plate back on my wife's car & started to walk back on the opposite side of the pond. When I heard a noise, I looked over and saw Ms. Collins laying on the ground. Her head & back were on the sidewalk with her legs were on the stairs. She was face up with her right arm extended holding the door knob. I checked to make sure she was breathing, with a clear airway & checked her pulse. She was unconscious. I didn't have my phone so I banged on the 1st fl door west of the stairs to call 911 & went back to Ms. Collins. She started to come back but was still slipping in & out of consciousness. I was holding her hand telling her to stay with me, help was on the way & to stay still until the ambulance came. The doorknob was in her hand until she started to gain consciousness."

Haniacek submitted an affidavit to the same effect.

¶ 9 Regal was formed in 1973, and its bylaws are included in the record on appeal. The current president of the Regal Chateaux Condominium Association Board is Karen French. She has held that position since 2008. She testified in deposition that the Association contracted with EPI to provide property management services and with Total Maintenance to provide maintenance services. EPI has been property manager for Regal for 13 years. If there is a maintenance problem at Regal, she or a unit owner is to call EPI not Total Management to get a work order created. EPI, through Terry Bond and Stephen Elmore, takes care of financial aspects at Regal and "do the regular inspections on the property itself." French did not know of any doorknobs that were replaced for being loose and is not aware of anybody complaining of a loose doorknob. She testified that no doorknob had ever come off in her hand at Regal and she had never noticed that a doorknob was looser than it should have been. According to French, as a "general maintenance measure," Regal had been replacing two doors per year for the "last several years" because of issues with the doors themselves such as degrading wood. Elmore, Busch, and the Board determined together which two doors should be replaced each year. To French's knowledge, no doors had ever been replaced at Regal due to a loose doorknob. She did not talk with Busch before he replaced the door handle in November 2013.

*3 ¶ 10 There is no evidence in the record that Regal or any of its Board members were aware of any prior accidents of a doorknob coming off of any of the doors to the condominium buildings and causing injury. There is also no evidence in the record that any prior complaints had been made to Regal relating to the door or doorknob on Collins' building, building 300.

¶ 11 At the time of Collin's injury, Regal had contracted with EPI to provide property management services, the nature of which are defined by the management contract and include: EPI is the "exclusive Managing Agent of the common area and facilities of [Regal]" and:

"(3) Under the supervision of one of its principal officers, [EPI] shall render services and perform duties as follows:

* * *

(c) [EPI] shall cause the common area and facilities of [Regal] to be maintained according to standards reasonably acceptable to [Regal]. [EPI] is authorized, in the name of and at the expense of [Regal], to make or cause to be necessary, and to purchase such supplies as may be necessary. ***

* * *

(e) [EPI] is authorized, with the approval of [Regal], in the name of and at the expense of [Regal], to make contracts for *** maintenance *** and other services or such of them as [Regal] shall deem advisable. ***

\* \* \*

(i) It shall be the duty of [EPI] at all times during the term of this Agreement to operate and maintain the Development according to the highest standards achievable consistent with the overall plan of [Regal] provided, however, that [Regal] shall not assert any claims against [EPI] on account of any alleged errors or judgment made in good faith by [EPI] in the management or operation of [Regal]. \*\*\*"

¶ 12 At the time of Collins' injury, Regal had also contracted with Total Maintenance to provide maintenance and cleaning services on Regal's property, the nature of which are defined by the maintenance contract and include:

"[Total Maintenance] shall perform the following duties, which include but are not limited to the following:

[Total Maintenance] (Dave Busch) shall personally be on the property a minimum of 20 hours per week which is defined as 5 days out of the normal 7 day week.

[Busch] shall perform the following work functions as a part of his 20 hour work week:

1. General Electrical repairs.

2. General Carpentry repairs.

3. General Plumbing repairs.

4. General Drywall and Tile repairs.

\* \* \*

10. Repair and Painting of the Hallways of the Buildings.

\* \* \*

To complete such other work orders that may be issued from time to time. NOTE: [Total Maintenance] must have a work order for all work done on the property and said work order must be returned to the Association denoting the time and materials used for each job."

¶ 13 EPI customer service representative Terry Bond testified she had worked at EPI for 10 years. She explained that Dave Busch worked as the on-site maintenance man for Regal Monday through Friday, where he performs general maintenance. She is able to create work orders for Busch when something comes to her attention that needs to be fixed. Sometimes she telephones Busch with a work order and sometimes Busch collects the written work orders at EPI. At other times, Busch will fix something he notices is broken, then notify her, and she will create a work order for the completed work.

¶ 14 Regarding Collins' fall, Bond testified that she received a telephone call from an unknown caller "sometime later in the afternoon" on November 20, 2013, that "said that a lady had fallen and the ambulance was there." She said the caller was not sure who had fallen. She said, "[The caller] said that [the person] had fallen, I believe, at the front stoop; that the door—door handle or knob had come off from the front door." Busch, who generally works from 7:00 a.m. to 1:00 p.m., had already left for the day, so Bond "made a note to call him first thing in the morning." The next morning, Bond telephoned Busch at approximately 8:45 or 9:00 a.m. to tell him about the doorknob. She testified:

\*4 "[TERRY BOND:] I told [Busch] that I had gotten a call, you know, that someone had fallen and that the doorknob needed to be repaired. And he had already known about it, probably from a resident because they all know [Busch]; he's been there for some many years. So he had already said he knew and he had fixed the door already.

\* \* \*

[ATTORNEY MR. NICHOLS:] Did [Busch] tell you when exactly he replaced the knob?

A. It was that morning prior to when I had called."

Bond explained that Busch keeps petty cash to pay for expenses, and Busch paid for the new doorknob with the petty cash.

¶ 15 Bond testified she did not "take any further action" regarding the doorknob. She did not ask Busch what he did with the broken doorknob. She was not aware of any damage to the front door of Collins' building, nor of any defects or damage to the doorknob of that front door. She also was not aware of any prior complaints regarding the doorknob being loose or dysfunctional at the 300 building. She testified that she would have expected Busch to throw a broken doorknob away when he replaced it with a new one.

¶ 16 EPI director of management Stephen Elmore testified that he performs monthly on-site inspections of the Regal property. His most recent inspection of the property prior to Collins' fall was on November 3, 2013, just 16 days before the injury. When he inspects the property, he starts at one end and walks the entire property looking for defects within the property. He also "follows up on any Work Orders with outside contractors to make sure that they were done" satisfactorily. Although he does not specifically recall inspecting the door handle in question, he testified it is his "custom and practice" to inspect every door and door handle system within the Regal property. He testified:

> "[STEPHEN ELMORE:] I inspect all the door handles because I have to get into the buildings. So I have to use the door handle to get into the buildings."

When inspecting the door and door handle, he "pull[s] on the door handle and normally [tries] and go[es] back and forth to see if it wobbles or not[.]"

¶ 17 He considers his inspections "very thorough" and is confident that, had a door handle been loose during his November 3 inspection, he would have noticed it. Elmore testified that Busch followed the proper procedure when he replaced the door handle immediately after finding it defective, rather than waiting to make a work order. The process is that Elmore makes monthly inspections of the property and reports any defects or problems to EPI. The EPI service department generates work orders, which are EPI's responsibility under its contract with Regal.

¶ 18 Dave Busch, owner of Total Maintenance, testified he provides general maintenance and cleaning services for Regal. Busch performs daily "rounds" of the property during which he collects garbage and looks out for defective conditions on the property. He does not inspect doorknobs at Regal. He had never seen a door handle fail and had never been asked to replace one at Regal prior to this incident. He had never heard of a door handle falling off at the Regal property. He acknowledged that there had been a work order to replace the rear door of building 300, but explained that, in reality, only the electronic door release needed to be fixed. Another time, pursuant to a work order, Busch had tightened a screw on a loose doorknob in the 600 building.

*5 ¶ 19 Regarding Collins' fall, Busch explained that he never saw Collins on the ground. He testified that, on November 21, 2013, he found a portion of the door handle on the ground before he heard from anyone, including residents and representatives from Regal or EPI. He said he found the door handle and "basically a trim ring" on top of the landing to the left of the doorway. He described that, when he saw the door handle, he thought, "somebody was moving in and moving out and broke it again, you know, because a lot of times they prop the doors open and stuff like that; but I just saw it laying there, saw it couldn't be repaired, so went and got another one." Upon further questioning, he explained that, by "broken again," he did not mean the unlocking-type of door handle involved here, but that the locking mechanism on security doors would sometimes break when "somebody tries to force it open." He could not recollect precisely, but he thinks Terry from EPI may have called later that morning to notify him of the broken door handle and he told her he had already fixed it. To repair the door, he "just went to Menards, picked up a new lock, and replaced it in the early morning." He did not take any pictures of the broken door handle because he "just looked at it as like a normal day. If something was broken, I'll fix it, throw it out, go on with my day."

¶ 20 Busch described the process he goes through when he discovers something needs to be repaired at Regal. Depending on the size of the problem, he either repairs it on his own or requests a work order from EPI. He also sometimes receives work orders generated by EPI. He explained that, in the five years prior to Collins' fall, he never replaced any door handles on any interior or external doors at Regal. He testified he uses that particular exterior door handle to building 300 approximately one time per week and agreed that "[t]his door handle that's the subject of [the lawsuit] is a door handle that [I] had never observed, felt, or known of having any problems with respect to being loose or otherwise dysfunctional[.]"

Dahn v. Regal Chateaux Condominium Association, Not Reported in N.E.3d (2017)

2017 IL App (1st) 152343-U

¶ 21 Sheryl Busch testified at deposition that she and her assistants provide the cleaning services for Total Maintenance. The cleanings at Regal had been done on Wednesdays for the past 20 years. These cleanings included vacuuming and dusting the common areas of each building, and inspecting interior and exterior light fixtures. When cleaning each building, Sheryl and her assistants enter and/or exit each door of the building they clean, including building 300. If they had ever noticed a problem with a door handle, they would have immediately notified EPI. Sheryl and her cleaning crew cleaned the buildings at Regal—including building 300—the morning of Collins' fall and did not notice any problems with the door handle. She agreed that "[w]ith respect to this particular doorknob, it functioned appropriately and as [I] would have expected every time [I] used it coming from the outside in for the 22 years that [I've] been doing this up to and including the morning of November 20th of 2013[.]"

¶ 22 Total Maintenance cleaner Leslie Van Ginder testified she cleaned the common areas of the Regal buildings, including building 300. She had cleaned building 300 for eight years and knows which door handle is at issue here. On Wednesdays when she cleaned, she would go in or out of that door one or more times and she never had any problem with the door handle.

¶ 23 Two of Collins' neighbors also testified in deposition. Neighbor Todd Shaer testified he had lived in the 300 building for most of the past 19 years. During all the years he has used the exterior door in question, he never noticed any problems with the door handle. Shaer testified that he used the door in the morning before Collins fell and had no trouble with the door. If he had noticed the door handle being loose or problematic, he would have called EPI or Dave Busch, but he did not notice anything wrong with the door handle. He used the door again approximately 15 minutes before Collins fell and did not notice any issues with the door handle. According to Shaer, November 20 was a dry, cloudy day with no snow or rain. He described that the front door to building 300 has a handle that a person must pull toward him in order to enter the building. In his opinion as a resident, it is a "safe entrance and exit." He had never heard of anyone having "any problems going up or coming down those stairs" or "any problems in opening the door, getting in and out of the door, because of the configuration of the stairs."

*6 ¶ 24 Shaer testified that, about 15 to 20 minutes after he arrived home that afternoon, his neighbor Jimmy pounded on his door, telling him to call 911. He did so, and went outside to see what had happened. He saw Collins lying on the ground with one leg on the first stair step. He did not see the door handle. As far as Shaer knows, nobody saw Collins fall. He could see bags of groceries strewn around the area where Collins lay.

¶ 25 Neighbor James Crater testified that he had lived at Regal for many years and had never noticed an issue with the door handle to the main entrance. He described "tension" on the door where, after opening the door with no trouble using the door handle, there would be a bit more tension than expected in order to fully open the door. He never reported this extra tension to the property management company. He clarified that the tension he mentioned was "nothing with the doorknob [but] tension on the door[.]" He was always able to open and close the door. He had never heard of any issues with any other doors or door handles on any other buildings at Regal. He had never personally had any "issues relating to any doorknobs either at the exterior doors" of building 300 or any other buildings at Regal.

¶ 26 Crater used the door handle at issue the day before Collins' fall and did not notice any problems with it. On the day of injury, Crater was inside building 300 looking out the window when he saw paramedics assisting Collins. He remained at the window, watching, until Collins was taken away by ambulance. He exited through the front entrance after the ambulance left. He could see blood on the sidewalk, but did not notice a door handle in the area. Over the years, Crater saw Collins from time to time carrying things through the exterior front door and never saw her having any difficulty with it. Although they spoke regularly, Collins never complained to Crater about anything having to do with the functioning of the doorknob on the exterior door.

¶ 27 Collins' son-in-law, Michael Dahn, who was listed as a plaintiff's witness, also testified at deposition. Dahn testified that he manages and supervises maintenance on a 200 million square foot manufacturing facility. He opined he is an expert in building maintenance because he "run[s]" the large facility with maintenance crew. In his opinion, "the door handle either broke, wasn't installed properly, but that door handle shouldn't have broke [when pulled on by a 95–pound woman like Collins.]" He is familiar with the type of non-locking, pass-through door handle such as the one in question. There are pass-through doors at the facility he manages. He acknowledged that, in his opinion, if a door handle such as the one in

question was checked to see that it was not loose and it latched properly, that would be an adequate inspection and there would be no "obligation or reason" for a maintenance person to do anything further. Dahn specifically stated, "If it passed inspection, fair enough. If it is not broke, it is not broke."

¶ 28 Also included in the record is an affidavit from Michael Panish, presented as plaintiff's expert witness in construction. In the affidavit, Panish describes his review of the evidence in this case, his on-site inspection of the premises, and the opinions he formed in this matter. Panish first opines that the term "general carpentry repairs," for which Total Maintenance had contracted to provide Regal, is "generally understood as a broad field that encompasses woodwork, repairs to doors and windows, and installation and maintenance of door locks." According to Panish, the original door locks at Regal, including the subject door lock, were "apparently" 37 years old at the time of the occurrence. These original doorknobs were a "Builder's Standard" grade, or a "Grade 4," which grade no longer exists today. He explains:

> *7 "10. *** [I]n 1977, there was a commonly accepted fourth grade that fell beneath the current 'Grade 3' rating, which was known as 'Builder's Standard.' Builder's Standard door locks were low-quality, inferiorly constructed locks that were intended for only a short period of use, up to three years. In 1977, Builder's Standard locks likely cost between $5.00 and $10.00 per lock. In 1977, it was commonly accepted within the construction field that a Builder's Standard lock had a rating of 100,000 duty cycles², meaning that they were only expected to endure 100,000 duty cycles before failure."

Panish further opined:

> "12. Builder's standard locks in 1977 were expected to last no longer than three years, after which time they should be replaced. The exercise of ordinary care for the safety of the Regal Chateaux's residents required that the Builder's Standard locks were replaced within three years of installation. The failure to replace the Builder's Standard locks within three years was negligence."

¶ 29 Based on the number of building residents, Panish estimated that the subject lock most likely exceeded its expected 100,000 duty cycles by 1982, and this lock was likely used through 630,720 duty cycles in its lifetime. Panish concluded:

> "15. The exercise of reasonable care for the safety of the Regal Chateaux residents required that the Builder's Standard locks be replaced before they exceed their duty cycle ratings. Allowing the Builder's Standard locks to remain in use at the Regal Chateaux for over 100,000 duty cycles, and especially in excess of 600,000 duty cycles, was negligent.

> 16. Under the customs and standards for general carpentry repair and/or building maintenance, the exercise of reasonable care required that a Builder's Standard lock be replaced within its anticipated 100,000 duty cycles, and long before it reached 600,000 duty cycles. The failure to do so was negligence."

¶ 30 Panish also described factors specific to the door in question that may have contributed to the failure of the door handle. For example, James Crater testified that the door took extra force to open the door. This extra force, opined Panish, "further stressed the lock and hastened the lock's failure."

¶ 31 Additionally, Panish opined that the landing on which Collins was standing at the time of the occurrence was more shallow than prescribed by the Cook County Building and Environmental Ordinance (the Code), and that, had the landing been of proper size, Collins may have merely come to rest on the landing itself rather than falling down the stairs.

¶ 32 Defendants filed motions for summary judgment pursuant to section 2–1005 of the Code of Civil Procedure (735 ILCS 5/2–1005 (West 2014)). Regal and EPI filed a joint motion for summary judgment, claiming, generally, that there was no notice of a dangerous condition and no foreseeability of injury, and that it lacked actual or constructive notice of the possibility of injury, that is, of a defective doorknob. Total Maintenance alleged that it had no contractual duty to repair the doorknob.

¶ 33 In August 2015, the circuit court granted summary judgment in its entirety against plaintiff and in favor of all defendants. In its memorandum order, the court found that plaintiff failed to establish either notice of foreseeability, through her expert or otherwise, as required to support her claims.

¶ 34 Additionally, with respect to the allegations of building code violations, which issue was raised for the first time in plaintiff's summary judgment response, the court found that the expert's opinions were speculative and without factual basis. The court, therefore, found that summary judgment in favor of Regal and EPI was appropriate.

*8 ¶ 35 The court also found that Total Maintenance did not owe a duty to provide preventative maintenance and that it, too, was entitled to summary judgment. In so doing, the court noted that plaintiff's concession that summary judgment in favor of Total Maintenance on the spoliation of the evidence claim was proper.

¶ 36 Plaintiff appeals.

## ¶ 37 II. ANALYSIS

¶ 38 On appeal, plaintiff contends the trial court's grant of summary judgment as to the premises liability claims was in error because there were genuine issues of material fact as to whether defendants had constructive notice of the hazardous condition.⁶ Specifically, plaintiff argues that constructive notice was established where: (1) the subject door lock had exceeded its useable lifespan; and (2) other doors on the premises had begun to fail.

### ¶ 39 A. The Panish Affidavit

¶ 40 First, defendants assert that plaintiff's expert's affidavit failed to meet the requirements of Illinois Supreme Court Rule (Rule) 191(a) (Ill. S. Ct. R. 191(a) (eff. Jan. 4, 2013)). Rule 191(a), which governs the content of affidavits offered in support of summary judgment, states that these affidavits:

> "shall be made on the personal knowledge of the affiants; shall set forth with particularity the facts upon which the claim, counterclaim, or defense is based; shall have attached thereto sworn or certified copies of all documents upon which the affiant relies; shall not consist of conclusions but of facts admissible in evidence; and shall affirmatively show that the affiant, if sworn as a witness, can testify competently thereto." 145 Ill. 2d R. 191(a).

¶ 41 Plaintiff responds that the Panish affidavit was, in fact, appropriate as an expert affidavit under Supreme Court Rule 191, and contends the trial court erred in striking paragraph seven of the affidavit.⁷

¶ 42 The purpose of affidavits submitted in support of summary judgment is to show whether the issues raised are genuine and whether each party has competent evidence to support his position. See *People ex rel. Vuagniaux v. City of Edwardsville*, 284 Ill. App. 3d 407, 412 (1996). After all, it is upon these affidavits that a trial court bases its decision whether to grant summary judgment, and that we, as a reviewing court, are to examine that decision. Accordingly, our courts have repeatedly held, and this proposition remains valid today, that when portions of an affidavit are improper under Rule 191(a), only those improper portions should be stricken or excised in reviewing summary judgment and the entire affidavit is not automatically invalidated. See *Roe v. Jewish Children's Bureau of Chicago*, 339 Ill. App. 3d 119, 128 (2003) (where affidavits contain allegations that did not meet standards of Rule 191(a), only improper portions are to be stricken and remainder may be considered by trial and reviewing courts); accord *Vuagniaux*, 284 Ill. App. 3d at 412 (only "tainted portion [of affidavit] should be excised, as opposed to the entire affidavit" under Rule 191(a)); *Nardi, Pain & Podolsky, Inc. v. Vignola Furniture Co.*, 80 Ill. App. 2d 220, 227 (1967) (some inadmissible statements do not render entire affidavit invalid under Rule 191(a)). Rather, the steadfast conclusion is that Rule 191(a) is satisfied if, " ' "from the document as a whole, it appears that the affidavit is based upon the personal knowledge of the affiant and there is a reasonable inference that the affiant could competently testify as to its contents at trial [.]" ' " *Piser v. State Farm Mutual Automobile Association*, 405 Ill. App. 3d 341, 349 (2010) (quoting *Doria v. Village of Downers Grove*, 397 Ill. App. 3d 752, 756 (2009) (quoting *Kugler v. Southmark Realty Partners III*, 309 Ill. App. 3d 790, 795 (1999))); see also *Nardi*, 80 Ill. App. 2d at 227 (test is whether it appears from the whole of the affidavit that affiant would be competent to testify if called upon).

*9 ¶ 43 An expert's opinion may be excluded where it offers no aid to the trier of fact in determining questions at issue, and

affidavits that provide legal conclusions rather than facts are insufficient to defeat a motion for summary judgment. *Hagy v. McHenry County Conservation District*, 190 Ill. App. 3d 833, 843 (1989); *Alop v. Edgewood Valley Community Association*, 154 Ill. App. 3d 482, 487 (1987).

¶ 44 We first address paragraph 7 of the Panish affidavit. Paragraph 7 states:

"A. Total Maintenance's Contract for Maintenance Required the Performance of 'General Carpentry Repairs,' which Includes Maintenance, Repair, and Replacement of Door Locks.

7. The contract between the Regal Chateaux Condominium Association and Total Maintenance and cleaning Services, Inc. calls for Total Maintenance and Cleaning Services, Inc. to perform 'general carpentry repairs.' In the maintenance context, carpentry is generally understood as a broad field that encompasses woodwork, repairs to doors and windows, and installation and maintenance of door locks. In the fields of construction and building maintenance, the ordinary understanding of the term 'general carpentry repairs' would include the installation, maintenance, repair, and replacement of door locks. The common understanding of the term 'general carpentry repairs' includes maintenance, repair, and replacement of door locks."

The trial court struck this paragraph, determining:

"[T]he affidavit of Plaintiff's expert, Michael Panish, inappropriately tries to interpret the contract between Regal and Total Maintenance. Furthermore, it is conclusory with regard to Total Maintenance and fails to establish any duty on the part of Total Maintenance outside of the clear and unambiguous terms of its contract. Thus, paragraph 7 of Panish's affidavit as to Total Maintenance is stricken."

¶ 45 The trial court did not err in striking paragraph 7. Where Panish inappropriately interpreted the contract between Regal and Total Maintenance. See Supreme Court Rule 191 (affidavits offered in support of summary judgment "shall not consist of conclusions but of facts admissible in evidence"). Additionally, it is appropriate to exclude this paragraph because it "provide[s] legal conclusions rather than facts," which conclusions are "insufficient to defeat a motion for summary judgment." See *Hagy*, 190 Ill. App. 3d at 843.

¶ 46 Next, all three defendants urge us to strike paragraphs 7–19 and 25–27 of the Panish affidavit as conclusory and noncompliant with Rule 191, as providing inappropriate legal conclusions, and, in general, "provid[ing] no factual or legal basis for a court to conclude that the defendants knew or should have known that the door knob on Building 300 was on the brink of failure," and failing to establish that the defendants otherwise acted negligently.

¶ 47 We provide here a summary of the Panish affidavit. In paragraphs 1 through 6, Panish establishes that he has education, training, and experience that qualify him to provide an expert opinion regarding doorknobs. He explains he is an "expert in the field of construction, with specialized knowledge in the fields of General Contracting; Electrical Contracting; Doors, Locks & Security Equipment Contracting; Cabinet & Millwork Contracting; and Painting & Finish Specialties Contracting." He provides a description of the materials he reviewed in reaching his opinions in this matter, including ten depositions, two affidavits, many discovery documents, and his personal inspection of the property and other original door locks of apparently similar ages. He attached the materials on which he relied to his affidavit, which materials are part of the record on appeal.

*10 ¶ 48 In paragraph 7, which we have quoted above, Panish provides his opinion regarding the definition of "general carpentry repairs" and what the parties intended by that term in the contracts. As noted, the trial court struck paragraph 7, and we have affirmed this decision.

¶ 49 Then, Panish describes the different standards and grades of locks. He begins with the premise that, while present-day standards define three grades of door locks and knobs, no such standards existed in 1977 when Regal was built. Despite the absence of these standards, however, Panish says a "fourth grade" of door lock existed at that time, known as a "Builder's Standard." He opines that doorknobs of this standard were "low-quality, inferiorly constructed locks that were intended for only a short period of use, up to three years." He also states that in 1977 "it was commonly accepted within the construction field that a Builder's Standard lock had a rating of 100,000 duty cycles, meaning that they were only expected to endure 100,000 duty cycles before failure." He provides no evidence to support these statements.

¶ 50 He then proceeds to describe the "Builder's Standard" locks he inspected from Regal, making the assumption that these three locks were "just like the subject lock on Collins's unit." Based on his earlier, unsupported duty cycle figures, he calculates how long a lock should last before failing and opines that it was negligence for Regal not to have changed out these locks:

> "12. Builder's standard locks in 1977 were expected to last no longer than three years, after which time they should be replaced. The exercise of ordinary care for the safety of the Regal Chateaux's residents required that the Builder's Standard locks were replaced within three years of installation. The failure to replace the Builder's Standard locks within three years was negligence."

¶ 51 Panish provides more calculations, in which he determines that the Builder's Standard doorknob in question exceeded its duty cycles in 1982 and, since it was kept in service until Collins' fall in 2013, it "likely endured six times as many duty cycles as it had been rated for." Panish then provides the following legal conclusions:

> "15. The exercise of reasonable care for the safety of the Regal Chateaux residents required that the Builder's Standard locks be replaced before they exceed their duty cycle ratings. Allowing the Builder's Standard locks to remain in use at the Regal Chateaux for over 100,000 duty cycles, and especially in excess of 600,000 duty cycles, was negligence.
>
> 16. Under the customs and standards for general carpentry repair and/or building maintenance, the exercise of reasonable care required that a Builder's Standard lock be replaced within its anticipated 100,000 duty cycles, and long before it reached 600,000 duty cycles. The failure to do so was negligence."

¶ 52 The affidavit continues, citing testimony from Regal resident James Crater that the front door of Building 300 required 'extra tension' to open. Panish opined that "[t]his lock had already long exceeded its useful life, and the additional forces required to open the door further stressed the lock and hastened the lock's failure."

¶ 53 Panish also opines that, while he was unable to inspect the subject doorknob, the exemplar doorknobs he examined contained significant corrosion "which would be expected over time in a light-duty lock that was installed on the exterior of a building." He said:

> *11 "This type of corrosion could have resulted in failure of the spring which holds the retention plate in place; the pin which is held in place by the spring could have sheered off; the stem that operates and is an integral part of the lock body could have broken off; or the knob itself could have failed due to corrosion and/or metal fatigue."

¶ 54 The affidavit also includes opinions regarding defendants' maintenance procedures. Panish opines that the "accepted industry standard for maintenance for common-area locks in a multi-unit dwelling" such as Regal "requires that the [doorknob be] disassembled, lubricated, cleaned, and inspected at least twice per year." According to Panish, the inspection process here, in which Busch inspected the doorknob by turning it to see if it was loose or wobbly, was insufficient. He says:

> "This method of inspection is inadequate and fails to meet the acceptable standards for maintenance and inspection and is significantly below the industry standard of care. Total Maintenance did not inspect the locks, maintain them in any fashion, or check them for wear. Through these actions, the Regal Chateaux, EPI, and Total Maintenance fell beneath the industry standard of acceptable maintenance for such door locks, and they were negligent."

He provides no documentation or other evidence to support the existence of this industry standard.

¶ 55 Additionally, Panish opines that the landing itself was smaller than required by the building code. He says he measured it himself and noted that it was of insufficient size, concluding:

> "Were the landing to have been deeper, Collins may have tumbled backward onto the landing and come to rest without ever reaching the stairs, thereby reducing the possibility for injury."

He also alleges a code violation regarding some of the hardware used on the door. The trial court addressed these claims of alleged violations at summary judgment, noting:

> "The Plaintiff attempts to raise another basis of liability for the first time in the response, that the landing size was in violation of the building code and caused the Decedent's fall. While this basis of liability was not alleged in the pleading, even if it had been, the Plaintiff fails to provide an evidentiary basis to support it. Moreover, Mr. Panish's opinions on this are speculative and without factual basis, and do not show that any ordinance violation proximately caused the complained injuries. Accordingly, summary judgment in favor of Defendants Regal and EPI is appropriate."

We agree with the trial court that these alleged building code violations cannot be used as a basis to defeat summary judgment here, where no such violations were plead in plaintiff's complaint. Plaintiff waived this argument and we will not consider it here, as plaintiff may not introduce a new theory of liability in response to a summary judgment motion.

> "The purpose of a complaint is to crystallize the issues in controversy, so that a defendant will know what claims it has to meet. [Citation.] When ruling on a motion for summary judgment, the trial court looks to the pleadings to determine the issues in controversy. [Citations.] If a plaintiff desires to place issues in controversy that were not named in the complaint, the proper course of action is to move to amend the complaint. [Citations.] If the plaintiff does not seek to amend, then it cannot move for summary judgment on those issues. *Gold Realty [Group Corp. v. Kismet Café, Inc.*, 358 Ill. App. 3d 675, 679 (2005) ] quoting *Pagano [v. Occidental Chemical Corp.*, 257 Ill. App. 3d 905, 911 (1994) ]; *Steadfast Insurance Co. v. Caremark Rx, Inc.*, 373 Ill. App. 3d 895, 900 *** (2007) ('A party cannot seek summary judgment on a theory that was never pled in the complaint.')." *Filliung v. Adams*, 387 Ill. App. 3d 40, 51 (2008).

*12 ¶ 56 Plaintiff here did not seek to amend her complaint, but instead relied on a new claim at summary judgment, that is, that building code violations existed affecting the safety of the entryway. Plaintiff cannot rely on new theories without first pleading them, and we will not consider the new, unpled claims based on alleged building code violations here.

¶ 57 Panish's affidavit was insufficient under Rule 191(a), which requires in relevant part that affidavits submitted in summary judgment proceedings "shall not consist of conclusions but of facts admissible in evidence." Ill. S.Ct. R. 191(a). First, Panish failed to provide evidence regarding the "fourth grade" standard he references, nor reference literature, a professional association, manufacturer, or building code that recognized or made use of his classification, whether in 1977 or anytime thereafter. He, in fact, provides no supportive documentation as to this theory which makes up the base of his opinions. Nor does Panish articulate how any differences in quality between the alleged Builder's Standard lock are relevant to whether the door knob could pull off of a door in such a manner as to cause injury such as in the case at bar. Although Panish opines that Builder's Standard locks are "inferiorly constructed," he does not provide statistics or any other factual basis to illuminate whether this inferior construction might cause the doorknob to actually detach from the door itself. Nor does he provide any information other than his personal opinion to support that "it was commonly accepted" that the Builder's Standard locks were "expected to last" for only a few years or for 100,000 duty cycles.

¶ 58 For that matter, Panish does not tell us whether the standards he refers to have ever been applied in Illinois or Cook County.[8]

¶ 59 Panish also fails to establish why he believes the lock was installed in the 1970s. He relies on statements made to him by maintenance man Dave Busch and by EPI representative Stephen Elmore. However, Busch had only been working at Regal for five years, and EPI had only been involved with Regal for about 8 years. No further information was provided regarding dating the doorknobs here.

¶ 60 Panish's opinions on lock maintenance suffer from the same conclusory deficiencies as mentioned above. He claims that the "accepted industry standard" to maintain the lock is to disassemble, lubricate, clean, and inspect it at least two times per year. However, he does not support this statement in any manner, *e.g.*, by even, at minimum, naming an industry organization that recognizes this standard. Nor does Panish opine whether this maintenance plan would have prevented this accident. He only speculates that corrosion "could have" resulted in failure, or the stem "could have" broken off, or the "knob itself could have failed due to corrosion and/or metal fatigue."

¶ 61 In our opinion, Panish's legal conclusions regarding negligence and contract interpretations, as well has his broad opinions offered without support do not give the court facts to assist in deciding this case. See *People ex rel. Vuagniaux*, 284 Ill. App. 3d at 412 (The purpose of affidavits submitted in support of summary judgment is to show whether the issues raised are genuine and whether each party has competent evidence to support his position). After all, it is upon these affidavits that a trial court bases its decision whether to grant summary judgment, and that we, as a reviewing court, are to examine that decision. Regardless, we are cognizant that the entire affidavit is not automatically invalidated. See *Roe*, 339 Ill. App. 3d at 128 (where affidavits contain allegations that did not meet standards of Rule 191(a), only improper portions are to be stricken and remainder may be considered by trial and reviewing courts); accord *Vuagniaux*, 284 Ill. App. 3d at 412 (only "tainted portion [of affidavit] should be excised, as opposed to the entire affidavit" under Rule 191(a)).

*13 ¶ 62 Here, then, we strike those portions of the Panish affidavit offering legal conclusions as to negligence. "It is well-settled that an expert witness may not testify with respect to legal conclusions" and such conclusions "cannot raise a genuine issue of material fact" for purposes of summary judgment. *Caracci v. Patel*, 2015 IL App (1st) 133897, ¶ 28 (citing *Todd W. Musburger, Ltd. v. Meier*, 394 Ill. App. 3d 781, 800 (2009)). We strike paragraph 8, which concludes that the doorknob in question was approximately 37 years old, as conclusory; and we strike paragraph 10, which introduces the Builder's Standard inferior-quality argument with no evidentiary support, as conclusory. These opinions are conjecture, which will not support a claim for negligence. See *e.g., McCormick by McCormick v. Maplehurst Winter Sports, Ltd.*, 166 Ill. App. 3d 93, 100 (1988) ("[S]urmise is not an adequate basis for establishing liability for negligence. Nor can an inference of negligence be established on inferences which are themselves speculative in nature."). Because Panish failed to support his Builder's Standard theory with any evidentiary support, we also strike all further reference to the Builder's Standard and the 100,000 duty cycles theory from this affidavit. Additionally, we strike paragraph 26, in which Panish provides the "industry standard for maintenance," but does not provide evidentiary support for the standard, as conclusory. See, *e.g., Hagy*, 190 Ill. App. 3d at 843 (An expert's opinion may be excluded where it offers no aid to the trier of fact in determining questions at issue, and affidavits that provide legal conclusions rather than facts are insufficient to defeat a motion for summary judgment). Accordingly, we will not consider the excluded portions of the affidavit in our further consideration here.

¶ 63 B. Notice and Foreseeability

¶ 64 We now turn to the question of summary judgment as to notice and foreseeability. In contending that the trial court improperly granted summary judgment in defendants' favor, plaintiff asserts that a genuine issue of material fact existed as to whether defendants had constructive notice of a dangerous condition, but did not fix it, resulting in the fall that caused Collins' death. Defendants respond that they did not have notice of any kind and that the injury was entirely unforeseeable.

¶ 65 Summary judgment is proper when the pleadings, affidavits, depositions and admissions of record, construed strictly against the moving party, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Morris v. Margulis*, 197 Ill. 2d 28, 35 (201); 735 ILCS 5/2–1005 (West 2014). This relief is an appropriate tool to employ in the expeditious disposition of a lawsuit in which " 'the right of the moving party is clear and free from doubt.' " *Morris*, 197 Ill. 2d at 35 (quoting *Purtill v. Hess*, 111 Ill. 2d 229, 240 (1986)). In ruling on a motion for summary judgment, the circuit court is to determine whether a genuine issue of material fact exists, not try a question of fact. *Williams v. Manchester*, 228 Ill. 2d 404, 417 (2008). Although the burden is on the moving party to establish that summary judgment is appropriate, the nonmoving party must present a *bona fide* factual issue and not merely general conclusions of law. *Caponi v. Larry's 66*, 236 Ill. App. 3d 660, 670 (1992). A party opposing a motion for summary judgment "must present a factual basis which would arguable entitle him to a judgment." *Allegro Services Ltd. v. Metropolitan Pier & Exposition Authority*, 172 Ill. 2d 243, 256 (1996). While he need not prove his case at this preliminary stage, the nonmoving party must, nevertheless, present some factual basis to support his claim and he is not simply entitled to rely on the allegations in his pleading in order to raise a genuine issue of material fact. See *Rucker v. Rucker*, 2014 IL App (1st) 132834, ¶ 49, and *CitiMortgage, Inc. v. Bukowski*, 2015 IL App (1st) 140780, ¶ 19. This basis must recite facts and not mere conclusions or statements based on information and belief. See *In Interest of E.L.*, 152 Ill. App. 3d 25, 31 (1987); see also *Morrissey v. Arlington Park Racecourse, LLC*, 404 Ill. App. 3d 711, 724 (2010) ("nonmoving party must present a *bona fide* factual issue and not merely general conclusions of law"). And, if his allegations of fact are lacking, any documents provided will be held insufficient to defeat the motion for summary judgment. See *E.L.*, 152 Ill. App. 3d at 31–32. Moreover, while a plaintiff need not prove his entire case during summary judgment, he must present some evidentiary facts to support the elements of his cause of action. See *Bellerive v. Hilton Hotels Corp.*, 245 Ill. App. 3d 933, 936 (1993). If the plaintiff fails to establish even one element of the cause of action, summary judgment in favor of the defendant is wholly proper. See *Bagent v. Blessing*

*Care Corp.*, 224 Ill. 2d 154, 163 (2007).

**\*14 ¶ 66** When determining whether a genuine issue of material fact exists, courts construe the pleadings liberally in favor of the nonmoving party. *Williams,* 228 Ill. 2d at 417. "Summary judgment is to be encouraged in the interest of prompt disposition of lawsuits, but as a drastic measure it should be allowed only when a moving party's right to it is clear and free from doubt." *Pyne v. Witmer,* 129 Ill. 2d 351, 358 (1989). "If the plaintiff fails to establish any element of the cause of action [asserted,] summary judgment for the defendant is proper." *Governmental Interinsurance Exchange v. Judge,* 221 Ill. 2d 195, 215 (2006). We review summary judgment rulings *de novo* (*Espinoza v. Elgin, Joliet & Eastern Ry. Co.,* 165 Ill. 2d 107, 113 (1995)) and we will only disturb the decision of the trial court where we find that a genuine issue of material fact exists. *Addison v. Whittenberg,* 124 Ill. 2d 287, 294 (1988). A genuine issue of material fact exists where the facts are in dispute or where reasonable minds could draw different inferences from the undisputed facts. *Morrissey v. Arlington Park Racecourse, LLC,* 404 Ill. App. 3d 711, 724 (2010); see also *In re Estate of Ciesiolkiewicz,* 243 Ill. App. 3d 506, 510 (1993). In our review, we may affirm on any basis found in the record regardless of whether the trial court relied on those grounds or whether its reasoning was correct. *Illinois State Bar Ass'n Mutual Insurance Co. v. Coregis Insurance Co.,* 355 Ill. App. 3d 156, 163 (2004); see also *Pepper Construction Co. v. Transcontinental Insurance Co.,* 285 Ill. App. 3d 573, 576 (1996).

**¶ 67** A possessor of land owes its invitees a common law duty of reasonable care to maintain its premises in a reasonably safe condition (*Deibert v. Bauer Brothers Construction Co.,* 141 Ill. 2d 430, 437–440 (1990)), but no legal duty arises unless the harm is reasonably foreseeable (*Renslow v. Mennonite Hospital,* 67 Ill. 2d 348, 354055 (1977)); *VanGelderen v. Hokin,* 2011 IL App (1st) 093152, ¶ 15 (citing Restatement (Second) of Torts § 343 (1965)) (A possessor of land may be subject to liability for physical harm caused to his invitees by a condition on the land if he has actual or constructive knowledge of the defective condition); *Simich v. Edgewater Beach Apartments Corp.,* 368 Ill. App. 3d 394, 408 (2006) (Under the theory of premises liability, a landowner may be liable for injuries caused to people coming onto the land even where the condition was not caused by the landowner, but only where the landowner had notice of the condition causing the injury). This court has explained:

"The existence of a duty is a question of law turning on whether, based on the parties' relationship to one another, public policy should impose a duty on the defendant to act with reasonable care toward the plaintiff. *LaFever [v. Kemlite Co.,* 185 Ill. 2d 380, 388–89 (1998) ]. Factors to consider in deciding whether to impose a duty are: (1) the reasonable foreseeability of the injury; (2) the likelihood of the injury; (3) the burden on the defendant to protect against the injury; and (4) the consequences of placing that burden on the defendant. *LaFever,* 185 Ill. 2d at 388–89 \*\*\*. 'When, as here, plaintiff alleges he was injured by a condition on defendant's property \* \* \*, we decide the foreseeability prong of the duty test by reference to section 343 of the Restatement (Second) of Torts.' *LaFever,* 185 Ill. 2d at 389 \*\*\*.

Section 343 of the Restatement reads:

'A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he

(a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and

(b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and

(c) fails to exercise reasonable care to protect them against the danger.' Restatement (Second) of Torts § 343 (1965)." *VanGelderen,* 2011 IL App (1st) 093152, ¶ 16.

**\*15** Accordingly, under both Illinois Law and the Restatement (Second) of Torts, to sustain a claim for premises liability, the plaintiff must establish that the injury was foreseeable by the defendant in that the defendant had ether actual notice or knowledge of the injury-causing condition and risk, or would have had notice or knowledge with the exercise of due care.

**¶ 68** The relevant inquiry for plaintiff's negligence claims are similar for purposes of this case. To properly state a cause of action for negligence, the plaintiff must show that the defendant owed her a duty, that the defendant breached that duty, and that this breach was the proximate cause of his resulting injuries. See *Heastie v. Roberts,* 226 Ill. 2d 515, 556 (2007); *Bermudez v. Martinez Trucking,* 343 Ill. App. 3d 25, 29 (2003). The "touchstone" of a duty inquiry "involves four factors: (1)

the reasonable foreseeability of the injury; (2) the likelihood of the injury; (3) the magnitude of the burden of guarding against the injury; and (4) the consequences of placing the burden on the defendant." *Vancura v. Katris*, 238 Ill. 2d 352, 383 (2010) (citing *Marshall v. Burger King Corp.*, 222 Ill. 2d 422, 463037 (2006)). "[I]t is axiomatic that no legal duty arises unless the harm is reasonably foreseeable." *Keating v. 68th and Paxton, LLC.*, 401 Ill. App. 3d 456, 471 (2010).

¶ 69 The parties do not dispute that defendants owed invitee plaintiff a duty to exercise ordinary care in maintaining its premises in a reasonably safe condition. See *Ward v. K Mart Corp.*, 136 Ill. 2d 132, 141 (1990). Rather, the question in the instant case is whether the plaintiff can establish that the defendants breached this duty. We turn, then, to the questions of notice and foreseeability, as Illinois law is clear that, in the absence of notice or foreseeability, a plaintiff's causes of action for either premises liability or negligence will fail for lack of duty. Of course, as we consider these questions, we do so without evidence concerning the quality of the locks, their expected service life in years or duty cycles, or the adequacy of maintenance as to biannual disassembly and cleaning, all of which were stricken from the Panish affidavit.

¶ 70 Plaintiff's main arguments concerning notice and foreseeability are the same. In the case at bar, there is no evidence that the condominium had actual notice of the hazardous condition, and no argument is made to that effect. Instead, plaintiff contends defendants had constructive notice where the doorknob on building 300 was of low quality, that it was old and past its expected service life, that the door knobs at Regal were generally not properly maintained, and that other door knobs on the premises were beginning to fail.

¶ 71 Where a plaintiff alleges constructive notice, the time element is a material factor, and "[c]onstructive notice can *** be shown where the dangerous condition is shown to exist for a sufficient length of time to impute knowledge of its existence to the defendants. *Ishoo v. General Growth Properties, Inc.*, 2012 IL App (1st) 110919, ¶ 28 (citing *Pavlik v. Wal–Mart Stores, Inc.*, 323 Ill. App. 3d 1060, 1065–66 (2001)); *Buford v. Chicago Housing Authority*, 131 Ill. App. 3d 235, 246 (1985) ("Constructive notice is established where a condition has existed for such a length of time, or was so conspicuous that authorities, by exercising reasonable care and diligence, might have known of it"). "Factors to be considered are the conspicuity of the defect and the length of time it existed." *Palermo v. City of Chicago Heights*, 2 Ill. App. 3d 1004, 473 (1971). Thus, "there is no liability for landowners for dangerous or defective conditions on the premises in the absence of the landowner's actual or constructive knowledge. If the gist of a complaint is that the landowner did not create the condition, the plaintiff must be required to establish that the landowner knew or should have known of the defect." *Tomczak v. Planetsphere, Inc.*, 315 Ill. App. 3d 1033, 1038 (2000). At issue here is whether there is a genuine issue of fact that defendants, by the exercise of reasonable care, should have discovered the dangerous condition of the door handle.

*16 ¶ 72 Here, there is no evidence in the record that defendants knew or should have known about any dangerous condition regarding the doorknob in question that would have caused the doorknob to separate from the door, nor any evidence suggesting the alleged dangerous condition had existed for such a long period of time so as to impute knowledge of its existence to the defendants. See *Ishoo*, 2012 IL App (1st) 110919, ¶ 28. Nobody testified that the subject doorknob was loose or wobbly in any way. Nobody testified there was any previous trouble regarding this doorknob. In fact, EPI Director of Management Stephen Elmore testified that he performs regular, monthly, on-site inspections of the property during which it is his "custom and practice" to inspect every door and door handle system within the Regal property. He does so by pulling on the door handle and moving it "back and forth to see if it wobbles or not [.]" His most recent inspection was just 16 days before Collins' fall, and he did not discover any defective door handles during that inspection.

¶ 73 In addition, cleaning personnel were in building 300 on the morning of Collins' fall and did not discover any problems with the door knobs. Sheryl Busch testified that she and her cleaning assistants enter and/or exit every door of the buildings they clean, including building 300. They had been cleaning the buildings at Regal weekly for 20 years and had never noticed a problem with a door handle. She testified that, if they had noticed a problem, they would have immediately notified EPI. She agreed that "[w]ith respect to this particular doorknob, it functioned appropriately and as [I] would have expected every time [I] used it coming from the outside in for the 22 years that [I've] been doing this up to and including the morning of November 20th of 2013[.]" Total Maintenance cleaner Leslie Van Ginder also testified that she had cleaned the common areas of the Regal buildings, including building 300, for the past eight years, and had never had a problem with the door handle in question.

¶ 74 Total Maintenance owner Dave Busch also testified that, in providing general maintenance for Regal, he performs daily "rounds" of the property during which he looks out for defective conditions on the property. Although he does not inspect the

door handles, he had never seen a door handle fail at Regal and had never heard of a door handle falling off at the Regal property. He testified that he had tightened a screw on a loose doorknob on a different building. He uses the subject exterior door handle approximately once per week and agreed that it "is a door handle that [I] had never observed, felt, or known of having any problems with respect to being loose or otherwise dysfunctional[.]"

¶ 75 Other Regal residents also testified that they had never experienced any problems with the subject door handle. Todd Shaer testified he had lived in building 300 for most of the past 19 years and had never noticed any problems with the door handle. He had, in fact, used the door handle without incident twice the day of injury, including entering the building via the subject door approximately 15 minutes before Collins fell.

¶ 76 Neighbor James Crater also testified he had lived at Regal for many years and never noticed an issue with the subject door handle. He described "tension" on the door where, after opening the door with no trouble using the door handle, there would be a bit more tension than expected in order to fully open the door. He never reported this extra tension to the property management company. He clarified that the tension he mentioned was "nothing with the doorknob [but] tension on the door[.]" He had never heard of any issues with any other doors or door handles on any other buildings at Regal, and never had any "issues relating to any doorknobs either at the exterior doors" of building 300 or any other buildings at Regal. He used the subject door handle the day before Collins' fall and did not notice any problems with it. He also testified that, over the years, he had seen Collins use the door without trouble, and Collins had never complained to him about anything having to do with the functioning of the door handle.

*17 ¶ 77 The subject door handle continued to work satisfactorily up to the very morning of Collins' accident. No evidence indicated that any individual from Regal, EPI, or Total Maintenance observed any unsafe condition prior to plaintiff's fall. Given the number of years that the door handle was in use without incident and the absence of any evidence that would have alerted defendants to the existence of any potentially dangerous condition, there is no genuine issue of material fact as to whether defendants had constructive notice of the dangerous condition of the door handle. See *Britton v. University of Chicago Hospitals*, 382 Ill. App. 3d 1009, 1012 (2008) ("[W]here a structure not obviously dangerous has been in daily use for an extended period of time and has proven adequate, safe, and convenient for the purposes to which it was being put, it may be further continued in use without the imputation of negligence."). Summary judgment was proper.

¶ 78 Additionally, plaintiff contends that summary judgment was error where there remains a material question of fact as to proximate cause. She argues that Collins presented circumstantial evidence that defendants' failure to properly maintain and replace the subject door handle resulted in the handle failing and subsequent injury to Collins, that the issue of proximate cause should be resolved by the jury, and that the trial court should not have "disregarded Panish's 'might or could' opinion testimony. Plaintiff also contends that summary judgment as to Total Maintenance was error where there remains a material question of fact as to the meaning of "general carpentry repairs" in its contract with Regal. Specifically, plaintiff contends that Total Maintenance was obligated to repair the doorknob and failed to do so, resulting in injury to Collins. Plaintiff also contends that Busch of Total Management "should have repaired or replaced the inferior, overused, and dangerous lock before it injured Collins." However, due to our determinations that: (1) the portions of the Panish affidavit relevant to this argument are stricken; and (2) there was no notice here, we find it unnecessary to address these arguments. See *Bagent*, 224 Ill. 2d at 163 (If the plaintiff fails to establish even one element of the cause of action, summary judgment in favor of the defendant is wholly proper).

¶ 79 Based on the lack of evidence here that defendants had actual or constructive notice of a dangerous condition, plaintiff is unable to demonstrate that defendants were negligent. Accordingly, liability may not be imposed and the defendants were entitled to summary judgment.


¶ 80 III. CONCLUSION

¶ 81 For all of the foregoing reasons, we affirm the court's entry of summary judgment in favor of all defendants.

¶ 82 Affirmed.

Justices Pucinski and Cobbs concurred in the judgment.

## All Citations

Not Reported in N.E.3d, 2017 IL App (1st) 152343-U, 2017 WL 951712

Footnotes

[1]    The fall occurred on November 20, 2013. Decedent was hospitalized that day and never regained consciousness to the extent she could communicate about the fall. She died on January 12, 2014.

[2]    The record and parties in this appeal use the terms "doorknob, door handle, and door lock interchangeably." On appeal, we do the same.

[3]    Plaintiff filed an amended complaint, which the court below considered. For ease of discussion, we refer to this amended complaint simply as "the complaint."

[4]    This count is misnumbered in the claim. We renumber the counts appropriately herein.

[5]    Panish previously defined a duty cycle as "the action of turning the door knob to activate the lock function to allow the door to be opened."

[6]    Although she regularly refers to the alleged spoliation of evidence, plaintiff on appeal does not challenge the dismissal of the spoliation of evidence claim.

[7]    Plaintiff points out—and we agree—that defendant Total Maintenance appears to state in its appellate brief that the trial court struck the entirety of the Panish affidavit. We are aware that the trial court only struck Paragraph 7 of the Panish affidavit.

[8]    From his affidavit and resume, we can see that Mr. Panish is licensed in the State of California.

End of Document                                                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

Clement v. Stanley Access Technologies LLC, Not Reported in F.Supp.3d (2016)

2016 WL 4443702
Only the Westlaw citation is currently available.
United States District Court,
W.D. Louisiana,
Lake Charles Division.

Rita Clement et al
v.
Stanley Access Technologies LLC et al.

CIVIL ACTION NO. 2:15-CV-266
|
Signed 08/19/2016

**Attorneys and Law Firms**

Richard E. Wilson, Somer George Brown, Cox Cox et al., Lake Charles, LA, for Rita Clement, et al.

Steven B. Witman, Law Offices of Steven B. Witman, Madisonville, LA, David J. Calogero, Davidson Meaux et al., Lafayette, LA, for Stanley Access Technologies LLC et al.


**MEMORANDUM ORDER**


PATRICIA MINALDI, UNITED STATES DISTRICT JUDGE

**\*1** Before the court is a Daubert Motion (Rec. Doc. 35) filed by plaintiffs Rita Clement and Donald Clement (collectively referred to as "Clement"), a Daubert Motion (Rec. Doc. 36) filed by Stanley Access Technologies LLC ("Stanley") and Wal-Mart Stores, Inc. ("Wal-Mart"), a Motion in Limine (Rec. Doc. 37) filed by Defendants, a Motion to Strike (Rec. Doc. 47) filed by Clement, an Opposition to the Motion in Limine (Rec. Doc. 43) filed by Clement, an Opposition to Clement's Daubert Motion (Rec. Doc. 44) filed by Defendants, an Opposition to Defendants' Daubert Motion (Rec. Doc. 49) filed by Clement, an Opposition to the Motion to Strike (Rec. Doc. 53) filed by Defendants, a Reply (Rec. Doc. 54) filed by Defendants, and a Reply (Rec. Doc. 57) filed by Defendants. For the following reasons, Clement's Daubert Motion (Rec. Doc. 35) is **GRANTED IN PART** and **DENIED IN PART**, Defendants' Daubert Motion (Rec. Doc. 36) is **GRANTED**, Defendants' Motion in Limine (Rec. Doc. 37) is **DENIED**, and Clement's Motion to Strike (Rec. Doc. 47) is **DENIED**.

On December 11, 2013, while Ms. Clement was a patron at the Wal-Mart in Sulphur, Louisiana, she was injured by an automatic door system.[1] The court has jurisdiction over this suit pursuant to 28 U.S.C. § 1332.[2]


MOTION TO EXCLUDE EXPERT TESTIMONY OF DAVID SITTER

Prior to the admission of expert testimony, a district court must ensure that a proposed expert witness meets the criteria set forth in Rule 702 which governs the admissibility of expert opinion testimony. FED. R. CIV. P. 702; *Roman v. W. Mfg., Inc.*, 691 F.3d 686, 692 (5th Cir. 2012) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592-93 (1993) (additional citations omitted)). Federal Rule of Evidence 702 was amended in 2000 "in response to the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, which 'charged trial judges with the responsibility of acting as gatekeepers to exclude unreliable expert testimony.' " *Seaman v. Seacor Marine, L.L.C.*, 326 Fed.Appx. 721, 724 (5th Cir. 2009) (citing

Advisory Committee Notes to FED. R. EVID. 702 (2000 Amendments) (citing *Daubert*, 509 U.S. 579)). Rule 702 states:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702. A trial court has great discretion in making this determination as to both the expert's qualifications as well as to the reliability of the proposed testimony. *Roman*, 691 F.3d at 692 (citing *Whitehouse Hotel Ltd. P'ship v. Comm'r*, 615 F.3d 321, 330 (5th Cir. 2010)).

**\*2** Defendants' proposed expert witness David Sitter, a Stanley employee, seeks to offer the following opinions:

(1) that the subject automatic door and all component parts were designed, manufactured, installed, and included the appropriate warning signage per the requirements of ANSI/BHMA A156.10-2005,

(2) that all servicing performed by [Stanley] on the subject automatic door and component parts was done in accordance with the 2011 Standard,

(3) that the subject automatic door and all component parts were operating in a safe condition, as intended, and in compliance with the 2011 Standard, as shown in the surveillance video before and at the time of Ms. Clement's incident,

(4) that there was no defect in the design, manufacture, installation, and servicing of the subject automatic door and all component parts, and

(5) that Ms. Clement's incident was caused by not exercising the proper care when in the presence of an automatic door.[3]

Sitter's opinions are largely based on a surveillance video, although he also reviewed various filings, depositions, witness statements, warranties, service records, manuals, and guidelines. However, Sitter did not examine the subject automated door and sensors because it was replaced on September 17, 2014, and incorporated different sensors than at the time of the incident. Clement argues that (1) Sitter's methodology is flawed by his reliance on facts which cannot be objectively and independently verified, (2) his expert opinions assumes facts that have not and cannot be established at trial, and (3) he did not provide documents he relied on in forming his opinion. Defendants respond that Sitter is qualified to present his opinions based on his review of the surveillance video with time calculations, and his review of the other documents.

There is no dispute that Sitter is qualified on the subject of automatic doors, though Clement argues that Sitter's opinions are self serving since he is employed by Stanley. The court finds that Sitter's review of the listed materials is sufficient for him to offer opinions one and two. Sitter is free to explain how the automatic doors and sensors generally operate. However, the surveillance video speaks for itself, and Sitter may not offer opinions based on his interpretation of the video. Thus, Sitter may not offer opinions three, four, and five because they unnecessarily encroach on the jury's role as factfinder. To summarize, Sitter may testify as to how automatic doors and sensors of that type generally operate to give the jury a basis for comparison, but not on whether the automatic doors and sensors were operating correctly on the day of the incident, or whether Clement was exercising proper care. Accordingly, Clement's motion is **GRANTED IN PART** and **DENIED IN PART**.

MOTION TO EXCLUDE EXPERT TESTIMONY OF MICHAEL PANISH

Defendants seek to preclude Michael Panish from giving any expert testimony. According to Defendants, Panish testified that (1) he is not certified by the American Association of Automatic Door Manufacturers ("AAADM"), (2) the last time he performed beta testing for services to determine the viability of automatic doors was approximately thirty-five (35) years ago, (3) the last time he serviced automatic doors was roughly fifteen (15) years ago, (4) he is not an expert in warning and/or in safety engineering, (5) he never qualified as an expert in automatic doors in the State of Louisiana, (6) he never inspected the automatic doors in questions, (7) he did not have the automatic door service records when he rendered his report, and (8) he went to an un-accredited college in the recording industry. Defendants conclude that Panish's testimony is based solely on lack of expertise, speculation, and subjective belief.

**\*3** Clement asserts that Panish testified based on his experience, a review of the applicable standards of the AAADM, and the surveillance video. The heart of Clement's argument, however, appears to be that if Defendants' expert Sitter is allowed to offer expert testimony based on the surveillance video, then Panish should be allowed to testify. As explained above, Sitter will be allowed to discuss the normal operation of those types of automatic doors and sensors, but it will be left to the jury to determine whether the automatic doors and sensors were operating properly based on the surveillance video. Given the lack of Panish's qualifications, the court finds that his expert testimony must be excluded. Thus, Defendant's motion is **GRANTED**.

## MOTION TO EXCLUDE AAADM CERTIFIED INSPECTOR PROGRAM COURSE MATERIALS

Defendants argue that the AAADM Certified Inspector Program course materials are irrelevant and are not admissible under FED. R. EVID. 401, 402, and 403. However, as Clement notes, Defendants' expert witness Sitter reviewed the course materials in formulating his opinions. The court finds that the course materials are relevant and admissible, and thus Defendants' motion is **DENIED**.

## MOTION TO STRIKE MEDICAL CAUSATION

Finally, Clement moves to strike Defendants' pleadings denying medical causation arguing Defendants have not produced any evidence or testimony to contradict Dr. Jonathon Foret's opinion that the medical treatment provided for Ms. Clement's hip fracture is related to the incident. Defendants respond that Clement did not produce an expert report giving the opinions of Dr. Foret to the medical causation of each and every injury sustained. Because the Clement has the burden of proof regarding medical causation, the motion to strike is **DENIED**.

## CONCLUSION

**IT IS ORDERED** that Clement's Daubert Motion (Rec. Doc. 35) is **GRANTED IN PART** and **DENIED IN PART**.

**IT IS FURTHER ORDERED** that Sitter may not offer opinions three, four, and five during his testimony, or otherwise testify as to whether the automatic doors and sensors were operating correctly on the day of the incident, or whether Clement was exercising proper care.

**IT IS FURTHER ORDERED** that Defendants' Daubert Motion (Rec. Doc. 36) is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendants' Motion in Limine (Rec. Doc. 37) is **DENIED**.

**IT IS FURTHER ORDERED** that Clement's Motion to Strike (Rec. Doc. 47) is **DENIED**.

Lake Charles, Louisiana, this 19 day of August, 2016.

**All Citations**

Not Reported in F.Supp.3d, 2016 WL 4443702

Footnotes

| | |
|---|---|
| 1 | Pet. (Rec. Doc. 2) ¶ 2. |
| 2 | Notice of Removal (Rec. Doc. 1). |
| 3 | Report of David J. Sitter (Rec. Doc. 35-3). |

End of Document                                   © 2018 Thomson Reuters. No claim to original U.S. Government Works.

Bailey v. Stanley Access Technologies, Inc., Not Reported in F.Supp.3d (2015)

98 Fed. R. Evid. Serv. 1202

2015 WL 6828921

United States District Court,
N.D. Mississippi,
Oxford Division.

Mariam BAILEY, Plaintiff
v.
STANLEY ACCESS TECHNOLOGIES, INC., and Desoto Inns, Inc., Defendants.

Civil Action No. 3:14–CV–72–SA–JMV.
|
Signed Nov. 6, 2015.

**Attorneys and Law Firms**

Michael J. Crow, Beasley Allen Crow Methvin Portis & Miles, PC, Montgmery, AL, William Corban Gunn, Corban Gunn, PLLC, Biloxi, MS, for Plaintiff.

Fred Exzell Bourn, III, Jonathan Hoyt Still, Butler Snow LLP, Ridgeland, MS, Jonathan Stuart Masters, Geoffrey Felix Calderaro, Holcomb Dunbar, Oxford, MS, for Defendants.

MEMORANDUM OPINION

SHARION AYCOCK, District Judge.

**\*1** This matter comes before the Court on the Complaint [1] of Mariam Bailey, who seeks damages for injuries she sustained while a guest at the Hampton Inn hotel owned by Desoto Inns. Bailey asserts various claims for negligence, gross negligence, *res ipsa loquitur,* and punitive damages. Each party anticipates having their own expert witness report and testify on their behalf.

DeSoto Inns filed motions to exclude the testimony of Plaintiff's expert [99] and Stanley's expert [97]. Desoto Inns also filed a motion to strike two motion memoranda supplements filed by Plaintiff [142].

Stanley filed motions to exclude the testimony of Plaintiff's expert [106] and DeSoto Inn's expert [108]. Stanley has also filed a motion to strike a supplemental report by Plaintiff's expert as untimely [101].

Finally, both Defendants filed separate motions for summary judgment [95, 110].

*Factual and Procedural Background*

On the afternoon of May 3, 2013 Mariam Bailey and her husband checked into the Hampton Inn hotel in Olive Branch, Mississippi. Plaintiff contends that while walking through the entryway, the hotel's automatic sliding door prematurely closed, striking her, and causing her to fall to the ground, fracturing her left hip, and sustaining other injuries.

Stanley Access Technologies manufactured and performed service on the automatic doors since their installation in 1998 when the hotel was built. Although DeSoto Inns did not have a maintenance or preventative-maintenance contract with

Stanley, Stanley has performed maintenance and service on the doors on an as-needed basis.

The allegations in the Plaintiff's Complaint [1] relate predominately to the Defendants' alleged failure to properly inspect and maintain the automatic sliding doors, to warn of potential danger, and to keep the doors in proper working order. Both Defendants have answered, and substantial discovery has taken place. The Court will first address the motions to strike and the motions to exclude because they affect, at least in part, the summary judgment analysis.

*Motions to Strike*

*Second Supplemental Report of Davis*
Plaintiff submitted a second (supplemental) report by Davis dated June 28, 2015 that is the subject of a motion to strike [101] as untimely. The Court finds that the Report and Recommendations of the United States Magistrate Judge dated September 9, 2015, were on that date duly served upon the parties, more than fourteen days have elapsed since service of said Report and Recommendations, and that no objection was filed or served by any party. The Court is of the opinion that the magistrate judge's Report and Recommendations should be approved and adopted as the opinion of the Court. Therefore, the Report and Recommendations of the United States Magistrate Judge dated September 9, 2015, are hereby approved and adopted as the opinion of the Court. Defendant Stanley Access Technologies, Inc.'s Motion [101] to Strike Plaintiff's Untimely Supplemental Expert Report is granted, and the supplemental expert report of Dr. Warren Davis is hereby stricken.

*Memoranda Supplements*
**2** On September 8, 2015, Plaintiff filed a supplement [138] to her memorandum in opposition [120] to DeSoto Inn's motion for summary judgment [95][1], and a supplement [139] to her memorandum in opposition [126] to DeSoto Inn's motion to exclude Davis [99][2]. DeSoto Inns filed a motion [142] to strike these two supplements, and Plaintiff did not respond.

Plaintiff submitted these supplements without leave of Court, outside the clearly established deadlines, and in violation of Local Rule 7. *See* L.U. CIV. R 7(b). As a practical matter, Plaintiff filed these supplements after DeSoto Inns' relevant replies had already been filed,[3] leaving no opportunity for DeSoto Inns to reply to the additional information.

In submitting these supplements, Plaintiff represented to the Court that the supplements were merely signed, notarized versions of the unsigned affidavits that were originally submitted [120–28, 126–3]. This is not the case. The Plaintiff's supplements contain nine additional pages of opinions, arguments, and findings by Plaintiff's intended expert witness Warren Davis. For all intents and purposes, these documents are actually supplemental expert reports, containing new opinions by Davis. Discovery closed in this case on March 2, 2015.

*Legal Standard*
Federal Rule of Civil Procedure 26(a)(2)(B) requires parties to serve expert disclosures containing "a complete statement of all opinions the witness will express and the basis and reasons for them...." *See* FED.R.CIV.P. 26(a)(2)(B); *see also Sierra Club, Lone Star Chapter v. Cedar Point Oil Co.,* 73 F.3d 546, 569 (5th Cir.1996). The purpose of Rule 26(a)(2) is "to eliminate unfair surprise to the opposing party." *Hill v. Koppers,* No. 3:03CV60, 2009 WL 3246630, at *2 (N.D.Miss. Sept. 30, 2009) (citations and internal quotations omitted).

Federal Rule of Civil Procedure 26(e)(1) provides that parties are under a duty to supplement their disclosures or discovery responses where they learn that a prior response was incomplete or incorrect and the additional corrective information was not otherwise known to the other parties during the discovery process. However, Rule 26(e) only applies to supplementation, not entirely new expert opinions. *See Ovella v. B & C Constr. & Equip., LLC,* No. 1:10CV285, 2011 U.S. Dist. LEXIS 93009, at *4–5, 2011 WL 3665120 (S.D.Miss. Aug. 5, 2011); *Charles v. Sanchez,* No. EP–13–CV00193, 2015 U.S. Dist. LEXIS 22752, at *27, 2015 WL 808417 (W.D.Tex. Feb. 24, 2015). "Rule 26(a)(2) does not allow parties to cure deficient

expert reports by supplementing them with later deposition testimony. The purpose of Rule 26(a)(2) is to provide notice to opposing counsel—before the deposition-as to what the expert witness will testify...." *Hill v. Koppers,* 2009 WL 3246630 at *2 (citing *Ciomber v. Cooperative Plus, Inc.,* 527 F.3d 635, 642 (7th Cir.2008). *See also Salgado v. General Motors Corp.,* 150 F.3d 735, 741–42, n. 6 (7th Cir.1998); *Sierra Club, Lone Star Chapter v. Cedar Point Oil Co., Inc.,* 73 F.3d 645, 571 (5th Cir.1996) ("The purpose of rebuttal and supplementary disclosures is just that-to rebut and to supplement"); *Shelter Mut. Ins. Co. v. Culbertson's Ltd., Inc.,* No. 97–1609, 97–1969, 1999 WL 135297, at *4 (E.D.La. Mar.11, 1999) (expert report discussing issues not included in initial report cannot be considered "supplementary").

**\*3** Although the Federal Rules of Civil Procedure provide for supplementation, parties do not have infinite time to supplement their experts' opinions with new information to respond to challenges to their experts' original evidence. Courts have stricken supplemental reports to the extent they go beyond opinions expressed in the experts' Rule 26 reports. *Avance v. Kerr–McGee Chem. LLC,* No. 5:04–CV–209, 2006 U.S. Dist. LEXIS 87224, at *21, 2006 WL 4108454 (E.D.Tex. Nov. 30, 2006) (citing *Beasley v. U.S. Welding Svc., Inc.,* 129 Fed. App'x 901, 902 (5th Cir.2005)). Also pertinent here is Rule 26(a)(5) of the Uniform Local Rules for the Northern and Southern Districts of Mississippi which provides: "A party is under a duty to supplement disclosures at appropriate intervals under Federal Rule of Civil Procedure 26(e) and in no event later than the discovery cut-off established by the case management order." L.U. CIV. R. 26(a)(5). A party who fails to comply with Rule 26 "bears the burden to show that its actions were substantially justified or harmless." *Avance v. Kerr–McGee Chem. LLC,* No. 5:04–CV–209, 2006 U.S. Dist. LEXIS 87224, at *21, 2006 WL 4108454 (E.D.Tex. Nov. 30, 2006) (excluding late filed report where plaintiffs failed to demonstrate " 'substantial justification' why the revisions and new affidavits were filed after the expert deadline...."). Additionally, Federal Rule of Civil Procedure 16(b) "authorizes the district court to control and expedite pretrial discovery through a scheduling order." *Geiserman v. MacDonald,* 893 F.2d 787, 790 (5th Cir.1990).

Exclusion of evidence as a means of enforcing a pretrial order pursuant to Rule 16 or imposing sanctions under Rule 37(c)(1) involves consideration of four factors:
(1) the explanation for the failure to identify the witness[4]

(2) the importance of the testimony;

(3) potential prejudice in allowing the testimony; and

(4) the availability of a continuance to cure such prejudice.
*Id.* at 791; *Hamburger v. State Farm Mut. Auto. Ins. Co.,* 361 F.3d 875, 883 (5th Cir.2004); *see also Kmart Corp. v. Kroger Co.,* No. 1:11–CV–00103, 2013 WL 6681614, at *3–4 (N.D.Miss. Dec. 18, 2013).

The first factor is self-explanatory. With respect to the second, importance of the testimony, the Fifth Circuit has stated that "[t]he claimed importance of expert testimony underscores the need for [plaintiff] to have timely designated his expert witness." *Geiserman,* 893 F.2d at 792. *See also Hamburger,* 361 F.3d at 883. The same holds true for new opinions offered by a previously designated witness. *Barrett v. Atlantic Richfield Co.,* 95 F.3d 375, 381 (5th Cir.1996). Moreover, the importance of the testimony "cannot singularly override the enforcement of local rules and scheduling orders." *Id.* (internal citation omitted).

As to the third factor, the Fifth Circuit has noted that a delay of even a few weeks in disclosing expert testimony disrupts the court's schedule and the opponent's preparation and, therefore, is prejudicial. *Geiserman,* 893 F.2d at 791; *see also Williams v. Gonzales,* No. 104–CV–342, 2005 WL 3447885, at *6 (E.D.Tex. Dec. 14, 2005) (citing *Geiserman,* 893 F.2d at 791) ("Disruption of the court's discovery schedule and the opponent's preparation constitutes sufficient prejudice to militate in favor of the exclusion of [expert] testimony.").

**\*4** Finally, the Fifth Circuit has held that while continuances may be possible to allow the other party to address the new testimony, it is within this Court's discretion to exclude such testimony where a continuance could result in additional expense in defending the lawsuit and would not serve to enforce local rules or court imposed scheduling orders. *Id.* at 792; *accord Barrett,* 95 F.3d at 381; *Sierra Club,* 73 F.3d at 573. As the *Hamburger* court noted, just "[b]ecause of a trial court's need to control its docket, a party's violation of the court's scheduling order should not routinely justify a continuance." *Hamburger,* 361 F.3d at 884.[5]

*Analysis*

Plaintiff has not responded to the instant motion to strike, and offers no explanation or justification for the submission of new opinions more than four months after the close of discovery. The prejudice of allowing such a late disclosure is obvious. DeSoto Inns will now have no opportunity to have its own expert opine on these new subjects. Nor will it be able to discover and depose witnesses relative to the new opinions.

Finally, no party has requested a continuance in this case. However, continuing the case to permit Plaintiff to reopen discovery, to assert new opinions first advanced well after the close of discovery would add substantial expense to the defendant's trial preparation efforts and expenses.

For these reasons, DeSoto Inns' Motion to Strike [142] is granted and the supplemental affidavits of Warren Davis [138–1, 139–1] are stricken.

*Expert Testimony*

The admissibility of expert testimony is governed by *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and the post-*Daubert* amendments to Federal Rule of Evidence 702. *See Guy v. Crown Equip. Corp.,* 394 F.3d 320, 325 (5th Cir.2004). Rule 702 states the following:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

FED.R.EVID. 702.

The purpose of Rule 702 is to guide the district court's gatekeeping function. *Guy,* 394 F.3d at 325. Before allowing a witness to testify as an expert, a court "must be assured that the proffered witness is qualified to testify by virtue of his 'knowledge, skill, experience, training, or education.' " *Wilson v. Woods,* 163 F.3d 935, 937 (5th Cir.1999) (quoting FED. R. EVID . 702). Further, the fact that a proposed witness is an expert in one area does not qualify him to testify as an expert in all related areas. *Id.* at 938. Therefore, "[a] district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject." *Id.* at 937.

**\*5** A court's gatekeeping function also involves ensuring that "the expert uses reliable methods to reach his opinions," and that those opinions are "relevant to the facts of the case." *Guy,* 394 F.3d at 325. "Reliability is determined by assessing 'whether the reasoning or methodology underlying the testimony is scientifically valid.' Relevance depends upon 'whether that reasoning or methodology properly can be applied to the facts in issue.' " *Knight v. Kirby Inland Marine Inc.,* 482 F.3d 347, 352 (5th Cir.2007) (quoting *Daubert,* 509 U.S. at 589, 113 S.Ct. 2786, 125 L.Ed.2d 469); *see also United States v. Fields,* 483 F.3d 313, 342 (5th Cir.2007). The party offering the expert bears the burden of establishing reliability by a preponderance of the evidence. *Moore v. Ashland Chem., Inc.,* 151 F.3d 269, 276 (5th Cir.1998) (en banc).

In *Daubert,* the Supreme Court described several non-exclusive factors that trial judges should consider in gauging reliability, including whether the proposed technique or theory can be or has been tested, whether it has been subjected to peer review

and publication, whether its error rate is acceptable, whether the theory is generally accepted in the scientific community, and whether there are standards controlling the technique. *Guy,* 394 F.3d at 325; *Knight,* 482 F.3d at 351. It later instructed that "the reliability analysis must remain flexible: not every *Daubert* factor will be applicable in every situation; and a court has discretion to consider other factors it deems relevant." *Guy,* 394 F.3d at 325 (citation omitted); *see also Hathaway v. Bazany,* 507 F.3d 312, 318 (5th Cir.2007). The Fifth Circuit has quoted with approval the Seventh Circuit's observation that "[u]nder the regime of *Daubert* a district judge asked to admit scientific evidence must determine whether the evidence is genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist." *Moore,* 151 F.3d at 278 (quoting *Rosen v. Ciba–Geigy Corp.,* 78 F.3d 316, 318 (7th Cir.1996)).

The *Daubert* analysis applies to the process of the expert's conclusions, not the merits of the conclusions themselves. *Guy,* 394 F.3d at 325. The merits remain subject to attack at trial under traditional principles of "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Daubert,* 509 U.S. at 596, 113 S.Ct. 2786, 125 L.Ed.2d 469. "[I]n determining the admissibility of expert testimony, the district court should approach its task 'with proper deference to the jury's role as the arbiter of disputes between conflicting opinions.' " *United States v. 14.38 Acres of Land, More or Less Situated in Leflore Cnty., State of Miss.,* 80 F.3d 1074, 1077 (5th Cir.1996) (quoting *Viterbo v. Dow Chem. Co.,* 826 F.2d 420, 422 (5th Cir.1987)). As a general rule, "questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration." *Id.*


## A. Plaintiff's Expert Warren Davis

### 1. DeSoto Inns' Motion to Exclude Warren Davis—Expert for Plaintiff

*6 Plaintiff has designated Warren Davis as their expert witness in this case to testify about the use of inspections to detect problems with automatic doors, the engineering principles involved in automatic door sensors, and relevant industry standards. Davis has a Ph.D. in physics from the Massachusetts Institute of Technology and a significant background in science. A substantial portion of Davis' knowledge and experience specific to automatic doors comes from his work as a professional expert witness for approximately twenty years. According to Davis, he also holds two patents related to automatic doors and has contributed to the development of industry standards for automatic doors.

"Whether a witness is qualified to testify as an expert is left to the sound discretion of the trial judge, who is in the best position to determine both the claimed expertise of the witness and the helpfulness of his testimony." *Elliot v. Amadas Indus., Inc.,* 796 F.Supp.2d 796, 805 (S.D.Miss.2011) (quoting *Sullivan v. Rowan Cos.,* 952 F.2d 141, 144 (5th Cir.1992)). An expert is not *per se* unqualified just because they are a professional witness. *Spansel v. State Farm Fire & Cas. Co.,* No. 1:08–CV–1516, 2010 WL 415264, at *5 (S.D.Miss. Jan.27, 2010). Status as a professional witness "goes to bias only, and thus to the weight and credibility of his testimony." *Id.* If his testimony is to be rejected on this basis, "it is for the jury to do so, not the Court." *Id.*

For purposes of summary judgment, and considering Davis' experience specifically related to automatic door sensors and the industry, as well as his science background, the Court finds that Davis is qualified to testify about the use of inspections to detect problems with automatic doors, the engineering principles involved in automatic door sensors, and relevant industry standards.

Desoto Inns argues that Davis' report and testimony should be excluded to the extent he asserts that: had DeSoto Inns performed daily safety inspections on the subject automatic sliding doors, any problems would have been discovered, thus preventing the Plaintiff's injuries. According to Davis' expert report dated October 30, 2015[6], this is an opinion he is likely to offer at trial.

DeSoto Inns' argument implicates two distinct opinions by Davis. The first involves the functioning of the doors and the effectiveness of daily inspections more generally. The second encompasses causation, specifically that the failure to perform inspections caused the Plaintiff's injuries.

Under Rule 702, the first question the Court must answer is do Davis' opinions qualify as "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." FED.R.EVID.

702(a). Expert testimony is not necessary to inform the jury about affairs "within the understanding of the average [person]." *Elliot,* 796 F.Supp.2d at 805; *United States v. Moore,* 997 F.2d 55, 57 (5th Cir.1993) (quoting *United States v. Webb,* 625 F.2d 709, 711 (5th Cir.1980)). While Davis' opinions have their origins in technical knowledge, he leaves the area of technical knowledge when he opines about causation, and the prevention of Plaintiff's injuries. Specifically, Davis' testimony about the scope, methodology, and effectiveness of daily inspections may assist the trier of fact to understand the evidence in this case. FED.R.EVID. 702(a). However, whether the failure to perform the inspections ultimately caused the Plaintiff's injuries is a question for the jury. *Thomas v. Great Atl. & Pac. Tea Co.,* 233 F.3d 326, 329–30 (5th Cir.2000) (holding "the issue of proximate or contributing causation is likewise one for the trier of fact").

**\*7** Further, Davis' opinion about causation embraces an ultimate issue in the case, and goes to the heart of Plaintiff's negligence claim against DeSoto Inns. Federal Rule of Evidence 704 abolished the per se rule against testimony regarding ultimate issues of fact. *United States v. Grote,* 632 F.2d 387, 390 (5th Cir.1980), cert. denied, 454 U.S. 819, 102 S.Ct. 98, 70 L.Ed.2d 88 (1981); *United States v. Miller,* 600 F.2d 498, 500 (5th Cir.1979), cert. denied, 444 U.S. 955, 100 S.Ct. 434, 62 L.Ed.2d 327 (1979). The rule provides that "an opinion is not objectionable just because it embraces an ultimate issue." FED.R.EVID. 704. However, Rule 704 does not require the automatic admission of all opinions either. The notes to the rule promulgated by the Advisory Committee make it clear that questions and opinions that allow the witness to instruct the jury as to what result to reach are not permitted. *Id.* "Nor is the rule intended to allow a witness to give legal conclusions." *Owen v. Kerr–McGee Corp.,* 698 F.2d 236, 240 (5th Cir.1983); *see also: United States v. Fogg,* 652 F.2d 551, 557 (5th Cir.1981), cert. denied, 456 U.S. 905, 102 S.Ct. 1751, 72 L.Ed.2d 162 (1982); *United States v. Milton,* 555 F.2d 1198, 1203 (5th Cir.1977).

In this case, Davis' opinion appears to be specifically tailored to answer the causation question, did DeSoto Inns' failure to inspect cause the Plaintiff's injuries. The causation portion of Davis' opinion is a legal conclusion, and as such is improper subject matter for expert testimony. *See* Restatement (Second) of Torts §§ 328B–C (1965).

For these reasons, DeSoto Inns' motion to exclude the expert testimony of Warren Davis is granted in part and denied in part. Davis' testimony is excluded to the extent it provides a conclusion to the jury about causation and the definitive causal link between DeSoto Inns' alleged failure to perform daily inspection and the Plaintiff's injuries. At this time, Davis' opinions about the methodology and effectiveness of daily inspections are not excluded.

*2. Stanley Technologies' Motion to Exclude Warren Davis—Expert for Plaintiff*
Defendant Stanley argues that Davis' opinions directed at them should be excluded for similar reasons. However, while Davis' opinions directed at DeSoto Inns involve causation, Davis' opinions directed at Stanley mostly support the Plaintiff's allegation that Stanley owed a duty to the Plaintiff, an allegation that Stanley repeatedly denies. Stanley objects to the admission of all of Davis' opinions that pertain to them.

Davis' opinions numbered two, five, and six in his October 30, 2015 report mostly relate to the way automatic doors like the ones in this case operate. These opinions include several possible explanations for a malfunction or defect offered to explain the cause of the alleged premature closing, and explanations of how automatic door sensors work.

While the average juror is certainly familiar with automatic doors given how many are installed in public places, it is not likely that the average juror is familiar with their more technical aspects, such as how the sensors actually function. *Elliot,* 796 F.Supp.2d at 805; *Moore,* 997 F.2d at 57. Given the allegation in this case, that the doors prematurely closed on the Plaintiff, Davis' technical knowledge about the door sensors, timing, and closing mechanisms could assist the "trier of fact to understand the evidence." FED.R.EVID. 702(a).

**\*8** As discussed above, the bases for Davis' opinions are insufficient to provide a definitive answer to the causation question at issue in this case. However, the bases are sufficient to provide a basis for Davis' opinions about how the doors and sensors function in the technical sense. FED. R. EVID. 702(b); *Daubert,* 509 U.S. at 590, 113 S.Ct. 2786, 125 L.Ed.2d 469). The Court may admit an opinion "[i]f experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject ..." FED.R.EVID. 703. The Defendants have not presented any evidence or argument that Davis' opinions are based on information not typically relied on by experts in the field.

**Bailey v. Stanley Access Technologies, Inc., Not Reported in F.Supp.3d (2015)**
98 Fed. R. Evid. Serv. 1202

To the extent that Davis' opinions concern the specifics of the alleged incident involving the Plaintiff, Stanley will have the opportunity at trial to challenge the bases and merits of these opinions. As a general rule, "questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration." *Elliot,* 796 F.Supp.2d at 805 (quoting *Viterbo,* 826 F.2d at 422). The merits remain subject to attack at trial under traditional principles of "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Daubert,* 509 U.S. at 596, 113 S.Ct. 2786, 125 L.Ed.2d 469.

For these reasons, the Court finds that Davis' opinions numbered two, five, and six in his October 30, 2015 report are not excluded at this time.

Davis' remaining opinions' mostly relate to Stanley's professional obligations and the industry standards applicable to automatic doors and door service technicians. Stanley's primary objection to these opinions is that they are inaccurate, especially as applied to the facts in this case. It is important to note that Stanley does not necessarily disagree with the industry standards cited by Davis, but with Davis' application and interpretation of the standards.

The Defendants have not presented any evidence or argument that these opinions are based on information not typically relied on by experts in the field. FED.R.EVID. 703. The *Daubert* analysis "applies to the process of the expert's conclusions, not the merits of the conclusions themselves." *Guy,* 394 F.3d at 325. The merits remain subject to attack at trial under traditional principles of "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Daubert,* 509 U.S. at 596 113 S.Ct. 2786. For these reasons, Davis' remaining opinions directed at Stanley are not excluded at this time.

Finally, some portions of Davis' report embraces the ultimate issue of whether Stanley owed a duty to Plaintiff. Consistent with the analysis of Davis' opinion related to DeSoto Inns and causation outlined above, Davis' opinion as to Stanley is excluded to the extent that he seeks to provide a definitive legal conclusion to the jury about Stanley's duty to the Plaintiff.

*B. Stanley Technologies Expert—David Sitter*
**\*9** Stanley has designated David Sitter as their expert witness in this case. Sitter's report shows that he intends to offer testimony about the effectiveness of daily inspections on automatic doors, and the implications of DeSoto Inns' failure to perform inspections. Sitter is an electrical engineer, and the senior safety assurance manager for Stanley Black & Decker, Inc. Sitter is a member of a number of professional organizations related to the automatic door industry. DeSoto Inns' objection to Sitter's testimony tracks its objection to Davis' analyzed above. Desoto Inns argues that Sitter's report and testimony should be excluded to the extent he asserts that: had DeSoto Inns performed daily safety inspections on the subject automatic sliding doors, any problems would have been discovered, thus preventing the Plaintiff's injuries. According to Sitter's expert report, this is an opinion he is likely to offer at trial.

As with Davis' opinions, Sitter's report implicates the distinct subjects of the effectiveness of inspections, and the causation of the Plaintiff's injuries.

Consistent with the Court's analysis of Davis' testimony, Defendant DeSoto Inns' motion to exclude the expert testimony of Sitter is granted in part and denied in part. Sitter's testimony is excluded to the extent it provides a conclusion to the jury about causation and the definitive causal link between DeSoto Inns' alleged failure to perform daily inspection and the Plaintiff's injuries. *Owen,* 698 F.2d at 240; *see also; Fogg,* 652 F.2d at 557 (5th Cir.1981), cert. denied, 456 U.S. 905, 102 S.Ct. 1751, 72 L.Ed.2d 162; *Milton,* 555 F.2d at 1203. Sitter's opinions about the methodology and effectiveness of daily inspections are not excluded.

*C. DeSoto Inns' Expert—Michael Panish*
Stanley explicitly objects to four opinions of DeSoto Inns' designated expert witness Michael Panish. The four opinions at issue are:

    1) that DeSoto Inns did not know they were supposed to perform daily safety checks;

2) that Stanley never informed DeSoto Inns about the need to perform daily safety checks;

3) that when he inspected the subject door eighteen months after the accident the sensor was maladjusted; and

4) that any time Stanley worked on the subject door, Stanley should have performed a thorough investigation to determine that the door was operating properly.

Stanley objects to Panish's first two opinions on the basis that they are improper subjects for expert testimony and invade the province of the jury. Rule 702 states that an expert may testify in the form of an opinion or otherwise if, "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." FED. R. EVID. 702(a). Panish's first two opinions are not related to any "scientific, technical, or specialized knowledge" that could necessitate the opinion of an expert to "help the trier of fact to understand the evidence or to determine a fact in issue." *Id.* What DeSoto Inns knew or did not know is not a proper subject for expert testimony. Similarly, what Stanley did or did not tell DeSoto Inns is also not a proper subject for expert testimony. The bases of Panish's first two opinions, the depositions of hotel management and employees, demonstrate that the jury does not need an expert to opine further on facts and testimony already before the Court. *See* FED.R.EVID. 701–2(a). Expert testimony "serves to inform the jury about affairs not within the understanding of the average [person]." *Elliot,* 796 F.Supp.2d at 805; *Moore,* 997 F.2d at 57 (quoting *Webb,* 625 F.2d at 711). The Court finds that the subject matter of Panish's first two opinions is well within the understanding of the average juror, and that Panish's testimony is likewise unnecessary to establish the bases of these opinions. For these reasons, Stanley's motion to exclude Panish's first two opinions is granted.

**\*10** Stanley objects to Panish's third opinion arguing that the timing of his inspection, eighteen months after the accident, was too far removed in time to be relevant to Plaintiff's case. DeSoto Inns argues, that the mere fact that an inspection came years after the alleged incident does not render the expert opinion irrelevant. However, while the mere passage of time may not render Panish's testimony irrelevant, changes in the condition of the doors in the time between the alleged incident and the inspection does. It is undisputed that at least some changes were made to the subject doors after the incident and before Panish's inspection.[x]

In *LeBoeuf v. K–Mart Corp.,* the Fifth Circuit upheld a district court's exclusion of expert testimony based on an inspection of a store premises two years after an accident. *LeBoeuf v. K–Mart Corp.,* 888 F.2d 330, 333 (5th Cir.1989). The District Court based it's exclusion on the fact that the relevant issue before that Court was whether a dangerous condition existed at the time of the accident, not two years later. *Id.* The Court finds, consistent with *LeBoeuf,* that Panish's opinion that the subject door's sensor was maladjusted eighteen months after the incident is not relevant, and may tend to mislead the jury because, "it's what was happening at the time of the accident that counts." *Id.* However, this finding is not a wholesale rejection of all of Panish's opinions derived from his inspection. For these reasons, Stanley's motion to exclude Panish's third opinion is granted.

Finally, Stanley argues that Panish's fourth opinion should be excluded under Federal Rule of Evidence 703. However, Stanley has presented no evidence that Panish based his opinion on facts or data on which experts in the field would not typically rely. FED R. EVID. 703. Instead, Stanley argues Panish's fourth opinion is irrelevant because Panish does not opine that Stanley's *actual* service was deficient, only generally that Stanley *should have* performed thorough investigations.

Again, Stanley's objections to Panish's fourth opinion go more to weight than admissibility. *Elliot,* 796 F.Supp.2d at 805 (quoting *Viterbo,* 826 F.2d at 422). At trial, Stanley will have the opportunity to cross-examine Panish and question the bases of his opinions. "[Q]uestions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration." *Id.* The merits of Panish's opinions remain subject to attack at trial. *Daubert,* 509 U.S. at 596, 113 S.Ct. 2786, 125 L.Ed.2d 469. For these reasons, Stanley's motion to exclude Panish's fourth opinion is denied.

In summary, Defendant Stanley's motion to exclude the expert testimony of Michael Panish is granted in part and denied in part. Panish's first three opinions above are excluded, and Panish's fourth opinion is admitted.

*D. Conclusion: Motions to Exclude Expert Testimony*

98 Fed. R. Evid. Serv. 1202

**\*11** This determination by the Court on the admissibility of these opinions is made for purposes of summary judgment. The expert reports contain statements of fact, opinions, and legal conclusions. If trial testimony follows the contours of the reports, some of it will likely be inadmissible, while some will likely be admissible. Therefore, the complete exclusion of any of these witnesses is premature at this point. However, the Court urges the parties to keep the broad guidelines and specific cases cited above in mind. The Court will not admit expert testimony that amounts to nothing more than mere legal conclusions. When disputed testimony arises at trial, the Court expects the parties to present specific case law to support the admission or exclusion of that particular testimony. The Court will consider objections on a case-by-case basis at trial, and this ruling has no effect on potential motions at trial or after trial concerning damages and sufficiency of the evidence.

### Summary Judgment

Both Defendants submitted Motions for Summary Judgment [95, 110] arguing that Plaintiff has failed to establish the necessary elements of her claims, and demanding judgment as a matter of law in their favor. The Plaintiff has responded and the Defendants have replied making these issues ripe for review.

### Summary Judgment Standard

Federal Rule of Civil Procedure 56 governs summary judgment. Summary judgment is warranted when the evidence reveals no genuine dispute regarding any material fact, and the moving party is entitled to judgment as a matter of law. FED.R.CIV.P. 56(a). The rule "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265. The nonmoving party must then "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine issue for trial.' " *Id.* at 324, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (citation omitted). In reviewing the evidence, factual controversies are to be resolved in favor of the non-movant, "but only when ... both parties have submitted evidence of contradictory facts." *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994) (en banc). When such contradictory facts exist, the Court may "not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). Conclusory allegations, speculation, unsubstantiated assertions, and legalistic arguments are not an adequate substitute for specific facts showing a genuine issue for trial. *TIG Ins. Co. v. Sedgwick James of Wash.,* 276 F.3d 754, 759 (5th Cir.2002); *SEC v. Recile,* 10 F.3d 1093, 1097 (5th Cir.1997); *Little,* 37 F.3d at 1075. Mississippi substantive law applies in this diversity case. *See Cox v. Wal–Mart Stores E., L.P.,* 755 F.3d 231, 233 (5th Cir.2014) (citing *Wood v. RIH Acquisitions MS II, LLC,* 556 F.3d 274, 275 (5th Cir.2009)).

### Premises Liability in Mississippi

**\*12** The analysis of premises liability claims, like the ones in this case, under Mississippi law requires a determination on three fronts: (1) legal status of the injured person, (2) relevant duty of care, and (3) defendant's compliance with that duty." *Wood,* 556 F.3d at 275 (citing *Massey v. Tingle,* 867 So.2d 235, 239 (¶ 12) (Miss.2004)). In this case, the parties agree the Plaintiff was a business invitee at the relevant times.

A premises owner has a duty of reasonable care, to "maintain its premises in a reasonably safe condition," but a premises owner is "not an insurer of the safety of invitees." *Pigg v. Express Hotel Partners, LLC,* 991 So.2d 1197, 1199 (¶ 15)

(Miss.2008); *Wood,* 556 F.3d at 275. This includes a duty to "warn of any dangerous conditions not readily apparent which the owner knew, or should have known, in the exercise of reasonable care, and the duty to conduct reasonable inspections to discover dangerous conditions existing on the premises." *Pigg,* 991 So.2d at 1199–1200 (quoting *Gaines v. K–Mart Corp.,* 860 So.2d 1214, 1216 (¶ 5) (Miss.2003)). The breach of either duty supports a claim of negligence. *Id.* at 1200; *Mayfield v. The Hairbender,* 903 So.2d 733, 738 (¶ 20) (Miss.2005).

*Summary Judgment Discussion and Analysis*

As stated above, both Defendants have moved separately for summary judgment. Stanley's argument turns on the issue of duty, while DeSoto Inns' turns on causation. Bearing in mind the admissibility determinations made above, each Defendant's arguments are addressed here in succession.

*1. Stanley Access Technologies*
Stanley argues that summary judgment in their favor is warranted because they did not owe Plaintiff any duty. Stanley's sole argument in support of their motion is that Plaintiff cannot prove that Stanley owed her a duty without the testimony of her expert witness Warren Davis, which, as discussed above, Stanley believes should be excluded.

Because the Court finds above that the complete exclusion of Davis' report and testimony is not warranted at this time, Stanley's argument for summary judgment is not well taken. The report and testimony of Stanley's own expert, David Sitter directly rebuts substantial portions of Davis' report, especially concerning any duty Stanley may have owed to Plaintiff.

Because underlying factual disputes exist that prevent the Court from reaching the legal question of whether Stanley owed a duty to the Plaintiff, and factual controversies are to be resolved in favor of the non-movant "when ... both parties have submitted evidence of contradictory facts," summary judgment in Stanley's favor is not warranted. *Little,* 37 F.3d at 1075.

*2. DeSoto Inns*
DeSoto Inns argues that summary judgment in their favor is warranted because the Plaintiff has failed to produce any evidence that a dangerous condition existed. Further DeSoto Inns argues that even if a dangerous condition did exist, Plaintiff cannot prove that daily inspections would have been prevented her injuries. In essence, DeSoto Inns argues that even if the Plaintiff can show that the doors were the actual cause of her injuries, she has not carried her burden in demonstrating that DeSoto Inn's failure to inspect was the proximate cause. The Plaintiff counters that properly conducted daily inspections would have uncovered the defect or malfunction in the doors, thus preventing her injuries.

**\*13** The Mississippi Supreme Court has articulated one limitation to a premises owner's liability for failure to conduct reasonable inspections. In *Jones v. Imperial Palace,* that Court held: "[t]here is no liability, however, for harm resulting from conditions from which no unreasonable risk was to be anticipated, or those which the occupier did not know and could not have discovered with reasonable care." *Jones v. Imperial Palace of Miss., LLC,* 147 So.3d 318, 319–20 (¶ 14) (Miss.2014) (citing *Moore v. Winn–Dixie Stores, Inc.,* 173 So.3d 603, 605 (Miss.1965)). In *Cox v. Wal–Mart,* the Fifth Circuit applied this doctrine in the specific context of failure to perform daily inspections on automatic doors. *See Cox,* 755 F.3d at 235. In that case, the Court held that the fact that a premises owner failed to perform daily inspections on automatic doors was not, "standing alone, sufficient to impute liability," but it did "bear on whether [the owner] maintained its premises in a reasonably safe condition, and whether [the owner] should have known and warned of any defect." *Id.* at 235; (citing *Pigg,* 991 So.2d at 1199). The Fifth Circuit further instructed, "these questions are for the jury." *Id.*

The issues in this case clearly fall within the parameters articulated in *Cox.* There is conflicting testimony in the record about the circumstances of the incident, and the existence of a defect or malfunction. Additionally, the expert witnesses disagree over whether properly performed daily inspections would have uncovered any defect, who should have performed inspections, and when. Because there are genuine issues of material fact as to whether DeSoto Inns' failed to maintain and

inspect the doors, and whether properly conducted daily inspections would have prevented the Plaintiff's injuries, summary judgment in favor of DeSoto Inns is not warranted.

*3. Res Ipsa Loquitur*

*Res ipsa loquitur* raises a rebuttable presumption of negligence when a plaintiff demonstrates:

1) the instrumentality causing the damage was under the exclusive control of the defendant,

2) the occurrence was such that in the ordinary course of things it would not have happened if those in control of the instrumentality used proper care, and

3) the occurrence was not due to any voluntary act on the part of the plaintiff.

*Huynh v. Phillips,* 95 So.3d 1259, 1262 (¶ 7) (Miss.2012). The requirement of "exclusive control" of the damaging instrumentality "does not limit res *ipsa loquitur* to a single defendant; the doctrine may be applicable where authority is shared concerning the instrumentality in question." *Coleman v. Rice,* 706 So.2d 696, 698 (¶ 10) (Miss.1997). The record in this case demonstrates that the facts pertaining to each prong of the *res ipsa loquitur* inquiry are clearly in dispute relative to both Defendants. When such contradictory facts exist, the Court may "not make credibility determinations or weigh the evidence." *Reeves,* 530 U.S. at 150, 120 S.Ct. 2097, 147 L.Ed.2d 105. For this reason, summary judgment on *res ipsa loquitur* is not warranted as to either Defendant.

*Conclusion*

**\*14** In conclusion, the Court finds as follows:

The Report and Recommendations [140] of the United States Magistrate Judge dated September 9, 2015, are hereby approved and adopted as the opinion of the Court. Defendant Stanley Access Technologies, Inc.'s motion to strike Plaintiff's untimely supplemental expert report [101] is GRANTED, and the supplemental expert report of Dr. Warren Davis is hereby stricken.

DeSoto Inns' Motion to Strike [142] is GRANTED, and the supplemental affidavits of Warren Davis [138–1, 139–1] are hereby stricken.

Defendant DeSoto Inns' motion to exclude the expert testimony of Warren Davis [99] is GRANTED in part and DENIED in part. Davis' testimony is excluded to the extent it provides a definitive legal conclusion about causation and the definitive causal link between DeSoto Inns' alleged failure to perform daily inspection and the Plaintiff's injuries.

Defendant Stanley's motion to exclude the expert testimony of Warren Davis [106] is GRANTED in part and DENIED in part. Davis' testimony is excluded to the extent that it provides a definitive legal conclusion about Stanley's duty to the Plaintiff.

Defendant DeSoto Inns' motion to exclude the expert testimony of David Sitter [97] is GRANTED in part and DENIED in part. Sitter's testimony is excluded to the extent it provides a conclusion to the jury about causation and the definitive causal link between DeSoto Inns' alleged failure to perform daily inspection and the Plaintiff's injuries.

Defendant Stanley's motion to exclude the expert testimony of Michael Panish [108] is GRANTED in part and DENIED in part. As outlined above, Panish's first three opinions are excluded, and Panish's fourth opinion is admitted.

Defendant Desoto Inns' Motion for summary judgment [95] is DENIED.

Defendant Stanley Access Technologies Inc.'s Motion for summary judgment [110] is DENIED.

Bailey v. Stanley Access Technologies, Inc., Not Reported in F.Supp.3d (2015)

98 Fed. R. Evid. Serv. 1202

**SO ORDERED**

### ORDER

For reasons fully articulated in a memorandum opinion issued this day, the Court orders the following:

The Report and Recommendations [140] of the United States Magistrate Judge dated September 9, 2015, are hereby approved and adopted as the opinion of the Court. Defendant Stanley Access Technologies, Inc.'s motion to strike Plaintiff's untimely supplemental expert report [101] is GRANTED, and the supplemental expert report of Dr. Warren Davis is hereby stricken.

DeSoto Inns' Motion to Strike [142] is GRANTED, and the supplemental affidavits of Warren Davis [138–1, 139–1] are hereby stricken.

Defendant DeSoto Inns' motion to exclude the expert testimony of Warren Davis [99] is GRANTED in part and DENIED in part. Davis' testimony is excluded to the extent it provides a definitive legal conclusion about causation and the definitive causal link between DeSoto Inns' alleged failure to perform daily inspection and the Plaintiff's injuries.

Defendant Stanley's motion to exclude the expert testimony of Warren Davis [106] is GRANTED in part and DENIED in part. Davis' testimony is excluded to the extent that it provides a definitive legal conclusion about Stanley's duty to the Plaintiff.

**\*15** Defendant DeSoto Inns' motion to exclude the expert testimony of David Sitter [97] is GRANTED in part and DENIED in part. Sitter's testimony is excluded to the extent it provides a conclusion to the jury about causation and the definitive causal link between DeSoto Inns' alleged failure to perform daily inspection and the Plaintiff's injuries.

Defendant Stanley's motion to exclude the expert testimony of Michael Panish [108] is GRANTED in part and DENIED in part. As outlined above, Panish's first three opinions are excluded, and Panish's fourth opinion is admitted.

Defendant Desoto Inns' Motion for summary judgment [95] is DENIED.

Defendant Stanley Access Technologies Inc.'s Motion for summary judgment [110] is DENIED.

**SO ORDERED.**

### *REPORT AND RECOMMENDATIONS*

JANE M. VIRDEN, United States Magistrate Judge.

Before the Court is Defendant Stanley Access Technologies, Inc.'s Motion to Strike Plaintiff's Untimely Supplemental Expert Report [101] filed July 28, 2015. The matter has been assigned to the undersigned U.S. Magistrate Judge for issuance of a report and recommendations.

### *Facts*

Plaintiff's expert designation deadline was October 30, 2014. Discovery closed in this matter on March 2, 2015. Plaintiff timely designated Warren Davis, Ph.D., as an expert in this litigation pursuant to FED.R.CIV.P. 26(a)(2)(B), but Dr. Davis was not deposed until April 28, 2015, when his deposition was taken, without leave of Court, approximately a month after the close of discovery.

On July 2, 2015 (250 days after Plaintiff's expert designation deadline and 4 months after the close of discovery), Plaintiff served Dr. Davis's "supplemental" expert report. Dr. Davis's "supplemental" expert report contains, in addition to other changes-noted but not discussed by the parties in their respective briefing-three new opinions aimed at Stanley under the section entitled "Cause of the Accident." The opinions are identified as (a) "Inadequate Oversight and Supervision of Technicians by Stanley"; (b) "Stanley Maintains Distance from End Users"; and (c) "Stanley Appears to Make a Farce of AAADM Certification." These opinions were briefly disclosed for the first time during the out-oftime deposition of Dr. Davis at which time he described them as "the beginnings of some additional opinions about Stanley" which, at least in part, "would need to [be] corroborate[d]."

### *Authorities*

Federal Rule of Civil Procedure 26(a)(2)(B) requires parties to serve expert disclosures containing "a complete statement of all opinions the witness will express and the basis and reasons for them...." *See* FED.R.CIV.P. 26(a)(2)(B); *see also Sierra Club, Lone Star Chapter v. Cedar Point Oil Co.,* 73 F.3d 546, 569 (5th Cir.1996) ("Rule 26(a) clearly require[s] initial [expert] disclosures to be complete and detailed."). The purpose of Rule 26(a)(2) is "to eliminate unfair surprise to the opposing party." *Hill v. Koppers,* No. 3:03CV60–P–D, 2009 WL 3246630, at *2 (N.D.Miss. Sept.30, 2009) (citations and internal quotations omitted). FED.R.CIV.P. 26(e)(1) provides that parties are under a duty to supplement their disclosures or discovery responses where they learn that a prior response was incomplete or incorrect and the additional corrective information was not otherwise known to the other parties during the discovery process. However, Rule 26(e) only applies to supplementation, not entirely new expert opinions. *See Ovella v. B & C Constr. & Equip., LLC,* No. 1:10CV285–LG–RHW, 2011 U.S. Dist. LEXIS 93009, at *4–5, 2011 WL 3665120 (S.D.Miss. Aug. 5, 2011); *Charles v. Sanchez,* No. EP–13–CV–00193–DCG, 2015 U.S. Dist. LEXIS 22752, at *27, 2015 WL 808417 (W.D. Tex Feb. 24, 2015).

**\*16** "Rule 26(a)(2) does not allow parties to cure deficient expert reports by supplementing them with later deposition testimony. The purpose of Rule 26(a)(2) is to provide notice to opposing counsel-before the deposition-as to what the expert witness will testify...." *Hill v. Koppers,* 2009 WL 3246630 at *2 (citing *Ciomber v. Cooperative Plus, Inc.,* 527 F.3d 635, 642 (7th Cir.2008). *See also Salgado v. General Motors Corp.,* 150 F.3d 735, 741–742, n. 6 (7th Cir.1998); *Sierra Club, Lone Star Chapter v. Cedar Point Oil Co., Inc.,* 73 F.3d 645, 571 (5th Cir.1996) ("The purpose of rebuttal and supplementary disclosures is just that-to rebut and to supplement"); *Shelter Mut. Ins. Co. v. Culbertson's Ltd., Inc.,* No. 97–1609, 97–1969, 1999 WL 135297, at *4 (E.D.La. Mar.11, 1999) (expert report discussing issues not included in initial report cannot be considered "supplementary"). And, even though the *Federal Rules of Civil Procedure* provide for supplementation, parties do not have infinite time to supplement their experts' opinions with new information to respond to challenges to their experts' original evidence. Courts have stricken supplemental reports to the extent they go beyond opinions expressed in the experts' Rule 26 reports. *Avance v. Kerr–McGee Chem. LLC,* No. 5:04–cv–209, 2006 U.S. Dist. LEXIS 87224, at *21, 2006 WL 4108454 (E . D.Tex. Nov. 30, 2006) (*citing Beasley v. U.S. Welding Svc., Inc.,* 129 Fed. Appx. 901, 902 (5th Cir.2005) (unpublished)). Also pertinent here is Rule 26(a)(5) of the *Uniform Local Rules for the Northern and Southern Districts of Mississippi* which provides: "A party is under a duty to supplement disclosures at appropriate intervals under FED.R.CIV.P. 26(e) and *in no event later than the discovery cut-off established by the case management order*." L.U.CIV.R. 26(a)(5) (emphasis added).

A party who fails to comply with Rule 26 "bears the burden to show that its actions were substantially justified or harmless." *Avance v. Kerr–McGee Chem. LLC,* No. 5:04–cv–209, 2006 U.S. Dist. LEXIS 87224, at *21, 2006 WL 4108454 (E.D.Tex. Nov. 30, 2006) (excluding late filed report where plaintiffs failed to demonstrate " 'substantial justification' why the revisions and new affidavits were filed after the expert deadline...."). It should also be noted that FED.R .CIV.P. 16(b) "authorizes the district court to control and expedite pretrial discovery through a scheduling order." *Geiserman v. MacDonald,* 893 F.2d 787, 790 (5th Cir.1990).

Exclusion of evidence as a means of enforcing a pretrial order pursuant to Rule 16 or imposing sanctions under Rule 37(c)(1) involves consideration of four factors:

(1) the explanation for the failure to identify the witness[i]

(2) the importance of the testimony;

(3) potential prejudice in allowing the testimony; and

(4) the availability of a continuance to cure such prejudice.

*Id.* at 791; *Hamburger v. State Farm Mut. Auto. Ins. Co.,* 361 F.3d 875, 883 (5th Cir.2004); *see also Kmart Corp. v. Kroger Co.,* No. 1:11–CV–00103–GHD–DAS, 2013 WL 6681614, at *3–4 (N.D.Miss. Dec.18, 2013).

**\*17** The first factor is self explanatory. With respect to the second, importance of the testimony, the Fifth Circuit has stated that "[t]he claimed importance of expert testimony underscores the need for [plaintiff] to have timely designated his expert witness." *Geiserman,* 893 F.2d at 792. *See also Hamburger,* 361 F.3d at 883. The same holds true for new opinions offered by a previously designated witness. *Barrett v. Atlantic Richfield Co.,* 95 F.3d 375, 381 (5th Cir.1996). Moreover, the importance of the testimony "cannot singularly override the enforcement of local rules and scheduling orders." *Id.* (internal citation omitted). As to the third factor, the Fifth Circuit has noted that a delay of even a few weeks in disclosing expert testimony disrupts the court's schedule and the opponent's preparation and, therefore, is prejudicial. *Geiserman,* 893 F.2d at 791; *see also Williams v. Gonzales,* No. 104–CV–342, 2005 WL 3447885, at *6 (E.D.Tex. Dec. 14, 2005) (citing *Geiserman,* 893 F.2d at 791) ("Disruption of the court's discovery schedule and the opponent's preparation constitutes sufficient prejudice to militate in favor of the exclusion of [expert] testimony."). Finally, the Fifth Circuit has held that while continuances may be possible to allow the other party to address the new testimony, it is within this Court's discretion to exclude such testimony where a continuance could result in additional expense in defending the lawsuit and would not serve to enforce local rules or court imposed scheduling orders. *Id.* at 792; *accord Barrett,* 95 F.3d at 381; *Sierra Club,* 73 F.3d at 573. As the Hamburger court noted, just "[b]ecause of a trial court's need to control its docket, a party's violation of the court's scheduling order should not routinely justify a continuance." *Hamburger,* 361 F.3d at 884. *See also Williams,* 2005 U.S. Dist. LEXIS 38838 at *17–18 (excluding untimely expert affidavit and holding that the fact "that potential prejudice may be cured by granting a continuance is not dispositive"); *Hill,* 2009 U.S. Dist. LEXIS 98798 at *39–40 (expert testimony was excluded because the plaintiff failed to timely supplement her expert's original report); *Owens v. United States,* No. 5:04cv304–DCB–JCS, 2005 U.S. Dist. LEXIS 43306, at *6 (S.D.Miss. Aug. 23, 2005) (excluding expert reports and stating that "[a] party should not be granted a continuance as an award for his dilatory conduct"); *Robbins v. Ryan's Family Steak Houses East, Inc.,* 223 F.R.D. 448, 454 (S.D.Miss.2004) (excluding supplemental expert testimony and noting violation of scheduling order should not routinely result in continuance).

*Analysis*

In the instant case, the Plaintiff asserts that pursuant to FED.R .CIV.P. 26(e)(2) she may supplement her expert report at any time prior to the time the parties' pretrial disclosures for preparation of the pretrial order under Rule 26(A)(3) are due (in this case, November 10, 2015). However, this contention overlooks the uncontested fact that the new report by Dr. Davis contains entirely new opinions not even mentioned by Dr. Davis until after the close of discovery. Furthermore, they were discussed only briefly during his out-of-time deposition during which he described them as in need of corroboration and only constituting the "beginnings of some additional opinions against Stanley." In addition, the Plaintiff completely disregards L.U.CIV.R. 26(e)'s requirement that supplementation be made by the close of discovery. Most importantly, Plaintiff offers no justification for the submission of entirely new opinions over four months after the close of discovery, and the prejudice of allowing such a late disclosure is obvious. Stanley will now have no opportunity to have its own expert opine on these new subjects. Nor will it be able to discover and depose witnesses relative to the new opinions. And, though Plaintiff accurately suggests that her expert did briefly raise the subject of the new opinions in his out-of-time deposition, it is well settled, as noted above, that a party may not sit by without supplementing her expert's opinions and rely on the chance that the expert will mention any new opinions during his deposition-especially one taken after the discovery deadline has run and without leave of court.

Bailey v. Stanley Access Technologies, Inc., Not Reported in F.Supp.3d (2015)
98 Fed. R. Evid. Serv. 1202

**\*18** Finally, no party has requested a continuance in this case. But, in any event, it is plain to the undersigned-though no decision is made on the subject-that continuing the case so as to permit Plaintiff to reopen discovery to assert new opinions first advanced well after the close of discovery would add substantial expense to the defendant's trial preparation efforts and expenses. For the foregoing reasons, it is recommended that the motion be granted and that the supplemental expert report of Dr. Warren Davis be stricken.

### Filing Objections

The parties are referred to L.U.Civ.R. 72(a)(3) for the applicable procedure in the event any party desires to file objections to the findings and recommendations herein contained. The parties are warned that any such objections are required to be in writing and must be filed within fourteen (14) days of this date. Failure to timely file written objections to the proposed findings, conclusions and recommendations contained in this report will bar an aggrieved party, except upon grounds of plain error, from attacking on appeal unobjected-to proposed factual findings and legal conclusions accepted by the district court. *Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir.1996).

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 6828921, 98 Fed. R. Evid. Serv. 1202

Footnotes

1       Plaintiff's Response was due on August 21, 2015.

2       Plaintiff's Response was due on August 25, 2015.

3       DeSoto Inns' replies to Plaintiff's responses to DeSoto Inns' motions for summary judgment and to exclude Davis were filed on August 28, 2015 and September 4, 2015 respectively.

4       Although the *Geiserman* case involved failure to timely designate certain experts, the same analysis is applied to other types of violations of scheduling orders, such as failure to timely reveal the opinions of properly designated experts. See, e.g., *Barrett v. Atlantic Richfield Co.*, 95 F.3d 375, 379–82 (5th Cir.1996) (affirming exclusion of expert testimony pursuant to Rules 16 and 37 where experts were timely designated but certain opinions were not timely disclosed); accord *Avance*, 2006 U.S. Dist. LEXIS 87224 at \*20–21, 2006 WL 4108454; *Shelter*, 1999 U.S. Dist. LEXIS 3241 at \*4.

5       *See also Williams*, 2005 U.S. Dist. LEXIS 38838 at \*17–18 (excluding untimely expert affidavit and holding that the fact "that potential prejudice may be cured by granting a continuance is not dispositive"); *Hill*, 2009 U.S. Dist. LEXIS 98798 at \*39–40 (expert testimony was excluded because the plaintiff failed to timely supplement her expert's original report); *Owens v. United States*, No. 5:04cv304–DCB–JCS, 2005 U.S. Dist. LEXIS 43306, at \*6 (S.D.Miss. Aug. 23, 2005) (excluding expert reports and stating that "[a] party should not be granted a continuance as an award for his dilatory conduct"); *Robbins v. Ryan's Family Steak Houses East, Inc.*, 223 F.R.D. 448, 454 (S.D.Miss.2004) (excluding supplemental expert testimony and noting violation of scheduling order should not routinely result in continuance).

6       As outlined above, Davis' second (supplemental) report by dated June 28, 2015 is stricken and will not be considered by the Court.

7       Davis' remaining opinions directed at Stanley are numbered 3, 4, 8, 9, 10, and 14 in his October 30, 2015 report.

8       The Court also notes that Panish's inspection and related opinions may raise an issue related to the admissibility of subsequent remedial measures. The Court will not address this issue here, as it has not yet been raised by the parties.

1       Although the *Geiserman* case involved failure to timely designate certain experts, the same analysis is applied to other types of violations of scheduling orders, such as failure to timely reveal the opinions of properly designated experts. *See, e.g., Barrett v. Atlantic Richfield Co.*, 95 F.3d 375, 379–82 (5th Cir.1996) (affirming exclusion of expert testimony pursuant to Rules 16 and 37

98 Fed. R. Evid. Serv. 1202

where experts were timely designated but certain opinions were not timely disclosed); *accord Avance,* 2006 U.S. Dist. LEXIS 87224 at *20–21, 2006 WL 4108454; *Shelter,* 1999 U.S. Dist. LEXIS 3241 at *4.

---

End of Document

© 2018 Thomson Reuters. No claim to original U.S. Government Works.