# EXHIBIT A

## Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRIT OF MASSACHUSETTS

C.A.NO.: 17-10432-DJC

---------------------------------------x

AMANDA ARNOLD,

        Plaintiff,

VS

THE WOODS HOLE, MARTHA'S VINEYARD

AND NANTUCKET STEAMSHIP AUTHORITY,

        Defendant.

---------------------------------------x

      DEPOSITION OF AMANDA ARNOLD,

taken on behalf of the Defendant,

pursuant to the applicable provisions of the

Massachusetts Rules of Civil Procedure, before

Tara L. Wosny, Notary Public and Certified

Shorthand Reporter, within and for the

Commonwealth of Massachusetts, at the offices of

Clinton & Muzyka, P.C., 88 Black Falcon Avenue,

Suite 200, Boston, Massachusetts, on Wednesday,

December 13, 2017, at 10:00 a.m.

## Page 2

1  APPEARANCES:
2  PENNOCK LAW FIRM
3  33 Wayne Street
4  Jersey City, New Jersey 07302
5  212.967.4213
6  BY:  Shannon Pennock, Esq.
7  shannonpennock@pennocklawfirm.com
8  Counsel for the Plaintiff
9
10  CLINTON & MUZYKA, P.C.
11  88 Black Falcon Avenue, Suite 200
12  Boston, Massachusetts 02210
13  617.723.9165
14  BY:  Thomas J. Muzyka, Esq.
15  Counsel for the Defendant

## Page 3

I N D E X

WITNESS:            AMANDA ARNOLD

  By Mr. Muzyka      4

      EXHIBIT INDEX

1  Answers to Interrogatories            165

2  Photograph of the Eagle Steamship Ferry     181

3  Photograph of Hallway                 182

4  Photograph                            182

5  Photograph                            184

6  Photograph                            185

## Page 4

P R O C E E D I N G S

      * * *

      AMANDA ARNOLD, the witness,
having been satisfactorily identified and
duly sworn by the Notary Public, was examined
and testified as follows in answer to direct
interrogatories:

      * * *

EXAMINATION BY MR. MUZYKA:

Q.  Ms. Arnold, have you ever had your deposition
taken before?

A.  No.

Q.  Okay.  Let me just give you some rules so that
things will be a little bit easier for all of
us.

A.  Okay.

Q.  I'm going to ask you a number of questions.
You're going to answer a number of questions.
Your counsel may object or make statements.
It's all going to be taken down by this woman.
She's usually 99 and 9/10 percent accurate, but
in order to help her out, I would appreciate it
if you would hold off answering a question until
I finish.  That way we're not talking over each



## Page 9

1    A.  No.
2    Q.  Okay.  So this was your first time on a
3    Steamship Authority vessel; is that correct?
4    A.  Yes.  That circulate that area.
5    Q.  Have you ever been on any other vessels?
6    A.  Yes.
7    Q.  What type of vessels?
8    A.  Other ferries?
9    Q.  Have you been on ferries?
10    A.  Yes.
11    Q.  All right.  Have you ever been on any type
12    of recreational boats?
13    A.  For personal use?
14    Q.  Yes.
15    A.  Okay.
16    Q.  And can you tell me what your experience is with
17    recreational vessels?
18    A.  To get to and from Fire Island.
19    Q.  What size vessels are we talking?
20    A.  I'm unfamiliar with boating sizes.  Small
21    fishing boats.
22    Q.  Are we talking 20 feet or 120 feet?
23    A.  Twenty.  Small.
24    Q.  Okay.  And how often would you be on these types

## Page 10

1    of recreational boats?
2    A.  A handful of times in my lifetime.  Under five.
3    Q.  Have you ever been on any type of ferry vessel?
4    A.  Once a large ferry.  Once before.
5    Q.  Where was that ferry located?
6    A.  That was in Washington.
7    Q.  State of Washington?
8    A.  Yes.
9    Q.  Where was it going between?
10    A.  I can't recall at this time.  It was when I was
11    much younger, and I was traveling with my
12    family.
13    Q.  I asked you a question about physical
14    impairments.  Do you have any impairments with
15    regard to your vision or your hearing?
16    A.  No.  My hearing is fine.  My vision is -- up
17    close it's fine.  At a distance I need it for
18    when I read far away.
19    Q.  Okay.  And when you say when you read far away,
20    are you prescribed glasses for that?
21    A.  I have a prescription, but I don't -- my doctor
22    said it's pretty minimal.  I can use them at my
23    own will.
24    Q.  So how far away can you see without needing the

## Page 11

1    use of glasses?
2    A.  I don't know the distance.
3    Q.  What is your best estimate?
4    A.  A small subtitle at a distance of -- I don't
5    know.  I don't know lengths very well.  I don't
6    have an estimate at this time.  I would say
7    watching the TV across the room.
8    Q.  Okay.  Do you have problems with your vision
9    seeing objects at 20 feet?
10    A.  No.  It's just making out small words.
11    Q.  Okay.  So in other words, if you were looking at
12    20 feet away, you'd be able to see a door or a
13    handrail or something like that?
14    A.  Yes.
15    Q.  Okay.  Do you wear contacts at all?
16    A.  No.
17    Q.  For the trip to go to Nantucket on September 30,
18    2016, who made the arrangements?
19    A.  Which arrangements?
20    Q.  To take the ferry from Cape Cod to Nantucket.
21    A.  My brother and I.
22    Q.  Okay.  Did you make the arrangements?  Did you
23    call in the reservation?
24    A.  We didn't make a reservation.

## Page 12

1    Q.  When you went from Cape Cod to Nantucket, did
2    you have a vehicle with you or were you
3    traveling without a vehicle?
4    A.  We drove to the ferry and parked in the
5    designated ferry parking lot.
6    Q.  And did you not take the ferry on board the
7    vessel?
8    A.  The car you mean?
9    Q.  The car.
10    A.  No.
11    Q.  Before boarding the ferry can you tell me what
12    type of a day you recall it was?
13    A.  How so?
14    Q.  Weatherwise.
15    A.  Oh, it was a little gloomy.
16    Q.  And when you say gloomy, what do you mean by
17    gloomy?
18    A.  The sun was not out.
19    Q.  How was the wind?
20    A.  The wind seemed fine on the drive.
21    Q.  On September 30th, what were you wearing?
22    A.  Jeans, Teva sandals with socks, a long-sleeved
23    shirt, sweater and a fleece vest and a ball cap.
24    Q.  On your right hand did you have any rings?

Page 13

1  A.  Yes.
2  Q.  Are you still in possession of those rings?
3  A.  I'm currently wearing it.
4  Q.  Could you describe for me how you boarded the
5      vessel on September 30th?
6  A.  You mean like how we got up the vessel?
7  Q.  Yes.
8  A.  There was an on-ramp.
9  Q.  And when you boarded the vessel, do you know the
10     name of the vessel?
11 A.  I believe it was Eagle.
12 Q.  And the onramp that you took to board the
13     vessel, was it at the front end or the back end
14     of the vessel?
15 A.  I don't recall.  Mid.
16 Q.  Somewhere in the middle?
17 A.  Yes.  It was not in either the extreme front or
18     extreme back.
19 Q.  And after you went up the ramp to get on board
20     the vessel, where did you get on the vessel?
21 A.  We sort of followed the crowd to the seating
22     area.
23 Q.  Once you got on board the vessel, did you go up
24     any further decks or did you stay on the deck

Page 14

1      that the ramp led to?
2  A.  I believe everybody went up.  We went up stairs
3      to the main area where there is, like, the
4      concession stands and you can oversee the water.
5      I don't know.  I don't recall what floor it was.
6  Q.  Okay.  When you went up to the area or the deck
7      with the concession stands, did you pick out a
8      place to sit down?
9  A.  Yes.
10 Q.  And where did you sit?
11 A.  We sat in the front.  There were four tables,
12     like, lunch-style seating that you would go to
13     like a diner, you know?
14 Q.  Okay.
15 A.  We were on the southeast -- I'm sorry, the
16     southwest of the four.
17 Q.  Southwest?
18 A.  If you were looking at if this was north, and
19     then they were lined up, it would have been the
20     bottom left one.
21 Q.  Okay.  Of the four tables?
22 A.  Yes.
23 Q.  And how many chairs are at that table?
24 A.  They aren't chairs.  It's like if you were to go

Page 15

1      to a diner and there's a bench seat.  Like that.
2  Q.  How many of those were there?
3  A.  It's one long one on one side and one long one
4      on the other side.
5  Q.  And did anybody sit at the table other than you
6      and your brother?
7  A.  No, just the two of us.
8  Q.  Do you recall what time the vessel departed from
9      its port in Cape Cod?
10 A.  It was early afternoon.  I don't recall the
11     exact time.
12 Q.  Did you purchase the tickets or did your brother
13     purchase the tickets?
14 A.  I purchased the tickets.
15 Q.  And is your brother older or younger than you?
16 A.  He is a few years older than me.
17 Q.  What does your brother do for an occupation?
18 A.  He's a working artist, as well as a bartender.
19 Q.  At the time what did you do for an occupation?
20 A.  The same occupation that I've had for 12 years,
21     which is managing a bar.
22 Q.  Can you give me a brief description of your
23     educational background?
24 A.  High school, some college, pattern making.  I

Page 16

1      took adult classes here and there when I worked
2      in fashion.  And that's about it.
3  Q.  Okay.  Which high school did you graduate from?
4  A.  Southwest High.
5  Q.  Where is that located?
6  A.  The Imperial Valley, El Centro, California.
7  Q.  When did you graduate?
8  A.  2002.
9  Q.  And did you immediately go to college after
10     that?
11 A.  No, I moved to San Diego and worked at a law
12     firm as a paralegal working there for a year or
13     so and then they did layoffs, and then I moved
14     to New York shortly after that.
15 Q.  Okay.  And did you follow up with any type of
16     formal education in New York?
17 A.  I attended FIT.
18 Q.  And the acronym FIT means?
19 A.  Fashion Institute of Technology.
20 Q.  What type of curriculum did you follow?
21 A.  Small leather goods and pattern making.
22 Q.  When you talk about pattern making, that's for
23     small leather goods?
24 A.  Yes, small leather goods.

## Page 17

1     Q.  And did you complete the curriculum at that

2       school?

3     A.  No, I did not.

4     Q.  How long did you go to that school?

5     A.  I took a couple of semesters and I was working

6       with a designer at the time.  I didn't feel the

7       need to finish the education because I already

8       had work, employment in the field.

9     Q.  Have you received any type of certifications or

10       certificates from any type of education beyond

11       that?

12     A.  No.

13     Q.  Prior to September 30, 2016, have you ever

14       injured any portion of your right hand or your

15       right arm?

16     A.  Not my right hand.  I did have a piece of glass

17       cut my right arm at work and I had stitches.

18     Q.  Okay.  Is that just on the surface of your right

19       arm?

20     A.  Yes, just here (indicating).

21     Q.  In the inside of the elbow?

22     A.  Yes -- no, that wouldn't be inside the elbow,

23       but where -- I think it was near the artery.

24     Q.  Did it cut the artery?

## Page 18

1     A.  No.

2     Q.  As a result of that injury, have you suffered

3       any type of lack of sensation or use of your

4       right arm?

5     A.  None.

6     Q.  Or your hand?

7     A.  No.

8     Q.  After you boarded the vessel on September 30th,

9       and you sat down in the location that you

10       described, how far was that from the concession

11       stand?

12     A.  The concession stand was -- it was basically --

13       there was space and then it was there just right

14       behind us.

15     Q.  Okay.  So were you on the outside of the vessel

16       near a window?

17     A.  No.

18     Q.  Were you in the center of the vessel itself?

19     A.  The center.

20     Q.  How long were you at the table in that area that

21       you described before going to the women's room?

22     A.  Maybe 25, 35 minutes.

23     Q.  During those 25 to 35 minutes or so, were you

24       always at that table?

## Page 19

1     A.  No.  I went up to get my brother and I beers at

2       the concession stand, and then brought them

3       directly back to the table.

4     Q.  Okay.  What type of beers did you buy?

5     A.  Ale.

6     Q.  How many?

7     A.  Two.

8     Q.  One for you and one for your brother?

9     A.  You got it.

10     Q.  Did you have any more beer than one apiece

11       before using the ladies' room?

12       MS. PENNOCK:  Objection.

13     A.  No, I didn't have a full beer.

14     Q.  How much of the beer did you drink?

15     A.  Half of it before I went to the ladies' room.

16     Q.  Do you know the make of the beer?

17     A.  I'm sorry, I don't understand.

18     Q.  The type of beer and the make, who made it.

19     A.  An ale.

20     Q.  Budweiser or --

21     A.  Well, Budweiser doesn't make ale.

22     Q.  I know.

23     A.  Whatever pale ale they had.  I don't recall the

24       brewery.

## Page 20

1     Q.  An IPA?

2     A.  A pale ale.

3     Q.  Prior to boarding the vessel, can you tell me

4       what you had consumed from the time you woke up

5       to the time you got on board the vessel?

6     A.  By consume, what do you mean?

7     Q.  Food, beverages, liquor.

8     A.  Water, coffee, seltzer.

9     Q.  Let's do this.  What did you have for breakfast?

10     A.  I think we stopped to get bagels by where we

11       picked up the car.  I had a coffee and probably

12       ate half the bagel.  Then we went -- we stopped

13       on the way, I believe, in Connecticut to get

14       gas, water, pretzels, beef jerky, and then I had

15       seltzer and then we got on the boat.

16     Q.  Okay.  So you didn't have a formal, sit-down

17       breakfast?

18     A.  No.

19     Q.  And no formal lunch?

20     A.  I do not usually have formal sit-down breakfast.

21     Q.  And you didn't have a formal lunch either; is

22       that correct?

23     A.  No.

24     Q.  Have you told me everything that you consumed



Page 65

1  Q. Was anybody from the ship with you?
2  A. Steve was there.
3  Q. He had accompanied you off the vessel?
4  A. Yes -- not off the vessel, but he took us
5     through an elevator to get down, and then waited
6     as we docked with -- my brother and I. And then
7     the ambulance was there to receive me.
8  Q. So there was an ambulance called to meet you at
9     the dock?
10 A. There was an ambulance called, yes.
11 Q. What happened as you were leaving the vessel?
12    Describe it for me.
13 A. I don't understand.
14 Q. Did Steve go with you to the ambulance?
15 A. No.
16 Q. All right. You and your brother walked down the
17    gangway to the ambulance?
18 A. Yes.
19 Q. All right. What happened next once you got to
20    the ambulance?
21 A. I was received by two EMTs. I think they were
22    EMTs. I know that they were firefighters and
23    they told me that. That doesn't matter.
24    Irrelevant. Two gentlemen that worked in the

Page 66

1     ambulance, and then there was somebody who was
2     driving it, and they received us. And we got
3     into the ambulance and we left the ferry.
4  Q. What did they do for you when you were received
5     by the two gentlemen who were in the ambulance
6     with you?
7  A. They put -- they were holding my fingers in
8     tact. I had a ring on -- this ring on this
9     finger.
10 Q. On your ring finger?
11 A. Yes. So they had to saw it off. That took a
12    good amount of time. They were trying to hand
13    saw it, and then they had to use kind of like a
14    power tool saw. That took primarily most of the
15    time. And then they didn't perform any kind of
16    surgery or anything. You know, no maintenance.
17    It was just kind of keeping things in place and
18    they were asking me questions, I think, to
19    distract me from the pain.
20 Q. Let me -- with regard to your ring, was the
21    removal of your ring happening at the ambulance?
22 A. In the ambulance.
23 Q. Before you left?
24 A. No. On the drive from -- during the -- the

Page 67

1     ambulance was moving.
2  Q. All right. What type of medical treatment did
3     they provide to you in the ambulance?
4  A. I don't really know what they were supposed to
5     provide. They just -- they didn't really
6     provide any medical treatment. They asked me
7     about -- they had to fill out a type of -- you
8     know, report for when they put you in the
9     hospital. So they kind of asked me those kinds
10    of questions. They asked me what had happened
11    and then they kind of were holding my fingers in
12    place and had ice packs on them until we got to
13    the hospital.
14 Q. Did they provide any medication for you?
15 A. No.
16 Q. Did they take your vital signs?
17 A. Yes.
18 Q. With regard to your fingers, when you say they
19    were holding them in place, describe it for me.
20 A. Like a rag and like a piece of cloth and ice
21    packs, and they were holding it still.
22 Q. Okay. Were they keeping the ends of your
23    fingers in place where they should be?
24 A. Yes. So the part that was hanging off, you

Page 68

1     would have to physically hold it on top in order
2     for it to not fall. So that's what they were
3     doing.
4  Q. That was done with the rag that you
5     were describing that was folded over your hands?
6  A. I was just trying to -- yes, just to hold it in
7     place because I didn't know what was going to
8     happen if I didn't.
9  Q. Where was the ice?
10 A. The ice from --
11 Q. You're indicating -- you're holding your right
12    hand with your left hand?
13 A. Yes.
14 Q. Where was the ice that they were putting on your
15    hand?
16 A. They weren't putting ice on my hand. The ice
17    happened on the ferry. When I got into the
18    ambulance, they had special cold packs that they
19    were doing that with.
20 Q. So they were putting cold packs on it?
21 A. Yes, it wasn't directly on ice.
22 Q. At that point in time did your pain level
23    decrease at all?
24 A. No, it only increased.



Page 193

1    COMMONWEALTH OF MASSACHUSETTS
2         SUFFOLK, SS.
3         I, Tara L. Wosny, Certified Shorthand Reporter
4    and Notary Public in and for the Commonwealth of
5    Massachusetts, do hereby certify that Amanda Arnold,
6    the witness whose deposition is herein before set forth,
7    was duly sworn by me and that such deposition is a true
8    record, to the best of my ability, of the testimony given
9    by the witness.
10        I further certify that I am neither related to
11   or employed by any of the parties in or counsel to this
12   action, nor am I financially interested in the outcome of
13   this action.
14        In witness whereof, I have hereunto set my hand
15   and seal this 30th day of January, 2018.
16
17
     Tara L. Wosny
18
     Notary Public
19
     My commission expires:
20
     June 10, 2019
21
22
23
24