## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

**AMANDA ARNOLD,**
     **Plaintiff,**

                                 **Civil Action**
                                 **No.: 17-10432-DJC**

**vs.**

**THE WOODS HOLE, MARTHA'S
VINEYARD AND NANTUCKET
STEAMSHIP AUTHORITY,**
     **Defendant.**

## DEFENDANT'S MEMORANDUM IN SUPPORT OF
## ITS RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW
## AND ALTERNATIVE MOTION FOR REMITTITUR AND/OR NEW TRIAL

Now comes the Defendant, the Woods Hole, Martha's Vineyard and Nantucket
Steamship Authority (the "Steamship Authority"), in the above-entitled action, by and
through its counsel of record, Clinton & Muzyka, P.C., and hereby submits its
Memorandum in Support of its *Renewed Motion for Judgment as a Matter of Law
pursuant to Fed.R.Civ.P. 50(b)* and *Alternative Motion for Remittitur* and/or *New Trial
pursuant to Fed.R.Civ.P. 50(b) and 59.*

## INTRODUCTION

The evidence in the light most favorable to the Plaintiff shows that the ladies'
bathroom door on the M/V EAGLE may have closed too fast and perhaps with too much
force, but this alone cannot establish liability. Plaintiff's case in chief fails on two fatal
fronts: (1) the alleged dangerous condition on the M/V EAGLE (a slamming door and no
handrails) was open and obvious, and (2) there is no evidence, via expert opinion or

otherwise, that the slamming door and lack of handrails were the "but for" or proximate causation of Plaintiff's fingertip injury. Plaintiff has failed to show in any sense, indeed, that her injury would have been prevented had the door been working within the Americans with Disabilities Act and other voluntary standards for which her expert witnesses advocate. Simply put, there is nothing that a shipowner can do to prevent passengers from being injured if they place their fingers between a closing door and the hinge side door frame. The expert testimony about the perceived failures of the door closer and hand rail system are nothing more than a red herring. Accordingly, Plaintiff has failed to provide evidence essential to her claim and Judgment as a Matter of Law should be entered pursuant to Fed.R.Civ.P. 50(b) directing verdict for the Defendant notwithstanding the jury award.

In the alternative, the Defendant respectfully moves that the Court exercise its discretion to alter or amend the Judgment issuing either (a) a remittitur reducing the award or (b) requiring a new trial pursuant to Fed.R.Civ.P. 59. The clear weight of the evidence cannot support (1) the jury's finding of no comparative fault and (2) the excessive award in this pain and suffering case. The evidence adduced at trial, indeed, unequivocally shows that the Plaintiff was not paying attention to where she was going and where she was placing her fingers at the time of her injury. This cannot support a finding of absolutely no comparative fault. Further, the pain and suffering award is excessive, disproportional, and evidently designed to improperly compensate the Plaintiff for her attorneys' fees and expert costs.

3

## FACTS

### I. THE PLAINTIFF

The Plaintiff is Amanda Arnold.  At the time of her claimed injury on September 30, 2016 she was thirty-one [31] years old.  She is five feet eleven inches tall [5'11"] and weighed approximately one hundred sixty-five pounds [165 lbs.] on the date of her claimed injury. ***Exhibit 24, Nantucket Cottage Hospital Records.***  She was working as a bar manager in New York City at the time of her injury and now working on vineyards in Napa Valley California.  ***Arnold Test., Trial Day 1.***

On September 30, 2016, the Plaintiff boarded the M/V EAGLE in Hyannis, Massachusetts bound for Nantucket, Massachusetts.  She was planning on attending a wedding and spending the weekend in Nantucket.  ***Arnold Test., Trial Day 1.***

### II. THE M/V EAGLE

M/V EAGLE (O.N. 910026) is a two hundred eighteen foot [218.7 ft] United States Coast Guard ("USCG") inspected passenger ferry.  ***Certificate of Inspection, Exhibit 42.***  The vessel is inspected quarterly by the United States Coast Guard and receives a Certificate of Inspection ("COI") when it passes this inspection.  ***Gifford Test., Trial Day 3; Exhibit 42, Certificate of Inspection.***  At the time of the incident, the M/V EAGLE was operating pursuant to a current Certificate of Inspection.  ***Gifford Test., Trial Day 3; Exhibit 42, Certificate of Inspection.***

There is a single ladies' restroom or "head" onboard the M/V EAGLE.  This restroom is located in a passageway that has a handrail across the passageway from the door, as required by USCG regulations.  The passageway is five feet [5'] wide.



*Exhibit 4: Passageway at issue.  The passageway had a*
*handrail opposite the Woman's Head Door as required by USCG*
*Regulation, within five foot [5'] reach.*

The woman's restroom door is controlled by a door closer, a Dorma model 8616.  ***Panish***

***Test., Trial Day 2.***

The door and the door closer were installed on the M/V EAGLE during its midlife

overhaul between December 2011 and April 2012.  ***Walker and Parent Test., Trial Day***

***3.***

There is no record of the door or closer malfunctioning prior to the alleged

incident on September 30, 2016.  ***Walker Test., Trial Day 3.***  All work orders and records

are kept electronically in the Steamship Authority's MAXIMO record keeping system.

***Walker Test., Trial Day 3.***  There was no outstanding work order request made as of that

time for this door and its closer.  ***Walker Test., Trial Day 3.***

### III. THE INCIDENT

Approximately halfway into the voyage, the plaintiff walked to the ladies' room.

At this time, <u>*the vessel was rolling because of the sea state, but this did not cause any*</u>

_concern for the plaintiff or hamper her ability to walk_.  **Id.**  The plaintiff walked from her

booth down the passageway to the only ladies' room which was located in the vessel's

midship area and to her left-hand side.  **Id.**



*Exhibit 4, Red Arrow Points to Ladies Room Door and the direction*
*of Plaintiff's approach.*

As Plaintiff opened the door and proceeded in, _she observed that the door was_

_heavy and that it had a closing device_.  **Arnold Test., Trial Day 1.**  The door opened into

the ladies' room and was hinged on the left side as she entered the ladies' room.  **Id.**

Once inside the ladies' room she observed that the door closed behind her as regulated by

the closing device.  **Id.**  She also observed in the ladies room that there was a woman and

a child present.  **Id.**  Both had left without injury prior to her departure.  **Id.**  As the

plaintiff was departing the ladies' room, she reached across her body with her right hand

and opened the door handle and proceeded to walk over the threshold after letting go of the door. *Id.* She proceeded through the door opening without incident. *Id.*

*After making it safely through the door threshold* on her way out of the woman's bathroom, the Plaintiff testified that she turned right and began to proceed down the passageway back toward her seat. ***Arnold Test., Trial Day 1.*** At this point, the vessel "rocked" and she braced herself by turning ninety degrees to her right, placing her left hand on the bulkhead to her right and placing her right hand with the fingers pointing up on the door frame. In so doing, her fingertips were placed between the hinge side jamb and the closing door. ***Arnold Test., Trial Day 1.***

Plaintiff testified that she was "*not paying attention*" to the closing door. ***Arnold Test., Trial Day 1.*** Plaintiff testified that her right hand was placed on the door frame for approximately two [2] seconds. ***Id.***

When the door automatically shut, it trapped the tips of the third and fourth fingers between the door and the frame. The plaintiff was unable to release herself and with the assistance of another nearby passenger the door was opened and she was immediately taken to a settee to sit down. ***Arnold Test., Trial Day 1.***

Plaintiff retained two expert witnesses, Mr. Panish and Dr. Cushing to opine (1) that the door was closing too fast and with too much force on the date of the incident in violation of American with Disabilities Act and other voluntary standards, and (2) that there was a lack of handrails on the bulkhead adjacent to the woman's head door. Neither opined nor can opine that her injury would not have occurred had the vessel been compliant with their recommendations.

## IV. PLAINTIFF'S INJURY

Plaintiff testified that she had a remarkable recovery and that her treating physician, Dr. Horak, performed an excellent surgery. ***Plaintiff Testimony, Trial Day 1.*** Plaintiff was treated between the date of her injury on September 30, 2016 and January 10, 2017. On her initial visit to Dr. Horak, Plaintiff reported pain at the level of 3 out of 10. ***Plaintiff's Testimony, Trial Day 1; Trial Exhibit 13, Dr. Horak medical file.*** On her final visit to Dr. Horak on January 10, 2017, Dr. Horak opined that the Plaintiff was "doing very well postoperatively. She has excellent range of motion and continued equal strength." She was instructed to see Dr. Horak on an as needed basis. ***Trial Exhibit 13, Dr. Horak medical file.*** Plaintiff made no pain complaints during her final visit to Dr. Horak and it was noted that digital alignment and rotation was excellent, and that the Plaintiff was capable of making a full composite fist and full extension of all digits. ***Id.; Dr. Horak Testimony, Trial Day 3.*** Plaintiff has no physical limitations and is capable of performing her everyday tasks.

As of the day of her testimony, Plaintiff testified that cosmetically there was nothing wrong with her fingertips. ***Plaintiff Test., Trial Day 1.*** Occasionally, she experienced sensitivity in her middle fingertip when she was exposed to cold and moisture. Nonetheless, she elected to change careers to work in vineyards. ***Plaintiff Test., Trial Day 1.***

## V. JURY DELIBERATIONS.

At the conclusion of trial evidence, the jurors were instructed to limit damages to pain and suffering, which was the only component of damages claimed by the Plaintiff. During deliberations, the jury inquired whether they could award Plaintiff her legal fees:

> DAMAGES ARE TO BE AWARDED TO THE
> PLAINTIFF AS <u>A FAIR</u> AND <u>REASONABLE</u>
> <u>COMPENSATION</u> FOR THE <u>LEGAL</u>  ($) WRONG
> DONE TO HER BY THE DEFENDANT"
> JURY QUESTION: <u>MEANING:</u> CAN WE CONSIDER
> LEGAL FEES <u>AS</u> "LEGAL WRONG"[?]

***Exhibit A, Jury Questions.***  The jury likewise indicated that they did not understand the

concept of pain and suffering damages:

> Under "Damages:", we are instructed, "the object is to try
> to restore the person to the position that she would have
> been in had the wrong not occurred."
>
> What does this mean, considering that we are only
> considering damages for pain and suffering?

***Exhibit A, Jury Questions.***

The jury awarded the Plaintiff $225,000.00 in damages for her alleged pain and

suffering.  In so doing, and despite the Plaintiff's unequivocal testimony that she was not

paying attention to where she was placing her hands, the jury found <u>no contributory</u>

<u>negligence for the plaintiff.</u>

## **ARGUMENT**

### I.  **DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW PURSUANT TO FED.R.CIV.P. 50(b).**

For purposes of brevity, Defendant incorporates herein by reference its arguments

set forth in its Memorandum in support of its initial Motion for Judgment as a Matter of

Law pursuant to Fed.R.Civ.P. 50(a), filed as ***Docket No. 145*** in the above captioned Civil

Action.

### II.  **DEFENDANT'S ALTERNATIVE MOTION FOR NEW TRIAL PURSUANT TO FED.R.CIV.P. 50(b) and 59.**

### A.  RULE 59 STANDARD.

A decision to grant a new trial or alter and/or amend the judgment is within the trial court's discretion.  *Cham v. Station Operators, Inc.,* 685 F.3d 87, 97 (1st Cir. 2012) (citing *Jennings v. Jones,* 587 F.3d 430, 435 (1st Cir.2009)). A trial court may grant a new trial "on the basis that the verdict is against the weight of the evidence." *Cham,*  685 F.3d at 87 (quoting *Jennings,* 587 F.3d at 435). Moreover, "the district court has the power and duty to order a new trial whenever, in its judgment, the action is required in order to prevent injustice." *Cham,*  685 F.3d at 87 (quoting *Jennings,* 587 F.3d at 435; *Kearns v. Keystone Shipping Co.,* 863 F.2d 177, 181 (1st Cir.1988)). The district court may "independently weigh the evidence" in deciding whether to grant a new trial. *Cham,* 685 F.3d at 87 (quoting *Jennings,* 587 F.3d at 435).

### B.  THE WEIGHT OF THE EVIDENCE REQUIRES A FINDING OF COMPARATIVE FAULT.

Under the General Maritime Law, a passenger plaintiff has a duty to use the care which a reasonably careful person would use under similar circumstances.  *Kermerec v. Compagnie Generale Transatlantique,* 358 U.S. 625, 1959 A.M.C. 597 (1959); *Counts v. Lafayette Crewboats, Inc.,* 622 F.Supp. 299, 1985 A.M.C. 2536 (W.D. La. 1983); *Kopcynzski v. The Jacqueline,* 742 F.2d 555, 557-58 (9th Cir. 1984), *cert denied,*  471 U.S. 1136 (1985); *Glynn v. Roy  Al Boat Management Corp.,* 57 F.3d 1495, 1995 AMC 2022 (9th Cir. 1995).  Included in this duty is the plaintiff's duty to make use of her sense of sight and exercise ordinary prudence and common sense for her own safety; if a condition could be perceived, it becomes the passenger's duty *to avoid that condition*. *The Great Northern,*  251 F. 826 (9th Cir. 1918); *Kopcynski,* 742 F.2d at 557-58; *Glynn,*

57 F.3d at 1495); *Luby v. Carnival Cruise Line, Inc.,* 633 F.Supp. 40, 42 (S.D. Fla. 1986), *aff'd mem,* 808 F.2d 60 (11th Cir. 1986);  *Keller v. United States,* 38 F.3d 16, 24 (1st Cir. 1994).

Further, when the weight of the evidence shows that the plaintiff was comparatively negligent, and the jury declines to enter any finding of negligence on the part of the plaintiff, the trial court has the power and the duty to issue a remittitur of the award, or, in the alternative, require a new trial on the issue of comparative fault.  *Crook v. Hawk Scallop Co., Inc.,* 2011 WL 4005357 at * 1 (D. Mass. August 30, 2011) (Zobel, J.)

Here, the weight of the evidence unequivocally requires a finding of comparative fault.  Closing doors are ubiquitous in modern society as is the danger of placing one's fingertips between the hinge side of the door frame and a closing door.  These open and obvious risks almost always require summary dismissal of the Plaintiff's complaint. *Cremeans v. Speedway Superamerica, LLC,* 196 Fed.Appx. 401 (6th Cir. Sept. 5, 2006); *Ray v. GPR Hospitality, LLC,* 2015 WL 12683828 at *5 (N.D. Ga. Sept. 30, 2015); *Beman v. K-Mart Corp.,* 232 Ga. App. 219, 221 (1998); *Parker v. Felco Lodging Trust, Inc.,* 2010 WL 3717308 at * 2 (N.D. Ga. Sept. 24, 2010).

Plaintiff testified, indeed, that she was <u>not paying attention</u> to where her fingers were at the time of the injury.  Defendant submits that this requires a directed verdict in favor of the defense notwithstanding the jury's verdict for the Plaintiff.  ***See Docket No. 145, Defendant's Memorandum of Law in Support of its Motion for Judgment as a Matter of Law.***  In the alternative, the Court should enter a remittitur reducing the award on account of Plaintiff's contributory fault resulting in her injury, or in the alternative,

require a new trial on account of the jury's absolute failure to attribute any portion of her injury to her obvious comparative negligence.  To hold no comparative fault in this circumstance is to essentially nullify the clear duty that all persons have to pay attention to their surroundings and account for their own safety.

*Crook v. Hawk Scallop Co., Inc.*, 2011 WL 4005357 (D. Mass. Aug. 30, 2011) is instructive.  In that case, the jury found no comparative fault despite the plaintiff's testimony that he saw the oil that he slipped on before his injury and tried to mop it up with his foot and a paper towel.  Judge Zobel, finding this condition open and obvious, set aside the jury's finding of no comparative fault, and entered a finding of 50% comparative negligence.  Judge Zobel entered a remittitur based on this comparative fault, reducing the jury award by 50%, or, in the alternative, providing the plaintiff the option to seek a new trial on the issue of comparative fault.

Like the circumstance in *Crook*, here, the Plaintiff testified that she used the door prior to her injury and was aware that it was heavy and that it had a closing device.  She further testified that she was not paying attention to her surroundings.  Clearly, the jury's finding of no comparative fault is not supported by the weight of the evidence, and the Court should properly exercise its discretion to either (a) issue a remittitur reducing the award based on a finding of comparative fault, or (b) require a new trial.

### C.  THE JURY AWARD IS EXCESSIVE.

Though notoriously difficult to quantify, noneconomic damages, such as pain and suffering and loss of enjoyment of life, "are not immune from appellate review," *Havinga v. Crowley Towing & Transp. Co.,* 24 F.3d 1480, 1484 (1st Cir. 1994) (citing *Anthony v. G.M.D. Airline Servs.,* 17 F.3d 490, 494 (1st Cir.1994*); Rivera v. Rederi A/B*

*Nordstjernan,* 456 F.2d 970, 975 n. 8 (1st Cir.), cert. denied, 409 U.S. 876, 93 S.Ct. 124, 34 L.Ed.2d 128 (1972)).  Though there is no absolute test to determine whether a pain and suffering award is excessive, typical benchmarks utilized by the First Circuit and other courts are (1) whether the injury "significantly affected" the quality of the plaintiff's life and caused her to "avoid activities in which [she] had engaged," and (2) the proportionality of the pain and suffering award compared to the Plaintiff's actual pecuniary loss.  *Havinga,* 24 F.3d at 1487.  Under this standard, the First Circuit and other courts have on a number of occasions ruled pain and suffering jury verdicts to be excessive.

In *Anthony v. G.M.D. Airline Services, Inc.,* 17 F.3d 490, 494 (1st Cir. 1994), an award *exclusively* for pain and suffering that was "over one hundred times larger than the $1,335 in out of pocket expenses and $3,000 in lost wages . . . incurred" was held grossly disproportionate, and set aside.  Noteworthy in that case is that the expert medical evidence showed that the plaintiff continued to suffer leg pain, took aspirin on a daily basis and was under medical orders to lie down several times a day and elevate his leg after his injury.  *Id.* at 494.

Likewise, in *Marchant v. Dayton Tire & Rubber Co.,* 836 F.2d 695, 703-04 (1st Cir. 1988), a $550,000 pain and suffering award was overturned as  unconscionable when, *inter alia,* the injury only caused approximately $50,000.00 in lost wages and medical invoices.

Here, the evidence at trial indicates that the Plaintiff suffered <u>no pecuniary loss</u> whatsoever.  Plaintiff waived her claim to any special damages in the form of lost earnings and lost future earning capacity.  Accordingly, the award of $225,000.00 in pain

and suffering for the Plaintiff's fingertip injury is clearly excessive on account that she suffered no real pecuniary loss pursuant to the evidence submitted at trial.

It appears that the Plaintiff waived her claim for pecuniary loss for strategic reasons, as the claim was exceptionally low in comparison to the jury award for pain and suffering.  The only evidence of medical invoices submitted was $7,921.45 from Mt. Sinai Hospital.  No claim for lost earnings was ever made.  It is very likely that had the jury considered the Plaintiff's actual pecuniary loss in its award calculus, then a more proportional pain and suffering award would have resulted.  Given that the pain and suffering award is highly disproportional, the Court should enter a remittitur to reduce that award based on the established precedent, or, in the alternative, require a new trial.

Moreover, the injury appears to have nominal impact on the Plaintiff's quality of life, as adduced at trial:

- Plaintiff does not claim any lost earnings on account of her injury.

- Plaintiff's sole and chief compliant is that her middle fingertip becomes occasionally sensitive to cold and damp conditions.  This is a common condition that occurs independently with aging.

- Notwithstanding this complaint, the Plaintiff is still capable of performing her new career working in cold and damp conditions, which she elected to undertake following the injury.

- Plaintiff requires no further treatment for her claimed injury and has no physical restrictions on account of her injury.

- Plaintiff testified that she does not take any pain medication as a result of her injury.

Accordingly, and under the appropriate standard set forth above, the relatively minor complaint of occasional cold and moisture sensitivity for an injury that is well healed after approximately three months of treatment does not give rise to pain and

suffering damages at the $225,000.00 level. The award, indeed, is excessively disproportional to the Plaintiff's actual pecuniary loss, which has not been claimed.

### D.  THE JURY AWARD IMPROPERLY INCLUDES ATTORNEYS FEES.

It is clear that the excessive amount of the award can be attributed in part to the jury's improper inclusion of Plaintiff's attorneys' fees.  The questions submitted during deliberations indicate an inclination of the jury to do so, and the amount of the award, $225,000.00, suggests that the jury intended to place $150,000.00 dollars into the Plaintiff's pocket, and $75,000.00 into the pockets of her counsel to account for fees. The amount of the award has no common psychological significance, and does not appear to be an amount that would be determined for a pain and suffering award without consideration of attorneys' fees.  In other words, it is not a "round number" such as $100,000.00, $150,000.00, $200,000.00, etc. that is typically provided in such awards.  It is, however, divisible by three, and two-thirds of it does place a "round number" into the Plaintiff's pocket.  It is common knowledge that personal injury lawyers typically take a one third contingency fee.

Noteworthy here is a study commissioned by Northwestern University School of Law, which examined fifty [50] actual jury deliberations in civil cases.  Shari Seidman Diamond, Beth Murphy, Mary R. Rose, *The "Kettleful of Law" in Real Jury Deliberations: Successes, Failures, and Next Steps,* 106 Nw. U. L. Rev. 1537 (Fall 2012). In that study, it was found that jurors often consider the costs of attorney and experts to fully compensate the plaintiff:

> The jury instructions in any civil case provide jurors with a list of damage categories that the jury may consider if it decides to make an award.  Notably absent from the list is any mention of how those damages will be paid, which is a

practical concern for the parties, but legally irrelevant to the jury's charge of assessing reasonable damages without regard to who will pay. Similarly absent from the list are the plaintiff's costs of pursuing the lawsuit--including attorney's fees, court costs, and expert fees--which are also legally irrelevant, but nonetheless have implications for the ability of the damage award to fully compensate the plaintiff. *The jury, or at least some of its members, is likely to consider one or more of these topics in evaluating what fair compensation will be.* Currently, they do so without guidance from the court, unless the jurors decide to ask the judge a question about insurance or about potential costs, such as attorney's fees or taxation of the award, a question the judge does not always answer. But even if they do not ask such questions, *jurors come to the court with experiences that have primed them to think about these topics*.

Diamond et al., *supra*, at 1578–79 (underscoring our emphasis).  One case was noted where the jury included an award for attorneys' fees despite the Court's response to questioning instructing otherwise:

As the jurors in this case struggled to determine how much they should add for attorney's fees, they submitted a question to the judge, who responded by advising them to look at the damages page in the instructions. They had already focused their attention on that page, so the judge's response provided no assistance in correcting their misunderstanding, and they interpreted the answer as requiring them to estimate the attorney's fees. The result is that they explicitly added one-third to the damage award that the group had already assessed.

Diamond et al., *supra,* at 1562.  The results of the study found that among the jury errors noted, "[b]y far, the largest category involved damages, which accounted for 94.8% of the omission errors. The primary sources of these damages errors were comments about insurance and *attorney's fees*." *Id.* at 1577 (underscoring our emphasis).  In that study, it was found that in 34 out of the 50 cases examined (68%), jurors improperly deliberated about attorneys' fees and were generally aware that in standard tort cases, plaintiff's

counsel takes a one third contingency fee.  *Id.* at 1581.  The study found that "[a]part

from insurance and attorney's fees, only a few other topics revealed jurors' willingness to

*nullify the law* . . ."  *Id.* at 1589 (underscoring our emphasis).  The study concluded that

"[t]he topics of insurance and attorney's fees come up so frequently during deliberations

that a more direct approach is required.  We cannot escape, so we should not ignore, the

fact that modern jurors are aware of the realities of litigation costs and sources of

reimbursement." Diamond et al., *supra,* at 1601.  The study found that jurors'

consideration of an award for attorneys' fees in their awards was "ubiquitous:"

> Even more challenging is the resistance that emerges from
> juror awareness that the plaintiff will have to pay attorney's
> fees. The evidence presented here of the ubiquitous nature
> of this concern, and the reasonableness of jurors' sense that
> full compensation should cover the plaintiff's costs in
> litigation, breathes new life into the arguments against the
> general application of the American rule that requires
> parties to bear their own litigation costs.

*Id. at* 1603.

Here, it is clear from both the excessive amount of the award, the nature of juror

questioning, and that the amount is removed from round numbers typically awarded in

pain and suffering matters, that the jury improperly included an award of attorneys' fees.

Awarding Plaintiff her attorneys' fees was an obvious point of improper discussion

during deliberations, as it appears to be in 68% of cases based on the study above.  Given

the nature of the award, the jury was clearly tainted by considering the award of

Plaintiff's attorneys' fees and perhaps other expert costs, and the excessive verdict should

accordingly be set aside.

**CONCLUSION**

In essence, the Plaintiff seeks to change reality on her terms to suit a finding of

liability.  There is nothing that a shipowner can do in a design or maintenance sense, however, to prevent a door from causing injury if fingertips are placed between the hinge side frame and a closing door.  No reasonable finder of fact could hold otherwise.  The claimed slamming door and inadequate handrail systems onboard the M/V EAGLE were open and obvious conditions requiring no action on behalf of the Steamship Authority. Even if a warning or correction were required, there is no evidence that a slower closing door or extra handrails would have prevented the Plaintiff's injury.  It is ubiquitous that using the space between a closing door and the hinge side frame as a handle is dangerous regardless of the door's condition or speed.  Further, there is no evidence that the Steamship Authority had any notice or opportunity to cure the alleged unsafe condition. For these reasons, the Court should enter Judgment as a Matter of Law directing a verdict in favor of the Defendant notwithstanding the jury verdict.

In the alternative, the Court should exercise its discretion pursuant to Fed.R.Civ.P. 59 and issue a remittitur and/or require a new trial because the weight of the evidence requires a finding of comparative fault and reduction of the excessive award, which improperly incorporated an award for Plaintiff's attorneys' fees.

Respectfully submitted,
By its attorney,
**CLINTON & MUZYKA, P.C.**

*/s/ Thomas J. Muzyka*
**Thomas J. Muzyka**
**BBO NO: 365540**
**Olaf Aprans**
**BBO NO: 670434**
88 Black Falcon Avenue
Suite 200
Boston, MA 02210
(617) 723-9165
Fax#: (617) 720-3489

18

Email: Tmuzyka@clinmuzyka.com

**CERTIFICATE OF SERVICE**

Pursuant to Local Rule 5.2, I further certify that I will cause the above document to be filed through the ECF system and sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non- registered participants on February 13, 2019**.**


"/s/ Thomas J. Muzyka"
Thomas J. Muzyka