# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

**AMANDA ARNOLD,**

      **Plaintiff,**

**VS.**

**THE WOODS HOLE, MARTHA'S VINEYARD
AND NANTUCKET STEAMSHIP
AUTHORITY,**

      **Defendant.**

Civil Action No.: 17-10432-DJC

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW AND IN THE ALTERANTIVE MOTION FOR REMITTITUR AND/OR NEW TRIAL

Now comes the Plaintiff in the above entitled matter and by and through her attorneys submits Plaintiff's Opposition to Defendant's Renewed Motion for Judgment as a Matter of Law and, in the alternative, Motion for Remittitur and/or New Trial.

## PRELIMINARY STATEMENT

At no point prior to trial did Defendant move to dismiss Plaintiff's complaint, nor did Defendant move for summary judgment. At the close of Plaintiff's case-in-chief Defendant moved for judgment as a matter of law and the Court denied Defendant's motion. At the conclusion of the five-day trial, the jury of eight found Defendant liable. Defendant now seeks to again argue that as a matter of law Plaintiff's case-in-chief must have failed and that Plaintiff could not, as a matter of law, have established liability, despite hours of testimony and dozens of documents being submitted demonstrating all of the elements necessary for Plaintiff, Amanda Arnold, to prove her *prima facie* negligence case.

Defendant, in the alternative, seeks remittitur and/or a new trial, despite the fact that the jury's award for pain and suffering was in line with jury verdicts rendered in similar matters within close physical proximity to Boston and that Defendant's own expert opined that the Plaintiff suffered a permanent impairment of her fingers, dominant hand and even her entire right upper extremity. Moreover, Defendant's argument that the jury award was designed to compensate Plaintiff for her attorney' fees and expert costs is purely speculative and not reflected in the ultimate amount of the verdict, which given the impairment and suffering evidence was arguably less than what would be sustainable.

## GENERAL BACKGROUND

Plaintiff, Amanda Arnold, was travelling aboard the Defendant's passenger ferry the M/V *EAGLE* to Nantucket on September 30, 2016. Ex. A, Rough Trial Tr., 94:5-7, Jan. 14, 2019 (hereinafter "Ex. A").[1] Midway through the trip Ms. Arnold exited the women's bathroom which was equipped with a 190-pound door. *Id.* at 99:23-25*;* Ex. 40 (Defendant's Answers to Interrogatories). As Ms. Arnold was exiting through the bathroom door, the boat rolled and Ms. Arnold attempted to brace herself on the only thing she could – the wall, which had no handrail, and the door frame. Ex. A, 103:2-4. In that instant, the door, which should have had a mechanism that slowly closed the heavy door, slammed shut on her fingers trapping them until she was freed by a nearby passenger who came to her aid and was able to open the door. *Id.* at 103:4-12 The ends of Ms. Arnold's right ring and middle fingers were nearly amputated. *Id.* at 103:16-22. Ms.

---

[1] At this time, Plaintiff only has Rough Transcripts from trial for trial days January 14 -17. In order to provide a copy of these transcripts to the Court, please find attached herein the Rough Transcripts as Exhibit A -January 14, 2019; Exhibit B - January 15, 2019; Exhibit C- January 16, 2019; and Exhibit D - January 17, 2019. Plaintiff can purchase and supplement this filing with final transcripts if requested by the Court. Although Plaintiff does not have the transcript, Plaintiff does cite to the final day of trial herein as Day Five and specifies the witness.

Arnold underwent surgery to save her fingertips and months of rehabilitation. *Id.* at 114:21-115:8. She was unable to use her right hand at all for several months and was unable to return to work completely for six months. *Id.* at 121:23-122:2.   Ms. Arnold further testified that she still is still suffering from pain, loss of sensation, stiffness, and numbness. *Id.* at 126:4-12.   All of this was corroborated by Defendant's expert, Dr. Andrew Terrono, who testified that it was his opinion based on reviewing Ms. Arnold's medical records and conducting an examination of Ms. Arnold two years after the accident that Ms. Arnold's injuries were permanent.   Ex. D, 118:19-119:3, 119:16-18.   The jury properly determined that Ms. Arnold's injuries resulted from Defendant's negligent conduct.   This conduct comprised of failing to properly maintain and adjust the door closer device affixed to the women's bathroom door to ensure that the door closed in a safe manner and failure to provide an accessible handrail adjacent to this critical public doorway, even though the Defendant had notice of similar injuries occurring in the very same manner at this same doorway.

## **ARGUMENT**

**I.     DEFENDANT IS NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW BECAUSE PLAINTIFF ESTABLISHED A *PRIMA FACIE* NEGLIGENCE CLAIM AT TRIAL**

When determining a motion for judgment as a matter of law, the Court must view evidence in the light most favorable to the non-moving party and draw all reasonable inferences in favor of the non-movant. *Crowley v. L.L. Bean, Inc.*, 303 F.3d 387, 393 (1st Cir. 2002).   All credibility issues must be resolved in favor of the verdict. *United States v. Scharon*, 187 F.3d 17, 21 (1st Cir. 1999).   Once a jury verdict is rendered, the party who wishes to challenge the verdict faces a "heavy burden" to disrupt the verdict. *White v. New Hampshire Dept. of Corrections*, 221 F. 3d 254, 259 (1st Cir. 2000) (citing *Scharon* at 20). When viewing the evidence in the light most

favorable to Plaintiff, drawing all reasonable inferences in favor of Plaintiff, and resolving all credibility issues in favor of the verdict, Defendant is unable to meet its burden and obtain judgment as a matter of law/notwithstanding the verdict.[2]

### A. The Elements of the Negligence Claim Here and Burden of Proof

The Court properly instructed the jury on the elements Plaintiff needed to prove in order to establish her *prima facie* negligence claim: that (1) Defendant owed Plaintiff a duty of reasonable care, that (2) Defendant breached its duty, (3) that injury or harm occurred to Plaintiff, and (4) that Defendant's breach of duty caused the injury or harm to Plaintiff. *Callahan v. Shepherd*, 2018 WL 4907525 (D. Mass. Oct. 9, 2018) (citation omitted). Plaintiff had the burden of proving these elements by a preponderance of the evidence, meaning that they were more probably true than not. *Sargent v. Mass Accident Co.*, 307 Mass. 246, 250 (1940); *see also Liaison Contributory Ret. App. Bd.*, 41 Mass. App. Ct. 246 (1996). Defendant does not contest that it owed Plaintiff a duty of reasonable care and as such Plaintiff will address the other elements more fully below.

### B. The Evidence Showed Defendant Breached its Duty to Plaintiff

### i. Defendant Failed to Maintain the Door Closer Device on its 190-pound door.

Ample evidence was submitted to demonstrate Defendant breached its duty of care in maintaining the 190-pound door and its door closer device. Over and over again the jury heard evidence from different Defendant employees that Defendant never once performed maintenance on the door closure device. Carl Walker, the Director of Engineering and Maintenance for

---

[2] Defendant seeks to improperly incorporate its earlier brief in support of its initial motion for judgment as a matter of law by reference in an attempt to subvert the 20-page limit of Local Rule 7.1(b)(4), in that Defendant's earlier brief totaled 20 pages, and the current brief filed as Document 159 is 17 pages. Plaintiff's opposition brief does not exceed 20 pages. Defendant's prior briefing should be disregarded on this motion.

Defendant, testified that no preventative or corrective maintenance had been done on the door at issue up until the date of the incident (and even after).  Ex. C, 67:11-23. This was further confirmed by the Captain of the *EAGLE*, Captain James Corbett, who also testified that his review of the Defendant's MAXIMO system used to track work orders demonstrated that no work of any kind had ever been done on the door closer.  *Corbett Test.*, Day Five.  As Plaintiff's expert Michael Panish testified, because the door closer device was never maintained or adjusted, by the time Ms. Arnold boarded the Eagle several years after its installation in 2011, the women's bathroom door was operating at an unsafe speed in violation of standards articulated by the American National Standards Institute ("ANSI"), the Americans with Disabilities Act ("ADA"), and Massachusetts architectural standards.  Ex. B, 43:25-45:15.  Mr. Panish testified that all three of these industry standards required that a door not close faster than six seconds.  *Id.* at 45:4-6. Mr. Panish also testified that a properly working door closer will display a latch phase during the door's closing. The latch phase is the portion of the door's sweep just before the door closes and this important phase prevents the door from slamming shut by pausing the door's rate of speed briefly at the end to allow the door to shut in a controlled manner.  *Id.* at 44:6-9, 56:5-10. Mr. Panish as well as Plaintiff's expert, Dr. Charles Cushing, a naval architect and marine engineer, and Defendant's employee who took the October Video, Captain Charles Gifford all testified that a video taken only a few weeks after Ms. Arnold was injured by the door indicated that the door was operating faster than the 6 seconds articulated as a maximum safe speed for public doors.[3]  Mr. Panish and

---

[3] Ex. B, 55:15-56:4 (Mr. Panish testifying it closed less than 5 seconds); Ex. D, 30:16-21 (Dr. Cushing testifying it closed less than 3 seconds); Ex. C, 33:22-25 (Captain Gifford testifying that the door closed in "two and a half to three seconds").  The October 2016 video being referred to by the witnesses was stipulated into evidence as Exhibit 20.

Dr. Cushing also testified that the door did not demonstrate a proper latch phase in the video.  Ex. B, 55:15-56:4; Ex. D, 110:4-8.

As Mr. Panish testified the weight of the door coupled with the malfunctioning door closer device allowed the door to close with much greater force and in fact, as he testified Mr. Panish's onsite inspection of the door revealed a door that closed with 120.85 pounds of force.[4]  As noted, Mr. Panish also explained that doors should have a latch phase at minimum of one to one and a half seconds.  *Id.*  at 44:6-9.  Mr. Panish testified that the door at issue did not display a latch phase portion in the October 2016 video or in his inspection and that "it was just unregulated, it went from fully open to fully closed without any retarded portion."  *Id.* at 61:21-23.  In addition, Mr. Panish testified that the manufacturer of the door closer device, DORMA, specifically states that in order for their door closers to work safely and properly that the door closer device should be inspected and adjusted annually.  *Id.*  at 58:17-23.  However, as Mr. Panish testified, he saw no evidence that there was proper maintenance of the door closer device.

Indeed, several of Defendant's employees testified that there was zero maintenance on this important piece of safety equipment on this 190-pound door.   Starting with Francis Tallino, who testified that as a carpenter he would receive the majority of all work orders for doors on the Eagle.  Ex. A, 193:2-6.  With regard to the issue of identifying whether a door closer was malfunctioning, Mr. Tallino testified that he did believe and would in fact fix a door if it didn't slow down before it latched.  *Id.* at 201:9-10.  However, Mr. Tallino testified that he had never been called upon to fix the door closer on the women's bathroom door, even though the evidence clearly revealed that the door did not have a latch phase.   After being impeached with his deposition testimony, he

---

[4] Mr. Panish's inspection of this door revealed that the door closed with 120.85 pounds of force, which Mr. Panish stated was "…the highest reading I've ever seen of any door closing that I've ever checked." *Id.* at 70:12-13.

admitted that at the time of his deposition he didn't know what was the appropriate rate at which doors should close. *Id.* at 203:9-12. He testified at trial that subsequent to having his deposition taken, he had read somewhere that a door should close in three to seven seconds but could not indicate what in this range was in fact the appropriate rate of speed for door to close. *Id.* at 203:15-21. Mr. Tallino also testified that he didn't time door closings and solely did a visual assessment. *Id.* at 205:2-7. He further testified that despite always being the one to receive work orders for doors on the Eagle, that he was never called upon to maintain or fix the women's bathroom door. *Id.* at 209:2-7.

Purser Stephen Healy, also an employee of the Defendant, testified that part of his job was to look out for things that may be dangerous to passengers "as much as I can." Ex. B, 136:25-137:4. He admitted that he was responsible for reporting any safety concerns about the bathroom door. *Id.* at 137: 22-25. Yet Purser Healy also testified that he did not know what the critical term "latch phase" even meant with regard to a door closing. Ex. C, 19:3-5. Moreover, when shown two videos, one of the women's bathroom door closing and one of the men's bathroom door closing just a few feet away, Mr. Healy's lack of training was particularly apparent. These two videos show the men's bathroom door shutting at a much slower speed than the woman's and with a prominent latch phase (Exhibit 38) whereas the women's bathroom's door demonstrates a closing speed of approximately 3 seconds with no latch phase (Exhibit 20). After being shown these videos, Mr. Healy testified that there was nothing about what he saw in the videos that would cause him to report problem with the door to the captain. Ex. C, 18:5-19:1. The testimony of Mr. Healy, Mr. Tallino, Mr. Walker and Captain Corbett provided ample evidence to the jury that Defendant failed to ever maintain the door closer on this incredibly heavy door and also failed to properly

train those individuals like Mr. Healy, who were responsible for identifying any safety concerns with the operation of a door that was used by hundreds of women and children in any given year.

The employees who actually were tasked with inspecting and maintaining the door did not know the proper speed for a door to safely close, did not know what the latch phase was and were unaware of the door closer manufacturer's recommendation that the door closer be serviced, at a minimum, annually.  Moreover, for all Defendant's bluster about being Coast Guard compliant, there was no evidence introduced that indicated the Coast Guard ever actually inspected the door at issue to ensure it functioned safely.  Viewing the evidence in the light most favorable to Plaintiff and resolving all credibility determinations in her favor, there can be no doubt that as a result of Defendant's failure to perform maintenance, the door did not operate correctly and closed too fast and slammed on Plaintiff's fingers in an instant just as she testified at trial.  Ex. A, 103:4-9.

### ii.    Defendant Failed to Provide Handrail

The evidence proved that there was no handrail next to the women's bathroom door on the *EAGLE*, but there was a handrail next to the men's door.  Ex. 38-39 (Mason Group Videos of bathroom entrances).  Plaintiff's expert, Dr. Cushing, performed an onsite inspection.  Ex. C, 82:11-14. Dr. Cushing testified that the absence of a handrail on both sides of the hallway was a "contributing condition to the accident, to the casualty." *Id.* at 82:20-83:4.  Dr. Cushing further testified that "…it's vital that you have handrails…in the interior of the ship…along the corridors so that people who can't see the horizon have something to hold on to, at least steady themselves, when the ship is rolling and pitching." Ex. D, 17:9-16.  Indeed, Defendant's expert, Mr. Van Hemmen, conceded that Plaintiff would not have been able to reach the handrail across the hallway from the bathroom exit. *Van Hemmen Test.*, Day Five.  There was no testimony that Defendant could not have placed a second handrail outside the women's bathroom entrance or originally placed the handrail in a

reasonable location where it would have assisted passengers navigating through the bathroom doorway.

### iii. The Jury Did Not Accept Defendant's Attempt to Invoke the Open and Obvious Defense

Defendant's primary argument in support of its present motion for judgment as a matter of law is that the door was an "open and obvious" danger, but, simply put, the open and obvious doctrine has no application in this matter.  In premise liability cases where the theory of negligence is failure to warn, a defendant premise owner may be relieved from liability by demonstrating that a dangerous condition was "open and obvious" and thus there was no need to warn the injured party of the dangerous condition.  *Potvin v. Speedway LLC*, 891 F. 3d 410, 416 (1st Cir. 2018). However, "[i]n cases where negligent failure to warn is not the only viable theory of negligence…the landowner may still owe a duty to the lawful entrant to remedy an open and obvious danger." *Dos Santos v. Coleta*, 465 Mass. 148, 158 (2013).  When a plaintiff brings multiple theories of negligence, including failure to warn and other theories, the analysis of the open and obvious doctrine only applies to the failure to warn theory. *Cohen v. Carnival Corp.*, 945 F. Supp. 2d 1351 (S.D. Fla. 2013) (where the court separated the failure to warn theory from the other theories of negligence*);  Mendel v. Royal Caribbean Cruises, Ltd.*, 2012 WL 2367853 (S. D. Fla. June 12, 2012) (where plaintiff alleged three different theories of negligence and the court only applied the open and obvious defense to the failure to warn theory).

While Plaintiff's complaint did allege that Defendant was negligent in failing to warn Plaintiff of the risk of injury posed by the door at issue, by the time of trial, Plaintiff had decided not to advance the failure to warn claim and proceeded on its other theories of negligence as expressly stated by counsel at the jury charge conference.  Plaintiff did not close on this theory of liability either.  Plaintiff contested the application of the open and obvious doctrine at the jury

charge conference as well as in briefing submitted to the Court subsequent to the charge conference. The Court charged the open and obvious defense and the jury was thus instructed to decide as to whether or not the danger was open and obvious here. Nonetheless, the jury correctly found that the danger here was not open and obvious. Even if the Plaintiff had pursued a failure to warn claim, thus making the open and obvious defense applicable, the evidence presented at trial clearly supports the jury's rejection of the notion that the dangers presented by this door were open and obvious.

First, there was nothing obvious to the Plaintiff that the door closer device on this 190-pound door had never been adjusted or maintained since its 2011 installment and, as a result, the door was operating in an unregulated manner that could allow it to suddenly slam shut when subject to the sudden forces of the boat rocking. Even in a failure to warn situation, which this is not, there must be an opportunity for a Plaintiff to perceive the allegedly open and obvious danger and decide to ignore it. *See Cohen v. Elephant Rock Beach Club, Inc.*, 63 F. Supp. 3d 130, 144 (D. Mass. 2014) (where the court stated that a jury must determine whether a reasonable person of ordinary intelligence in the plaintiff's position would have considered jumping from the rocks at issue to be an obvious danger). The evidence here was that Ms. Arnold did not have such an opportunity. Ms. Arnold testified that as she was exiting the women's bathroom the boat suddenly rocked and she instantly reached for something to brace herself on so she would not fall; without a hand rail to safely place her hand the only place she could brace herself on was the flat wall and the door frame, which Plaintiff grabbed, as indicated in Exhibit 4, a photo of the hallway which Ms. Arnold marked to indicate where she placed her hands. Ex. A, 103:2-4; 105:11-106:1.

Moreover, the cause of this injury was not a door jamb. The cause of the injury was the failure to have a hand-rail and the failure to maintain the door closer device so it could properly

and safely regulate the 190-pound door. In the absence of a handrail, Ms. Arnold had no choice but to grab for the first thing she could – the wall and the door frame. As Mr. Panish and Dr. Cushing testified, because the door was unregulated due to the malfunctioning door closer, the already enormous door slammed with even greater force under the rocking of the boat than it would have if it had been properly controlled by a working door closer device. The weight of the door coupled with an inadequately, unmaintained working door closer are not in the least open and obvious dangers. Quite the opposite. They are completely unknowable to a person using that doorway and were unknowable and unknown to the Plaintiff. This too is uncontroverted. For all of these reasons, the Defendant's continued insistence on clinging solely to the open and obvious doctrine does not in any way support its motion for as a matter of law.

Finally, even if the Court determines that as a matter of law Defendant had no duty to warn because the dangers of the door were open and obvious, *that would not relieve Defendant of liability*, because no failure to warn claim was pressed at trial and this was not the only theory of negligence alleged. Defendant's argument as to the open and obvious doctrine is a red herring, and inapplicable to the circumstances before the Court making its reassertion all the more strange. *Cohen v. Carnival Corp.*, 945 F. Supp. 2d 1351 (S.D. Fla. 2013).

### iv. The Evidence Demonstrated Defendant was on Notice

Defendant appears to argue that Plaintiff failed to provide sufficient evidence of notice because Defendant did not have any record of any defect or problem with the door, and therefore Defendant *per se* had no notice of the door's dangerous condition. Of course, evidence admitted at trial revealed two prior incident reports involving the women's bathroom door, involving very similar occurrences and injuries as the incident here. Exhibits 42-43 (Prior Incident Reports).

These incidents were sufficiently similar to provide Defendant with both actual and constructive notice.

Specifically, Defendant has been on notice of the dangers presented by this door since at least November 20, 2011, when the first accident occurred.  As indicated in the incident report, Exhibit 42, a passenger exiting the women's bathroom door had her right hand slammed shut in the door.  Just like Ms. Arnold, this passenger attempted to steady herself as she was exiting the bathroom during "rough conditions" and had to reach for the door frame, at which point the door slammed also slammed on her right hand, just like Ms. Arnold.  Like Ms. Arnold, this passenger was also taken to Nantucket Cottage Hospital for emergency medical treatment.  This incident demonstrates Defendant had actual notice that the door could close quickly and suddenly and substantially injure a passenger, and furthermore, that the absence of a handrail at this critical vector where passengers were entering a hallway could lead them to grab onto the door frame to prevent them from falling.

The second incident occurred June 29, 2012, Exhibit 43, and the also describes a passenger that loses her balance while exiting the bathroom door passageway with the door slamming shut on her right hand just like Ms. Arnold causing a significant injury. *See* Ex. 43 ("Little girl coming from lady restroom when vessel rocked side to side, she stepped back and door closed on right hand injuring two fingers.").

### C. The Jury Properly Determined the Incident Door Causing Plaintiff's Injuries was Foreseeable and a Substantial Factor

Issues regarding causation are uniquely fit for a factfinder to determine, rendering them inappropriate for a renewed motion for judgment as a matter of law after a jury trial. *See  Swift v. United States*, 866 F. 2d 507, 510 (1st Cir. 1989) ("Application of the legal cause standard to

circumstances of a particular case is a function ordinarily performed by, and peculiarly within the competence of, the factfinder").   In this case, the issues of causation were properly submitted to and decided by the jury.   The jury was specifically tasked with deciding whether it was foreseeable that the women's bathroom door closing too quickly and lack of a handrail could have led to Plaintiff's injuries Plaintiff's injuries; the jury was also asked to decide if the door closing too quickly was a substantial factor in Plaintiff's injuries.   *Napier v. F/V DEESIE, INC.*, 454 F. 3d 61, 68 (1st Cir. 2006) (describing the foreseeability and substantial factor tests a jury is to employ to determine whether the causation element has been met).   The jury panel unanimously and correctly found that it was foreseeable that the women's bathroom door closing too quickly caused Plaintiff's injuries, and that the door closing was a substantial factor in Plaintiff's injuries.

A ship rolling is eminently foreseeable by those who operate it.   It is foreseeable that  an ordinary passenger who is not used to being on a seafaring vessel may lose his or her balance like Plaintiff.   It is entirely foreseeable that a passenger who loses their balance would reach out to whatever they could to avoid falling. Indeed, a door slamming shut too quickly can foreseeably injure a person and has in fact done so on this very ship with this very door.   As already noted, there was expert testimony from Mr. Panish that while the manufacturer of this door closer device recommends that   the closer be maintained and adjusted at minimum of once a year, in his experience that in high usage location such as this bathroom door, it is recommended that quarterly inspections be done. Ex. B, 58:19-23. Mr. Panish further testified that when the speed or force of a door isn't controlled "…the door ends up slamming because it can't be regulated to slow down to the required five seconds a swing." *Id.* at 42:11-16. The door here wasn't maintained in any way for five years, in violation of the manufacturer's instructions, and it closed too quickly, causing Plaintiff's debilitating injuries that have caused her pain for years now and they are unlikely to

fully return back to normal.  It was entirely foreseeable that a door closer device on a 190-pound door could cause significant injuries if not regulated to safely close.

Had the door closer been properly regulated the door to close in a manner consistent with the  ANSI and ADA standards, at a slower pace and therefore, with less force, Plaintiff's injuries may not have occurred at all as she would have had time to react to the closing of the door, or her injuries could have been much less severe as she would have noticed the door pinching her fingers and been able to remove them.  Had the door closed on Plaintiff's hand with less force and speed, the injuries would not have occurred at all or would have been less severe.  Finally, had a handrail been in the proper place, Plaintiff would have had a safe place to place her hands as she was exiting and pivoting into the hallway.

To this end, Defendant's intervening and superseding cause analysis is also misapplied.  "An intervening cause is a new and independent cause of harm which is neither anticipated nor reasonably foreseeable by the defendant; it must operate independently of and occur after the conclusion of the defendant's negligence." *Napier* at 68 (1st Cir. 2006).  Despite Defendant's self-serving conclusory statements with respect to the issues of causation in this case, "[t]he issues of foreseeability and superseding cause are properly for the jury to decide when there may be reasonable differences in opinion." *Id.* at 69.  Moreover, "[t]he party seeking to establish a superceding cause has the burden cause of demonstrating that the act in question was the sole proximate cause of the injuries incurred." *Silivanch v. Celebrity Cruises, Inc.*, 171 F. Supp. 2d 241, 255 (S. D. N.Y. 2001).  Whether that party has met its burden is typically an issue to be submitted to the jury.  *Id.; see also Putnam Res. v. Pateman*, 958 F. 2d 448, 460 (1st Cir. 1992) ("When, as here, the existence of proximate cause turns on an issue of superseding causation…the jury's role may be especially significant.").  Defendant's argument that Plaintiff's act of grabbing at the door

jamb was a superseding cause is wrong because that act was not a "new and independent cause." *Napier* at 68 (1st Cir. 2006). Rather, the placement of Plaintiff's fingers was caused by the lack of a handrail, which meant she had nothing else to grasp when trying to stay upright. Ex. D, 48:6-12. Defendant's failure to properly maintain both the door and to install a handrail next to the door were the causes of Plaintiff's injuries. Clearly, Defendant did not and could not meet its burden to demonstrate that there was a superseding cause relieving it from liability in this matter.

## II. DEFENDANT'S ALTERNANTIVE MOTION FOR A NEW TRIAL PURSUANT TO FED. R. CIV. PROC. 50(b) AND 59 SHOULD ALSO BE DENIED.

### A. The New Trial Standard Pursuant to Fed. R. Civ. Proc. 59

When determining whether to grant a new trial, a district court judge cannot displace a jury's verdict merely because [the district judge] disagrees with it or would have found differently in a bench trial. *Ahern v. Scholz*, 85 F. 3d 774, 780 (1st Cir. 1996). "The mere fact that a contrary verdict may have been equally-or even more easily-supportable furnishes no cognizable ground for granting a new trial." *Freeman v. Package Mach. Co.*, 865 F.2d 1331, 1333-34 (1st Cir. 1988).

### B. The Weight of the Evidence Does Not Require a Finding of Comparative Fault

A jury is afforded considerable latitude in determining whether the actions of a tort plaintiff are reasonable in apportioning comparative fault. *Rodriguez-Quinones v. Jimenez & Ruis, S.E.* 402 F. 3d 251, 256 (1st Cir. 2005) (court refused to find comparative negligence as a matter of law after a jury declined to find the plaintiff comparatively negligent). In the instant case, the jury exercised its latitude and determined Plaintiff was not at fault. Defendant's claims that Plaintiff testified Plaintiff was "not paying attention" to where her fingers were at the time of the injury is a mischaracterization of Plaintiff's actual testimony, which showed that Plaintiff at all relevant times acted reasonably.

On direct examination, Plaintiff testified that the rolling of the ship and the subsequent injury to her finger happened "within like a second. It just happened instantly. Like I walked out of the door, and it just rocked and I was trying not to fall, and then boom." Ex. A, 105:4-6.  On cross-examination, Plaintiff testified that she wasn't paying attention to the door when she "*was trying not to fall*." *Id.* at 158:6-7.  Obviously, Plaintiff's testimony that she wasn't paying attention to the door occurred in the context of her trying not to fall and while looking for something to brace herself in the mere seconds before the door slammed shut.

Notably, all of Plaintiff's testimony regarding the incident went uncontroverted as Defendant did not produce any testimony or evidence as to the closing speed of the door from the date of the injury or any other evidence that might contradict Plaintiff's testimony.  Defendant's own expert conceded that it was not realistic to expect Plaintiff to grab the handrail on the other side of the hallway.  *Van Hemmen Test.*, Day Five.  Plaintiff, an ordinary passenger, could not have reasonably anticipated the ship to roll immediately upon her exiting the bathroom and cause her to brace herself.  When viewed in the light most favorable to Plaintiff and resolving all inferences in her favor, the evidence can and does support a finding of 0% comparative fault on the side of Plaintiff.

### C.  The Jury Award Should Not Be Subject to Remittitur.

"Translating legal damages into money damages-especially in cases which involve few significant items of measurable economic loss-is a matter peculiarly within a jury's ken." *Milone v. Moceri Family, Inc.*, 847 F. 2d 35, 37 (1st Cir.1988) (citing *Wagenmann v. Adams*, 829 F. 2d 196, 215 (1st Cir. 1987)).  Courts have routinely held that a jury damage award "must endure unless it is grossly excessive, inordinate, shocking to the conscience of the court, or so high that it would be a denial of justice to permit it to stand."  *Correa v. Hospital San Francisco*, 69 F. 3d

1184, 1197 (1st Cir. 1995) (citations omitted).  Courts are not to disturb jury awards on the basis

that the award is extremely generous or on the basis that had the judge conducted a bench trial, the

damages awarded would have been considerably lower.  *Havinga v. Crowley Towing and Traps.*

*Co.*, 24 F. 3d 1480, 1484 (1st Cir. 1994) (citations omitted).

In this instance, Plaintiff's sought to recover damages for her pain and suffering and

subsequent disability from her severe injuries.  Plaintiff testified at length to the intense and

continuing pain she has had in the years since the incident. To briefly recap, the bones in Plaintiff's

finger tips were fractured, per Dr. Horak's report, which was admitted into evidence as Exhibit 13.

Plaintiff credibly testified that her fingers were nearly amputated.  Ex. A, 94:8-11.  She testified

that she had to try to hold her fingers together so she didn't lose them.  *Id.* at 107:15-21.  Plaintiff

went to the emergency room in Nantucket where her fingers were basically sewn back on.  Exhibits

24.  She then was seen by hand surgery specialist, Dr. Bradley Horak, M.D.  *Id.* at 112:4-7.  She

underwent surgery, was placed into a cast, and then underwent physical therapy. *Id*. at 114:16-

115:8; 119:8-13.  This surgery consisted of internal wire fixation necessitating a cannulated to drill

in order to pass Kirschner wires into Plaintiff's bones. Ex. E, Horak Dep*.*, 37:3-18, May 29, 2018

(video deposition played at trial on Jan. 16, 2019). The internal fixation wires were subsequently

removed in another procedure.  *Id.*  at 53:5-12.  Dr. Horak testified that Plaintiff was still having

symptoms over a year post-op.  *Id.*  at 67:6-21. He also testified that there were no other medical

treatments he could offer Plaintiff for the continued symptoms she experienced.  *Id.*  at 71:12-24.

Defendant's own expert, Dr. Andrew Terrono, assigned Plaintiff approximately 30 percent

impairment in the right middle and ring finger.  Ex. 18 (Terrono Report). Dr. Terrono also

concluded that the 30% finger disability in turn conferred an 8% disability of the hand, and that in

turn conferred a 3% disability of Plaintiff's entire right arm.  *Id.*  Plaintiff testified as to the pain

she experienced during and immediately after the incident, and is still presently experiencing, all of which went uncontroverted. Ex. A 103:6-23; 128:16-18.   Plaintiff also testified that she had to take pain medication for her pain.  *Id.* at 110:6-9.  She testified that she does "whatever [she] can to warm [her fingers] up," including rubbing her thighs and running them under hot water if available, which she said happens a handful of times every single day when she's working. *Id.* at 184:24-16.  Between Plaintiff's testimony, Dr. Horak's testimony, and Dr. Terrono's testimony, it was made  abundantly evident that Plaintiff has experienced an injury that is and will continue to be significant and permanent.

Numerous jury verdicts rendered to plaintiffs in New England with similar injuries resulted in jury verdicts of similar or higher awards.  A Massachusetts state court jury rendered a verdict in 2015 for $150,000 where the plaintiff suffered 40% permanent partial disability rating of the finger and a 10% permanent partial disability rating of the left hand. Ex. F, *Scott v. Magee* Verdict and Settlement Summary.  A Maine state court jury in 1997 awarded $200,000[5]  to a plaintiff who suffered comminuted fractures of middle and ring fingers to the dominant hand and had 20% permanent partial disability of the hand attributable to limitation of motion and 8% permanent partial disability attributable to weakness; in that case, the plaintiff's medical special damages were approximately $26,000 and the plaintiff's claimed lost wages total approximately $11,000.  Ex. G, *Denis Lafontaine and Linda Lafontaine v. New Hampshire Boring* Verdict and Settlement Summary.  In 1999, a Massachusetts state court jury awarded a plaintiff $646,791.00[6]  where the plaintiff suffered a torn collateral ligament of his left index finger, requiring surgery and causing

---

[5] $316, 829.67 in today's dollars when adjusted for inflation.
https://www.bls.gov/data/inflation_calculator.htm
[6] $980,841.82 in today's dollars when adjusted for inflation.

permanent impairment of his dominant hand and weakness in his thumb and index fingers, and limited his motion. Ex. H, *Deleon v. Buzzelli*, Verdict and Settlement Summary.

The jury's award of $225,000 for pain and suffering is in line with jury awards for similar injuries detailed in the above-referenced cases despite the inherent difficulty in quantifying pain and suffering in each factual circumstance. The jury's award here was supported by the evidence submitted, and the Court should defer to the jury's determination.

### D. There is No Evidence to Support the Claim that the Jury Award Improperly Included Attorneys' Fees

During deliberations, the jury asked two questions: the first was essentially "Can we consider legal fees as 'legal wrong?'" The Court correctly instructed the jury **"No**," (emphasis added). The second question was "Under 'Damages:', we are instructed 'The object is to try and restore the person to the position that she would have been in had the wrong not occurred.' What does this mean, considering we are only considering damages for pain and suffering?" The Court properly instructed the jury "That is a theory of damages but **you may only consider pain and suffering**," (emphasis added). Plainly, the Court made it abundantly clear that the jury was to only award damages based on pain and suffering in response to legitimate questions from the jurors.

Defendant's position seems to be that whenever a jury award in a personal injury action is divisible by three and two-thirds of that award ends up being a "round number" (a phrase Defendant has re-defined to suit itself, here seemingly meaning a six digit number wherein the last four digits contain zeroes), the award must be reduced to some unspecified amount due to its belief that it is commonly known that personal injury lawyers typically take a one third contingency fee. The entire argument is preposterous. Maybe the jury was going to award 350,000 and account for fees and costs but reduced it to 225,000. Or maybe the jury was familiar with the fact that in

Massachusetts and the majority of states, unlike New York, 40% is permitted. The best analysis is to stop preposterous speculation and look at the evidence: traumatically injured finger tips that were nearly amputated, general anesthesia surgery, uncontested permanent impairment of fingers, hand *and* arm, and daily pain in the cold that continues to this day and is likely to continue permanently.  If anything, the verdict here was arguably less than what should have been awarded but it certainly was entirely reasonable.

## IV. CONCLUSION

For all the foregoing reasons, all of Defendant's motions should be denied.

Dated: February 27, 2019                    Respectfully submitted,

                                            Plaintiff's Counsel

                                            By: /s/ Shannon Pennock
                                            Pennock Law Firm LLC
                                            *Pro Hac Vice*
                                            411 Lafayette Street, 6th Floor
                                            New York, NY 10003
                                            (551) 200-6352
                                            Fax: (929) 235-7273
                                            shannonpennock@pennocklawfirm.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 27, 2019, that a true and correct copy of the foregoing document was served upon counsel of record by electronic mail through the U.S. District Court, District of Massachusetts, electronic case filing system.

**PENNOCK LAW FIRM, LLC**

By: <u>/s/ Shannon Pennock</u>
Pennock Law Firm LLC
*Pro Hac Vice*
411 Lafayette Street, 6th Floor
New York, NY 10003
(551) 200-6352
Fax: (929) 235-7273